SANDRA R. BROWN
Acting United States Attorney
DENNISE D. WILLETT
Assistant United States Attorney
Chief, Santa Ana Branch Office
CHARLES E. PELL (Cal. Bar No. 210309)
Assistant United States Attorney
Santa Ana Branch Office
    Ronald Reagan Federal Bldg & U.S. Courthouse
    411 West 4th Street, Suite 8000
    Santa Ana, California 92701
    Telephone: (714) 338-3542
    Facsimile: (714) 338-3561
    E-mail:    Charles.E.Pell2@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. SA CR 15-00099-JLS-2 |
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT DAVID M. MORROW |
| v. | Hearing Date: August 25, 2017 |
| DAVID M. MORROW, | Hearing Time: 8:30 a.m. |
| Defendant. | Location:    Courtroom of the Hon. Josephine L. Staton |

Plaintiff United States of America, by and through its counsel of record, the acting United States Attorney for the Central District of California and Assistant United States Attorney Charles E. Pell, hereby files its Sentencing Position for defendant David M. Morrow.

This Sentencing Position is based upon the attached memorandum of points and authorities, the exhibits to this filing (filed under

///
///
///
///

seal), the files and records in this case, and such further evidence

and argument as the Court may permit.

 Dated: August 11, 2017          Respectfully submitted,

                                 SANDRA R. BROWN
                                 Acting United States Attorney

                                 DENNISE D. WILLETT
                                 Assistant United States Attorney
                                 Chief, Santa Ana Branch Office


                                 _____/s/_____
                                 CHARLES E. PELL
                                 Assistant United States Attorney
                                 Santa Ana Branch Office

                                 Attorneys for Plaintiff
                                 UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

I.    SUMMARY.....................................................1

II.   FACTUAL BACKGROUND..........................................9

      A.    Defendant's multi-million dollar health care fraud
            scheme................................................10

            1.    Summary.........................................10

            2.    Facts to which defendant agreed in the plea
                  agreement.......................................11

            3.    Evidence........................................13

                  a.    Summary of types of evidence demonstrating
                        the fraud at TMI..........................13

                  b.    Background and overview of defendant's
                        health care fraud scheme..................15

                  c.    Cooperating TMI insider Dr. Wu detailed the
                        pervasive fraud that defendant perpetrated
                        at TMI....................................21

                  d.    Background on insurance companies billed by
                        defendant/TMI.............................25

                        i.    *Amounts billed to insurance companies*.....25

                        ii.   *Overview/Background: insurance billing*
                              *procedures*..............................30

                  e.    Search warrant evidence...................34

                        i.    *Patient Files*............................34

                        ii.   *Digital Evidence: Electronic Medical*
                              *Records (EMRs) and email messages*........35

            4.    To further defendant's health care fraud scheme,
                  defendant and other doctors fabricated diagnoses....38

                  a.    Patient Thelma A..........................39

                  b.    Patient Annette F.........................40

                  c.    Patient Michelle B........................41

            5.    Defendant would alter medical records and other
                  documents as part of his fraudulent scheme.........42

i

**TABLE OF CONTENTS (CONTINUED)**

<u>DESCRIPTION</u>                                                                 <u>PAGE</u>

a.   Defendant would hand write on top of the existing text on the original medical records to conceal the cosmetic nature of the procedures billed to insurance as medically necessary...........................43

    i.   *Patient Rosario O.*......................43

    ii.  *Patient Thelma A.*.........................46

b.   Defendant would insert white text boxes over the information on various original medical records, in order to conceal the cosmetic nature of the procedures......................46

    i.   *White text box (patient Jessica B.)*.......47

    ii.  *White text box (patient Angie B.)*.........48

    iii. *White text box (patient Ruben G.)*.........49

    iv.  *White text box (Patient Tiffany S.)*.......51

    v.   *White text box (patient Sean W.)*..........52

    vi.  *White text box (patient Alma Z.)*..........54

c.   Patients would be directed to re-do their intake forms to conceal the fact that they had gone to TMI for cosmetic procedures, including defendant's personally sitting down with them................................56

    *i.   Patient Kathryn D. (now Kathryn H.)*.......56

    ii.  *Patient Anna G.*..........................58

d.   Defendant would direct doctors to re-do (or split) their operative reports, in order to conceal from the insurance companies that a cosmetic procedure had been done..............58

6.   Defendant and others at TMI would create and pressure patients to sign declarations with false information.......................................60

a.   Patient Blanca M.............................61

b.   Patient Alma Z.............................63

**TABLE OF CONTENTS (CONTINUED)**

<u>DESCRIPTION</u>                                                    <u>PAGE</u>

   c. Kathryn D. (formerly Kathryn H.)...............64

  7. Evidence of defendant's tax fraud: tax years 2008, 2009, and 2010................................64

   a. Tax facts admitted by defendant in plea agreement....................................65

   b. Tax year 2008: unreported income of $160,244 (tax loss ≈ $57,444)...........................65

   c. Tax year 2009: unreported income of $1,686,037 (tax loss ≈ $574,396)...............66

   d. Combined tax loss for tax years 2008 and 2009..........................................68

   e. Tax year 2010: siphoned income of $4,926,846 (attempted tax loss ≈ $2,076,211)..............68

   f. Examples of personal expenditures from the siphoned funds................................71

   g. Tax conclusion.................................71

III. SENTENCING GUIDELINES.......................................73

 A. Summary of Guidelines calculation.......................73

 B. Applicable loss amount.................................74

  1. Actual loss amounts formally claimed by victims.....75

  2. Attempted loss agreed to in plea agreement.........75

  3. Updated attempted loss amount......................77

  4. Updated actual loss amount.........................80

  5. Restitution........................................81

 C. U.S.S.G. § 3B1.3: Abuse of position of trust............82

  1. To further his fraudulent scheme, defendant abused his position of trust by performing procedures on patients without their knowledge or informed consent, which sometimes resulted in ongoing medical problems...........................83

**TABLE OF CONTENTS (CONTINUED)**

<u>DESCRIPTION</u>                                                          <u>PAGE</u>

   2.   To further his fraudulent scheme, defendant
        abused his position of trust to pressure patients
        to undergo procedures or treatments that they did
        not need, so he could bill insurance for those
        procedures..........................................85

        a.   Defendant pressured patients to undergo
             surgeries they did not need, so he could
             bill them to insurance.........................85

        b.   Defendant pressured patients to undergo
             treatments that they did not need, so he
             could bill them to insurance...................88

   3.   To further his fraudulent scheme, defendant
        abused his positon of trust to the insurance
        companies when he falsely reported symptoms from
        the patients and fake diagnoses.....................88

   4.   To further his fraudulent scheme, defendant
        abused his position of trust to the patients by
        unlawfully using their identification
        information.........................................90

        a.   Patient Blanca M..............................90

        b.   Patient Georgiana E...........................91

   5.   To further his fraudulent scheme, defendant
        abused his position of trust to patients by
        disclosing their protected health information to
        cappers, which also violated HIPAA..................93

   6.   Defendant abused his position of trust with the
        other doctors by illegally signing operative
        reports using their names...........................96

   7.   Abuse of position of trust conclusion...............97

D.   U.S.S.G. § 2B1.1(b)(2)(A)(i): Defendant's scheme had
     more than 10 victims, which included insurance
     companies, patients on whom procedures were performed
     without authorization and suffered bodily injury, and
     patients whose identification or medically-protected
     information was unlawfully used or disclosed............98

   1.   Insurance company victims (7 victims)...............99

   2.   Patient victims - bodily injury (10 victims).......100

iv

**TABLE OF CONTENTS (CONTINUED)**

<u>DESCRIPTION</u>                                                           <u>PAGE</u>

       3.   Patient victims - unlawful use of identity
          information/identity theft (2 victims)..............103

       4.   Patient victims - HIPAA violations/unlawful use
          of identity information (20 victims):..............103

       5.   Victim conclusion.................................104

E.   U.S.S.G. § 2B1.1(b)(10)(C): Sophisticated Means.........104

F.   U.S.S.G. § 3B1.1: Aggravating Role......................105

       1.   Defendant was the organizer and leader of his
          fraudulent scheme.................................106

       2.   Defendant's scheme both involved more than five
          participants and was otherwise extensive..........117

          a.   Defendant's scheme involved five or more
              participants..................................117

              *1.*   *Linda*..................................118

              *2.*   *Dr. Wu*.................................119

              *3.*   *Dr. John Coon*..........................119

              *4.*   *Dr. Robert Hardesty*....................121

              *5.*   *Dr. Harry Marshak*......................125

              *6.*   *Dr. Stephen Pincus*.....................126

               *7.*   *TMI capper Lisa C*......................128

              *8.*   *TMI employee Rosell M*..................129

           b.   Defendant's scheme was "otherwise
              extensive."...................................130

       3.   Aggravating role conclusion.......................137

G.   U.S.S.G. § 3C1.1: Obstruction of Justice...............137

       1.   Failure to appear.................................137

       2.   Providing false information to U.S. Probation......138

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                            PAGE

           a.   Defendant concealed from Probation the
               quitclaim transfer and immediate sale of his
               Beverly Hills residence for $9.5 million,
               which occurred days after he pleaded guilty
               in March 2016...................................138

           b.   Defendant falsely represented to Probation
               that he was not the grantor, donor, trustee,
               fiduciary, or beneficiary of any trust........140

           c.   Defendant falsely reported to Probation that
               he had never been party to a lawsuit, when
               in fact, he has been party to many lawsuits...142

    H.   Defendant does not qualify for acceptance of
        responsibility credit under Section 3E1.1..............145

    I.   Defendant's health care fraud offense does not group
        with his tax offense...................................147

IV.  ADDITIONAL RELEVANT SECTION 3553(A) INFORMATION..............147

    A.   Prior similar troubling conduct by defendant...........147

    B.   False information to U.S. Probation....................148

V.   APPROPRIATE SENTENCE.......................................148

VI.  CONCLUSION................................................157

1

**TABLE OF AUTHORIITIES**

2

**DECRIPTION**                                                        **PAGE**

3

**Cases**

4

Conkle v. Jeong,

5      73 F.3d 909 (9th Cir. 1995) ................................. 144

6

Ringler Assocs. Inc. v. Md. Cas. Co.,

7      80 Cal. App. 4th 1165, 96 Cal. Rptr. 2d 136 (2000) ............. 144

8    United States v. Amponsah,

9      247 F. App'x 395 (3d Cir. 2007) ............................. 146

United States v. Baldovinos,

10     113 F. App'x 187 (8th Cir. 2004) ............................ 146

11

United States v. Bazuaye,

12     240 F.3d 861 (9th Cir. 2001) ................................ 146

13

United States v. Beacham,

14     774 F.3d 267 (5th Cir. 2014) ................................ 118

15

United States v. Berger,

      587 F.3d 1038 (9th Cir. 2009) ............................... 77

16

United States v. Berry,

17     258 F.3d 971 (9th Cir. 2001) .............................. passim

18

United States v. Chavez,

19     549 F.3d 119 (2d Cir. 2008) ............................ 106, 136

20

United States v. Clarke,

      520 F. App'x 603 (9th Cir. 2013) ............................ 146

21

United States v. Egge,

22     223 F.3d 1128 (9th Cir. 2000) ........................... 106, 118

23

United States v. Farris,

24     585 F. App'x 934 ........................................... 130

25

United States v. Fata,

      650 F. App'x 260 (6th Cir. 2016) ......................... 89, 92

26

United States v. Guerra,

27     307 F. App'x 283 (11th Cir. 2009) ......................... passim

28

**TABLE OF AUTHORIITIES (CONTINUED)**

<u>DECRIPTION</u>                                                          <u>PAGE</u>

<u>United States v. Iloani</u>,
  143 F.3d 921 (7th Cir. 1998) ................................... 89

<u>United States v. Jenkins</u>,
  578 F.3d 745 (8th Cir. 2009) ................................... 105

<u>United States v. Jennings</u>,
  711 F.3d 1144 (9th Cir. 2013) ................................. 104

<u>United States v. Kieffer</u>,
  621 F.3d 825 (8th Cir. 2010) ................................... 105

<u>United States v. Leung</u>,
  34 F.3d 1402 (9th Cir. 1994) ................................... 130

<u>United States v. Liss</u>,
  265 F.3d 1220 (11th Cir. 2001) ................................. 88

<u>United States v. McKinney</u>,
  15 F.3d 849 (9th Cir. 1994) ................................... 145

<u>United States v. McMahan</u>,
  531 F. App'x 757 (7th Cir. 2013) ............................. 146

<u>United States v. Miell</u>,
  744 F. Supp. 2d 904 (N.D. Iowa 2010) ......................... 155

<u>United States v. Norman</u>,
  776 F.3d 67 (2d Cir. 2015) ................................ passim

<u>United States v. Rodriguez</u>,
  482 F. App'x 231 (9th Cir. 2012) ............................. 118

<u>United States v. Rosas</u>,
  615 F.3d 1058 (9th Cir. 2010) ................................. 146

<u>United States v. Rostoff</u>,
  53 F.3d 398 (1st Cir. 1995) ............................. 117, 130

<u>United States v. Rutgard</u>,
  116 F.3d 1270 (9th Cir. 1997) ................................. 104

<u>United States v. Santos</u>,
  527 F.3d 1003 (9th Cir. 2008) ................................. 77

TABLE OF AUTHORIITIES (CONTINUED)

<u>DECRIPTION</u>                                                                              <u>PAGE</u>

<u>United States v. Sherman</u>,
   160 F.3d 967 (3d Cir. 1998) ...................................... 88

<u>United States v. Showalter</u>,
   569 F.3d 1150 (9th Cir. 2009) .................................... 77

<u>United States v. Sidhu</u>,
   130 F.3d 644 (5th Cir. 1997) ................................. 83, 84

<u>United States v. Swanson</u>,
   253 F.3d 1220 (10th Cir. 2001) ........................... 145, 146

<u>United States v. Tomko</u>,
   562 F.3d 558 (3d Cir. 2009) .................................... 155

<u>United States v. Treadwell</u>,
   593 F.3d 990 (9th Cir. 2010) .................................... 77

<u>United States v. Vucko</u>,
   473 F.3d 773 (7th Cir. 2007) ................................... 147

<u>United States v. Zhou</u>,
   678 F.3d 1110 (9th Cir. 2012) .............................. passim

**Statutes**

18 U.S.C. § 3149................................................. 2

18 U.S.C. § 1028(a)(7)........................................... 63

26 U.S.C. § 7206(1)............................................... 2

42 U.S.C. § 1320d............................................. 93, 95

42 U.S.C. § 1320d-6(a)(3)....................................... 93

42 U.S.C. § 1320d-6(b)(1)....................................... 93

42 U.S.C. § 1320d-6(b)(3)....................................... 93

42 U.S.C. § 1395x(u)............................................ 95

**TABLE OF AUTHORIITIES (CONTINUED)**

<u>DECRIPTION</u>                                                    <u>PAGE</u>

**Rules**

U.S.S.G. § 1B1.3.................................................. 81

U.S.S.G. § 2B1.1.............................................. passim

U.S.S.G. § 2B1.1(a)(1).................................... 7, 73, 75

U.S.S.G. § 2B1.1(b)(1)........................................... 80

U.S.S.G. § 2B1.1(b)(1)(L)..................................... passim

U.S.S.G. § 2B1.1(b)(10)(C).................................... passim

U.S.S.G. § 2B1.1(b)(2)........................................... 99

U.S.S.G. § 2B1.1(b)(2)(A)..................................... passim

U.S.S.G. § 2B1.1(b)(2)(A)(i)......................... 98, 99, 161

U.S.S.G. § 2F1.1................................................. 77

U.S.S.G. § 2T1.1................................................. 72

U.S.S.G. § 2T1.1(a)(1)........................................... 74

U.S.S.G. § 2T1.1(b)(1)........................................... 74

U.S.S.G. § 3B1.1.............................................. passim

U.S.S.G. § 3B1.1(a).......................................... passim

U.S.S.G. § 3B1.1(a)-(b)......................................... 118

U.S.S.G. § 3B1.3.............................................. passim

U.S.S.G. § 3C1.1.............................................. passim

x

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    SUMMARY**

Dr. David M. Morrow, M.D., a dermatologist turned cosmetic surgeon ("defendant"), owned and operated the Morrow Institute ("TMI"), a surgery center located in California's Inland Empire that specialized in plastic surgery.  From 2007 to 2011, Morrow ran a scheme where he billed insurance companies a total of more than $80,000,000 for cosmetic procedures such as breast augmentations, tummy tucks, and nose jobs, fraudulently classifying them as medically necessary so insurance would pay for them.  To trick the insurance companies into paying for those cosmetic procedures, most billed at more than $50,000, defendant altered official medical records and falsified medical reports by fabricating symptoms that did not exist and reporting false testing results.  Defendant's scheme worked for several years, while he defrauded the insurance into paying out more than $20,000,000 to him.  Through the tireless work of FBI, California Department of Insurance, and IRS agents, defendant's fraudulent scheme was uncovered and shuttered, and defendant was brought to answer for his crimes.  Unfortunately, defendant fled pending sentencing and currently remains a fugitive from justice.  As detailed below, defendant should be sentenced to **23 years of imprisonment**, which is the statutory maximum sentence available, $22,013,606 in restitution, and a $500,000 fine.

In March 2011, FBI and California Department of Insurance executed a federal search warrant on TMI, seizing TMI's server as well as hard copies of patient files.  During the five-year investigation, federal and state law enforcement agents interviewed approximately 90 witnesses, many of whom have also testified before

1  the grand jury, and reviewed thousands of documents.

2  In September 2015, defendant and his wife Linda Morrow ("Linda")

3  were indicted for conspiracy to commit mail fraud, 20 counts of mail

4  fraud, and various HIIPA violations, and defendant was charged alone

5  with filing false tax returns for two years.

6  In March 2016, pursuant to a written plea agreement, defendant

7  pleaded guilty to Count 21 (conspiracy to commit mail fraud, in

8  violation of 18 U.S.C. § 3149) and Count 22 (false tax return, in

9  violation of 26 U.S.C. § 7206(1)) of the indictment.  Although the

10 government had previously made certain concessions as part of the

11 plea agreement between the parties,[1] because defendant has now

12 breached his plea agreement, the government is no longer bound by

13 that agreement.  Specifically, the Guidelines enhancement based on

14 the intended loss increases from the plea agreement intended loss

15 figure by 6 levels, based upon increasing the applicable intended

16 loss from $3.49M to more than $25M, and that defendant should no

17 longer receive the acceptance of responsibility adjustment nor a low

18 end Guidelines sentence.  Other adjustments were specifically left

19 open in the plea agreement, so defendant's breaches of the plea

20 agreement do not affect the government's recommendations as to those

21 5 adjustments, which constitute 12 points in upward adjustments to

22 the Guidelines offense level.

23 As summarized immediately following and in depth within this

24 memorandum, the government believes that the applicable intended loss

25 amount for Guidelines purposes is approximately $42,000,000, which

26

27 [1] In the plea agreement, the parties had limited the intended
loss from defendant's health care fraud scheme at $3,491,053, the
actual loss (restitution amount) at $1,493,647.65, and the applicable
28 tax loss at approximately $650,000, but left open other specific
offense characteristics and adjustments.

falls within Section 2B1.1's range of more than $25,000,000 but less than $65,000,000.  Further, based on the facts and as detailed *infra*, the following <u>five</u> additional Guideline adjustments also apply: (1) aggravating role (U.S.S.G. § 3B1.1); (2) abuse of position of trust (U.S.S.G. § 3B1.3); (3) more than 10 victims (U.S.S.G. § 2B1.1(b)(2)(A)); (4) sophisticated means (U.S.S.G. § 2B1.1(b)(10)(C)); and (5) obstruction of justice (U.S.S.G. § 3C1.1).

In the Revised PSR, Probation found that the four-point aggravating role and the two-point abuse of position of trust adjustments applied.  (DE 149 ¶¶ 111-15.)  On the other hand, the Revised PSR found that the two-point 10+ victim and the sophisticated means adjustments did not apply, albeit Probation noted in its First Addendum that the sophisticated means adjustment "is a close issue, and applies the rule of lenity in favor of the defendant and defers to the Court's judgment for final resolution."  (DE 150 at 1.) Because defendant had not yet become a fugitive from justice as of the time of the Revised PSR, the obstruction enhancement on that basis had not yet been addressed by Probation.

As discussed in depth below, defendant abused his position of trust by:

- pressuring patients to undergo procedures or treatments that they did not need, so he could bill those procedures/treatments to insurance;

- performing procedures on patients without their knowledge or informed consent, so he could bill those procedures to insurance;

- reporting false symptoms and diagnoses to the insurance

companies, to trick the insurance companies into paying for cosmetic procedures;

- unlawfully using identification information of patients; and
- unlawfully disclosing patients' protected health information to cappers, which also violated HIPAA.

The Revised PSR found only four victims: 3 insurance companies and patient B.M.  (DE 149 ¶ 106.)  The government respectfully disagrees.  As discussed in depth below, defendant's health care fraud scheme involved more than 10 victims, which included:

- 7 insurance companies/entities that sustained actual loss;
- 10 patients who sustained bodily injury as a result of defendant's offense, including being disfigured;
- 2 patients whose means of identification were used unlawfully or without authority; and
- 20 patients whose protected health information defendant unlawfully disclosed to cappers, in violation of HIPAA.

As discussed in depth below, defendant's scheme was sophisticated, involving: (1) making the patients undergo multiple procedures in a short time frame; (2) fabricated diagnoses; (3) fabricated test results; (4) fabricated symptomology; (5) splitting operative reports into cosmetic and non-cosmetic parts, and submitting only the non-cosmetic part to the insurance companies; (6) digitally altering medical files (*e.g.*, by placing white text boxes to conceal parts of documents or reports) and official medical reports and other documents; (7) seeking pre-authorizations in advance as a shield against subsequent scrutiny (even when such pre-authorization was not required); (8) instructing patients to cash checks; (9) creating fraudulent declarations/letters from patients;

(10) creating fabricated signatures of some patients on said letters;
(11) Directing staff on how to conceal the cosmetic terms;
(12) rotating fake diagnoses; and (13) convincing some patients to
come in and re-do intake forms.  (DE 104 at 3-5.)[2]

The government agrees with the Revised PSR's conclusion that the
aggravating role adjustment applies.  As discussed below, defendant
was the leader of his extensive multi-million-dollar fraudulent
scheme, which also had more than five participants, as shown by:

- Decision-making authority: defendant made all the decisions
  regarding his fraudulent scheme.

- Nature of participation in commission of offense: Defendant
  participated in all aspects of his fraudulent scheme, from
  "soup to nuts," including:
  o Pressuring patients to undergo unnecessary procedures, so
    he could bill insurance;
  o Falsifying consultation and operative reports;
  o Altering medical records (including hand writing false
    information on them);
  o Altering medical reports dictated by other doctors, and
    then unlawfully using digital signatures in those other
    doctors' names;
  o Billing the insurance companies for the fraudulent
    surgeries;
  o Sending additional fraudulent documentation to the
    insurance companies, to respond to the insurance companies'
    refusals to pay for certain surgeries; and

---

[2] In one email message, defendant wrote to Dr. Wu that "The Pas
[pre-authorizations] are cash in the bank!"

- o Meeting with patients and directing them to re-do their intake documents, to conceal the cosmetic nature of their visit.

- Claimed right to a larger share of the fruits of the crime: Defendant made most of the money from the scheme, with other participants being paid either a set salary or a market-rate for performing the surgeries;

- Degree of participation in planning or organizing the offense:

  - o Defendant created the fraudulent scheme, and directed TMI staff and other doctors in his fraud;

  - o Defendant would also consult with medical coder/capper Lisa C. (unindicated co-conspirator 2) to formulate which codes to use to conceal his fraud from the insurance companies;

  - o Defendant utilized 2 nominee entities when billing multiple surgeries for the same patient to conceal that all the surgeries were actually being performed at TMI; and

  - o Once the insurance companies started to question TMI and demand additional documents, defendant planned and executed the cover-up, including altering documents and having patients re-do their intake forms;

- The nature and scope of the illegal activity: Defendant's fraudulent scheme was extensive, sophisticated, and egregious:

  - o From 2007 to 2011, defendant fraudulently billed insurance more than $75,000,000 for cosmetic procedures and was paid more than $20,000,000;

  - o Defendant's fraudulent scheme fraudulently billed for

procedures performed on hundreds of patients;

   o Defendant's fraudulent scheme was sophisticated, focusing on patients with "good insurance" with no daily cap for the surgery center fee and seeking pre-authorizations when not required;

   o Defendant's fraudulent scheme involvement multiple layers of falsities, from the original consultation reports, to the operative reports, to fraudulently altering multiple types of medical reports (*e.g.*, intake and anesthesia forms, and nurses notes); and

   o Defendant went so far during the scheme as to alter medical reports dictated by other doctors, and to then digitally sign those altered reports in those other doctors' names.

- The degree of control and authority exercised over others:
  - o Defendant was in complete control at TMI and directed everyone how to orchestrate his complex fraudulent scheme, including exercising control over other professionals.

Applying those offense characteristics, the government calculates the applicable Guidelines offense as **41**:

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| $25M < Loss < $65M: | +22 | U.S.S.G. § 2B1.1(b)(1)(L) |
| More than 10 victims: | +2 | U.S.S.G. § 2B1.1(b)(2)(A) |
| Sophisticated means: | +2 | U.S.S.G. § 2B1.1(b)(10)(C) |
| Aggravating role: | +4 | U.S.S.G. § 3B1.1(a) |
| Abuse of position of trust: | +2 | U.S.S.G. § 3B1.3 |
| Obstruction of justice: | +2 | U.S.S.G. § 3C1.1 |
| Acceptance of responsibility: | -0 | U.S.S.G. § 3E1.1 |
| **TOTAL FOR COUNT 21:** | **41** | |

Because the tax offense (Count-22) has an offense level of 24, under the Grouping rules, there is no increase to the Count-21 offense level to arrive at the final offense level of 41.  With a Criminal History Category I, the applicable Guidelines sentencing range is therefore 324 to 405 months' imprisonment, capped at the statutory maximum of 276 months/23 years.  A sentence at the statutory maximum – **23 years' imprisonment** – while below the low end of the applicable Guidelines range, is nonetheless not unreasonable, nor overly lenient.  In addition to the applicable restitution, which the government calculates at $22,013,606, the applicable fine range is $50,000 to $500,000.  The government believes that a sizable fine is also appropriate in this case, as defendant is a person of means and can easily afford it, and thus, recommends the high-end Guidelines fine of $500,000.

As discussed in depth *infra*, multiple reasons justify said recommended sentence.  <u>First</u>, even though defendant was a rich and privileged surgeon who owned his own surgery center in the Inland Empire, as well as owned multiple residences, including a $9.5 million property in Beverly Hills and property in Hawaii, defendant nonetheless attempted to defraud insurance companies of tens of millions of dollars by tricking them into paying for cosmetic surgery.  <u>Second</u>, defendant's fraudulent scheme was egregious.  His scheme not only involved lying to the insurance companies by fabricating symptoms and diagnoses in order to trick the insurance companies into paying for cosmetic surgery, but defendant also altered medical records as part of his scheme, including personally writing over the existing text on medical records and covering up/whiting out other parts of records.  <u>Third</u>, defendant's scheme had

various types of victims.  Defendant victimized not only large

insurance companies such as Anthem, but also self-insured public

entities such as REEP.  Defendant also victimized the patients

themselves, some of whom had procedures performed on them to which

they did not give informed consent, which has resulted in ongoing

medical problems or disfigurement.  Moreover, to further his

fraudulent scheme, defendant unlawfully used patients' identification

information and disclosed their protected medical information.

Fourth, defendant was the leader of his multi-million dollar

fraudulent scheme who benefitted the most from that scheme, i.e., he

made most of the money.  Not only did defendant orchestrate, lead,

and attempt to conceal his multi-million dollar health care fraud –

one of the largest in the history of the Inland Empire – but also, he

tried to cheat the IRS by siphoning off millions of dollars into his

personal bank accounts and filing corresponding false federal tax

returns that failed to report that huge amount of siphoned income.

Fifth, even after defendant knew he had been investigated for years

and had been caught, charged, and ultimately pleaded guilty, rather

than face his victims and accept his sentence from this Court,

defendant instead fled and remains a fugitive from justice.  Last,

deterrence demands a long prison sentence.  In this case, justice, as

well as deterrence, mandates a significant prison sentence.

Thus, the government recommends the statutory-maximum sentence

of 276 months (23 years) of imprisonment.

## II.  FACTUAL BACKGROUND

The Revised PSR did a very good job identifying the

coconspirators, summarizing the conspiracy, finding and discussing

relevant facts, and describing the execution of defendant's huge

insurance fraud scheme (including falsification of records, fabricated patient diagnoses, and instructions to patients). (DE 149 ¶¶ 15-77.) However, based upon defendant's 35 pages of objections to the original PSR, the government details below many of the facts as necessary to respond to defendant's overwhelmingly meritless objections to the factual findings in the original PSR.

### A. Defendant's multi-million dollar health care fraud scheme

#### 1. <u>Summary</u>

Defendant owned and operated TMI, where he billed insurance companies for cosmetic procedures such as breast augmentations, tummy tucks, and nose jobs, fraudulently classifying them as medically necessary so insurance would pay for them. From 2007 to 2011, Morrow billed more than $80 million in surgeries to Anthem Blue Cross, Blue Shield of California, Aetna, CIGNA, and other insurance companies, which together paid out more than $20 million to defendant/TMI. Some of the entities whose employees underwent surgeries at TMI, which were subsequently paid for by the health insurance companies, include the Desert Sands Unified School District, the Palm Springs Unified School District, the city of Palm Springs (including the Palm Springs Police Department), Coachella Valley Water District, Staples, and Fed Ex. TMI billed procedures performed on patients who came from throughout the Central District of California, including Orange, Los Angeles, Riverside, and San Bernardino Counties.

To trick the insurance companies into paying for the cosmetic procedures, defendant altered medical records and falsified consultation and operative reports by fabricating symptoms that did not exist and reporting false testing results. For example, from evidence seized during the March 2011 search, agents discovered

digital evidence of PDFs where defendant had inserted blank white text boxes over certain text on medical records (such as anesthesia reports) or hospital UGI reports in order to conceal that the procedures he was billing were cosmetic (*e.g.*, a tummy tuck or breast augmentation) or not covered by insurance unless specific criteria were met (*e.g.*, LAPBAND). Defendant would also re-write/edit transcribed operative reports that had been dictated by other doctors to conceal that the procedures were in fact cosmetic, and would then digitally sign the altered reports in the name of the other doctors. Defendant also pressured patients to undergo unnecessary surgeries by frightening them that if they did not undergo the procedures, they would have medical problems, or alternatively by promising them benefits such as free cosmetic procedures or, for a few, cash.

FBI and California Department of Insurance executed a federal search warrant at TMI on March 8, 2011, seizing TMI's server as well as hard copies of patient files. In addition, federal agents interviewed approximately 90 witnesses, many of whom also testified before the grand jury.

Last, an insider doctor who worked for defendant at TMI for several years, Dr. Allan Wu, interviewed multiple times and testified in the grand jury, completely laying out the fraud at TMI and credibly implicating both defendant and defendant's wife Linda.

### 2. Facts to which defendant agreed in the plea agreement

In the plea agreement, defendant agreed to the following facts:

- Between January 2007 through March 2011, defendant billed certain cosmetic surgeries to insurance companies as "medically necessary," so that the insurance companies would pay for them.

- Defendant participated in a scheme to obtain money from insurance companies by means of false and fraudulent pretenses.

- Defendant submitted altered documents to the insurance companies in support of billings that defendant had submitted to the insurance companies.

  o For example, defendant submitted to an insurance company an Anesthesia Form dated 07/02/09 for patient R.O. where defendant had written "umbilical & ventral hernias" over the original text of "Abdominoplasty" in the procedure section of that form.

- During years 2008 and 2009, defendant deposited checks made payable to his surgery center and to him into bank accounts at Bank of America and Wells Fargo that were in his name, which checks constituted income for him during those respective years.

  o During 2008, he deposited more than $100,000 in such income.

  o During 2009, he deposited more than $1,500,000 in such income.

  o When defendant's tax return preparer was preparing the federal income tax returns for him and his surgery center for tax years 2008 and 2009, defendant never told his tax return preparer that he was depositing business income into his personal bank accounts, rather than into the business bank accounts.  Accordingly, defendant's tax return preparer prepared tax returns for tax years 2008 and 2009 for himself and his surgery center that

were false, because the tax returns failed to report the amount of income that defendant had failed to tell his tax return preparer about for each of those years.

- On September 11, 2009, defendant filed a false tax return for 2008, which failed to report more than $100,000 in income.

- On October 12, 2010, defendant filed a false tax return for 2009, which failed to report more than $1,500,000 in income.

(DE 42 at 8-11.)

### 3. **Evidence**

#### a. Summary of types of evidence demonstrating the fraud at TMI

There are several main types of evidence in this scheme that demonstrate the fraud by defendant at TMI:

- Altered documents: Defendant altered many documents to conceal that TMI had actually performed and billed cosmetic surgeries, including medical records where he would write over the procedures on operative notes, intake documents, and other documents, as well as defendant's using Adobe Acrobat to insert white text boxes over information that he wished to conceal. Defendant would also alter operative notes that had been transcribed from dictations by other doctors, and electronically sign the altered operative notes in the name of the other doctors without those doctors' knowledge or consent. As discussed *infra*, multiple copies of the same document with parts altered were seized during the search, showing that defendant did the altering. Moreover, Dr. Wu testified that defendant showed him how defendant was altering the documents.

Patients also testified that defendant and/or others at TMI directed them to re-do parts of their intake forms to change the purpose of their visit to TMI from cosmetic in nature to medically necessary in nature.

- <u>Fabricated diagnoses</u>: Defendant, Dr. Wu, and other doctors would fabricate diagnoses on many medical records, such as the pre-authorization reports sent to the insurance companies as well as the operative reports, in order to justify the surgeries, by adding symptoms that the patients did not have as well as reporting false test results.  As discussed in depth below, Dr. Wu testified that he and defendant completely made up diagnoses to qualify the procedures for insurance payment, and he had many discussions with defendant about that.  In addition, the email evidence detailed below demonstrates some of those conversations between defendant and Dr. Wu, where they specifically discuss making up diagnoses.

- <u>Same symptoms and set of surgeries for patients</u>: As detailed *infra*, many patients underwent a similar set of several surgeries: nose, breast, tummy tuck, and vein, all billed as medically necessary, even though they were cosmetic.  A review of the pre-authorizations and operative reports shows that many of the same alleged symptoms are repeated for many patients.  As described below, the same story emerges of an individual going into TMI to receive a free facial, and leaving with diagnoses of a deviated septum, tuberous breasts (or other medical issues with breasts), hernias, scar revisions, and severe ambulatory problems, which all necessitated cosmetic surgeries billed to insurance for hundreds of thousands of dollars.

- <u>Patient statements/testimony</u>: witnesses were interviewed

and/or testified in the grand jury as to the falsities on their medical records, as well as other parts of defendant's fraudulent scheme, such as kick-backs to some.  Likewise, Dr. Wu was interviewed and testified in the grand jury, completely laying out the fraud. One patient testified in the grand jury that defendant directly paid her for undergoing additional procedures, and others testified that defendant promised them that if they underwent particular procedures first, he would then give them the other cosmetic procedure(s) they really wanted, for free.

- <u>Email messages</u>: Email messages among and/or between defendant, the doctors, TMI employees, and/or defendant's wife Linda exemplify the ways in which they were attempting to conceal from the insurance companies that they were billing cosmetic surgeries as medically necessary, including completely fabricating diagnoses.

- <u>Bank records</u>: The bank records show that defendant siphoned off approximately $7,000,000 of income during calendar years 2008 through 2010, which he failed to report to his tax return preparer, resulting in false tax returns for TMI and the Morrows filed for 2008 and 2009, and false tax returns prepared, but not filed, for 2010 (because FBI executed the search warrant in March 2011, *i.e.*, before the deadline to file the 2010 tax returns).

      b.   <u>Background and overview of defendant's health care fraud scheme</u>

TMI was located in Rancho Mirage, California, was a non-hospital surgery center, commonly referred to as an ASC (ambulatory surgery center) or "out-patient surgery center," wherein various surgical procedures are performed.  Outpatient surgery centers are independent medical facilities (not hospitals) typically owned by a

group of physicians/surgeons.  The surgery centers perform surgical procedures that do not require more than twelve hours.  TMI is also a doctor's office and spa facility that offered facials and the like.[3]

Defendant was TMI's Medical Director,[4] and Linda was TMI's Executive Director.  Together with each other and the other participants (doctors, TMI employees, and cappers), they operated TMI to fraudulently bill cosmetic surgeries as "medically-necessary" surgeries so that the insurance companies would unwittingly pay for cosmetic procedures.  Either the entire cosmetic surgery was fraudulently billed as a medically-necessary procedure (*e.g.*, a tummy tuck billed as an "abdominal reconstruction"), or two procedures were performed – a medically-necessary one and a cosmetic one – and the insurance company was billed for the entire time of both procedures, without knowing that most of the time was spent on the cosmetic procedure, because defendant concealed that the cosmetic procedure had been done at the same time.  Even when the two procedures were performed during the same period, insurance was billed for the "medically necessary" codes only, even though the primary reason for the surgery was, in fact, cosmetic for the patient, and the functional aspect of the surgery was incidental at best.

Defendant made most of the money off the scheme from the exorbitant fees he charged for the "surgery center fees" from the

---

[3] At the time of the search, TMI advertised on the internet as "The Morrow Institute Specialty Plastic Surgery."

[4] According to TMI's website at the time, "David M. Morrow, MD, FAAD, FAACS, founder and director of The Morrow Institute and the International Center for Stem Cell Surgery and Regenerative Medicine, is a diplomate of the American Boards of Cosmetic Surgery and Dermatology.  Named one of the Top 100 Cosmetic Surgeons in the World by the International Academy of Cosmetic Surgery, Dr. Morrow is well known for performing the first laser facelift and pioneering the Designed Skin Peel®, Stork Lift™ and Triangle Lift™ procedures."

surgeries performed at TMI, *i.e.*, the fees for using the surgery center for the procedures, as opposed to the "professional services fees," *i.e.*, the fees billed by the surgeons for performing the surgeries.  In other words, TMI was an "out-of-network" provider for all of the insurance companies he exploited, which means that the insurance companies did not impose a "daily cap" on the amount the insurance would pay for the surgery center fee portion of the bills for the surgeries conducted there.  (A "daily cap" is the maximum amount an insurance company will pay for out-of-network facility fees in one day, *e.g.*, a maximum of only $350/day.)  As discussed in depth *infra*, defendant would bill the insurance sometimes as much as $100,000 for an individual procedure, such as a tummy tuck (fraudulently billed as abdominal reconstruction), where the lion's share of the fees were attributed to the surgery-center portion of the surgery, as opposed to the professional services fee charged by the doctor.  Because defendant exploited a gap in the out-of-network insurance agreements where no cap for the surgery center fee existed, he could bill as much as he wanted for the surgery center fee, and he did.  For example, for one of the surgeries (vein) billed for patient Angie B. discussed below, TMI billed $93,500 for the surgery center fee and $16,000 for the professional services (surgeon) fee.

During most of the scheme, defendant employed Dr. Wu as a full-time "fellow" at TMI, because Dr. Wu, who was at the time an OB-GYN physician, was seeking to obtain certification in cosmetic surgery.  (Subsequently, defendant hired him on as a doctor at TMI.)  Defendant also paid and/or billed various itinerant doctors who came in to TMI to perform surgeries, and who would be paid per surgery on an independent contractor basis, as opposed to an in-house doctor like

1  Dr. Wu, who was paid a set salary by TMI/defendant.

2      Defendant and Linda and other marketers or cappers recruited

3  patients into TMI by flyers offering free esthetician services such

4  as facials, and also did so by targeting specific employers/companies

5  (*e.g.*, Staples and Fed Ex) that they knew offered good insurance.

6  Referrals also came to TMI based on word of mouth once they saw the

7  physical results in co-workers and friends.  The patients were

8  screened for "good insurance" during initial contact with marketers

9  or during the initial consultation at TMI.  Subsequently, they were

10  told they could use their PPO health care benefit to pay for cosmetic

11  surgeries, which obviously are generally not covered by insurance.

12  The marketers or cappers then directed the patients to call TMI to go

13  in for a consultation.

14      Defendant told patients that they could receive free or

15  discounted cosmetic surgeries in conjunction with a surgery that was

16  "medically necessary."  Patients were sometimes coached to present

17  specific symptoms to reflect a medical necessity, or often, defendant

18  would simply fabricate symptoms on the medical records.  Defendant

19  pressured patients to undergo multiple procedures that could be

20  billed to the patients' union or PPO health care benefit program,

21  often all performed within a very short time period.  The procedures

22  were typically deviated septum (septoplasty), hernias, abdominal

23  reconstructive surgeries, tuberous breast deformity, Rectocyle

24  cycstocyle, vein surgeries, or eyelid surgeries.

25      Patients underwent multiple surgeries, which TMI then billed to

26  the patients' union or PPO health care benefit program by submitting

27  claims for payment.  Because the claim was submitted to the health

28  care benefit program, a reimbursement check was issued by mail

sometimes directly to the patient or to the provider, such as
defendant and Drs. Wu and Harry Marshak.[5]   The patient was directed
by defendant or other employees of TMI to sign over and send the
check to TMI "payable to MORROW" or "Dr. David Morrow."

The patients then underwent free or discounted cosmetic
surgeries, including tummy tucks, breast augmentations, face lifts,
rhinoplasty, liposuction, vaginal rejuvenation, and treatment for
spider veins in the legs.  Defendant would at times hold off on doing
the surgery the patient really wanted until the patient had undergone
other unnecessary surgeries first and he had been paid by insurance
for those surgeries.

Further, tummy tucks were billed as hernia repair surgeries,
rhinoplasties as deviated septum repair surgeries, breast
augmentations as medically-necessary mastopexy (breast lifts) and
tuberous breast deformities, lapbands as hiatal hernias, and cosmetic
varicose vein surgeries as necessary due to non-existent pain.
Follow-up revisional surgeries to fix things like "dog ears"[6] on the
breasts and tummy were also billed to the insurance companies, even
though those procedures were also cosmetic.

In order to further his fraudulent scheme, defendant instructed

---

[5] Dr. Marshak performed eye surgeries at TMI on an independent
contractor basis.

[6] The term "dog ears" generally refers to a corner of a page
turned down to mark your place.  In plastic surgery, the term "dog
ears" refers to a one-sided mound of redundant tissue, which is seen
after the repair of certain skin lesions and defects, and the
puckering at the end of a scar, most often at the end of skin-
tightening incisions. As applicable in this case, in tummy-tuck
surgery, skin is removed from the belly button down to the pubic area
in the shape of an ellipse.  Because skin is maximally tightened
centrally, and not so much laterally and not at all past the scar
itself, a "dog-ear" is a skin protuberance where the incision ends.
In other words, skin is tight along the scar and looser after it, so
it tends to want to pucker: leaving dog ears.

patients to change their insurance from HMO to PPO or from capped PPO to uncapped PPO.  Defendant even suggested to some patients to change employers to an employer that he knew had "good insurance," *i.e.*, PPO insurance that did not have a daily cap for surgery center fees. Defendant also straight-out paid some patients to have surgeries. (Patient Tiffany S. testified to being paid by defendant.)  For another patient, rather than making that patient pay back $10,000 from an insurance check from a previously-billed procedure that she had improperly kept, defendant allowed keep her it in exchange for undergoing additional procedures that the patient did not want or request.  Defendant even paid a patient's premiums in order that she would continue to have "good" insurance, so that he could then perform and bill for the additional surgeries.  Defendant even went so far as to pay for lodging for patients so they would be able to stay and undergo procedures.

In addition to altering medical records or fabricating diagnoses and symptoms on medical reports, defendant also deliberately deceived the benefits coordinator for one company by having patients sign a form that they would pay their part of the procedure (*e.g.*, 80/20) that he never intended to collect and/or specifically told the patients he would not collect.  He also had patients sign promissory notes that he never intended to collect and/or specifically told the patients he would not collect.  The amounts were arbitrary.

Defendant also used two different entities that had listed different mailing addresses from TMI[7] to bill for surgeries,

---

[7] TMI's address was 69-780 Stellar Drive, Rancho Mirage, California 92270, Tax Identification number XXXXX4548, NPI XXXXXX7768, UPIN XXX963.  The other 2 entities had different mailing addresses and billing identifiers, even though they were just used to

particularly for when multiple surgeries were billed for the same patient over a short time period.  As discussed below, that was done to conceal from the insurance companies that TMI was performing and billing so many surgeries on the same patients.

Last, defendant also routinely failed to collect co-insurance payments for the procedures, which was never disclosed to the insurance companies.  Whether a doctor is charging/collecting the co-insurance payment from the patients is important to the insurance companies, because they rely on the co-insurance business model to control costs and ensure that any given bill is legitimate by ensuring the patient will be bearing part of the cost of the procedure, be it 80/20, 70/30, or some variant.  In addition, when a doctor waives that co-insurance payment due from the patient, it constitutes a "kick-back" to the patient, because the patient is receiving a benefit (not paying their required portion of the cost) for doing the surgery with that particular doctor.

> c. Cooperating TMI insider Dr. Wu detailed the pervasive fraud that defendant perpetrated at TMI.

Dr. Wu worked for defendant at TMI during most of the years defendant was orchestrating his fraudulent scheme.  Dr. Wu began working at the TMI in 2007 as a full-time fellow (to obtain his cosmetic surgery certification), making approximately $50,000/year, and a couple years later, became a full-time doctor there, and was

bill procedures at TMI: (1) SPECIALTY SURGEONS INC., 197 West Via Lola #22, Palm Springs, California 92262, TIN XX-XXX0573, NPI XXXXXX5155; and (2) STELLAR SURGICAL SPECIALTIES, INC., 220 West Hermosa Place, Palm Springs, California 92262, TIN XX-XXX9818 NPI XXXXXX1772.  The Via Lola address was a condominium owned by defendant, and the Hermosa Place address was a residence owned by defendant.

1    still working there as of the date of the March 2011 search by the

2    FBI and California Department of Insurance.  Dr. Wu is the classic

3    insider witness, because he worked at TMI every day, and multiple

4    other witnesses have stated and/or testified that he worked side-by-

5    side with defendant.  Further, Dr. Wu was present during the

6    fraudulently-billed surgeries, often scrubbing in as the surgeon or

7    assistant surgeon.  As discussed immediately below, Dr. Wu also often

8    had direct conversations with defendant about how defendant would be

9    designing and conducting the fraud, be it altering documents or

10   fabricating diagnoses.  Last, as shown in the email section *infra*,

11   Dr. Wu and defendant had very direct email messages that many times

12   did not even try to hide the fraud among themselves, *e.g.*, an

13   01/17/10 email exchange between them where they both discuss revising

14   operative notes to include qualifying symptoms that insurance would

15   want to see, and where Dr. Wu suggested that in the future, they

16   should rotate the reported false symptomologies so as "to not make us

17   look one dimensional or 'fake.'" (Exh.-1 (rep309/sub31/2995114).)

18        In the grand jury, Dr. Wu related the following about the fraud

19   perpetrated by defendant at TMI:

20

21

22

23

24                              **6(e)**

25

26

27

28



6(e)



6(e)

**6(e)**

    d.    <u>Background on insurance companies billed by</u>

        <u>defendant/TMI</u>

        i.    *Amounts billed to insurance companies*

Defendant billed to several different insurance companies or self-insured entities[8] in this case:

---

[8] Like Anthem, Blue Shield of California is both a third party administrator for self-insured plans and has direct individual family plans. When it functions as a third-party administrator, it simply processes the claims but the self-insured entity ultimately pays the costs for the claims processed by Blue Shield on its behalf.

- <u>Aetna</u>: Aetna was an insurance company that provided the policies that most of TMI's employees used.  Many of those TMI employees also underwent cosmetic procedures that TMI billed as medically necessary to Aetna.[9]  From January 2007 to March 2011, defendant/TMI billed more than $5,000,000 to Aetna, for which approximately $1,800,000 was paid.

- <u>Anthem Blue Cross</u>: Anthem Blue Cross, a private insurance company, was both a third party administrator to groups that are self-insured as well as a direct provider of insurance to members.  A physician or medical provider will then be either a participating or non-participating entity with Anthem Blue Cross.  From February 2008 to January 2011, Morrow billed approximately $57,000,000 to Anthem, of which approximately $15,500,000 was paid.  Anthem involved the following entities:

  o <u>City of Palm Springs</u>: The City of Palm Springs had insurance with Anthem.

  o <u>REEP</u>: The Riverside Employee/Employer Partnership is a self-insured group that used Anthem Blue Cross as a third-party administrator to process its claims.  Two major entities of REEP are the Desert Sands USD and Palm Springs USD.

  o <u>Staples</u>: Staples had a distribution center located in the Island Empire, whose employees' claims were paid through Anthem.[10]

---

[9] For example, for 9 TMI employees, TMI billed approximately $2.8 million, for which approximately $1,000,000 was paid.

[10] Anthem Blue Cross is owned by Wellpoint.  Wellpoint owns other Blue Cross entities throughout the United States.  When a company is self-insured or directly insured with an insurance company owned by Wellpoint, the member is able to access services in different states. The local Wellpoint insurance company pays the claim for the member.

- From April 2008 to December 2010, TMI submitted approximately 180 claims for approximately 20 Staples employees, which totaled approximately $5,100,000.

A sample of some of the larger total billed amounts by TMI and amounts paid by Anthem Blue Cross for individual patients is:

| NAME | AMOUNT BILLED | AMOUNT PAID |
|------|---------------|-------------|
| Karla A. | $115,850 | $94,763 |
| Joann A. | $461,835 | $417,969 |
| Linda A. | $874,670 | $477,705 |
| Amy B. | $511,544 | $364,197 |
| Lisa C. | $2,207,235 | $1,399,762 |
| Sylvia C. | $1,186,255 | $494,224 |
| Anna G. | $577,275 | $548,159 |
| Jill G. | $1,717,182 | $402,987 |
| Stephanie G. | $1,044,533 | $314,623 |
| Vera J.-W. | $392,050 | $163,416 |
| Bernice L. | $1,371,260 | $759,382 |
| Patricia M. | $225,250 | $172,017 |
| Carmen M. | $636,350 | $370,054 |
| Blanca M. | $632,925 | $4,162 |
| Leonor R. | $437,900 | $95,600 |
| Lisa R. | $126,611 | $88,815 |
| Sheila V. | $559,485 | $380,693 |

(Exh.-3 (03/2011 search warrant) at exh.3 (USA_SW_0000166-170); Exh.-4 (Anthem excel spreadsheet: USA_DMORROW_00004795).)

Anthem Blue Cross also conducted an internal fraud investigation involving defendant and TMI, where their Special Investigations Unit (SIU) investigators interviewed patients and reviewed many of the

---

A "Blue Card" member can access services in one state when the headquarters "home plan" of the company is in a different state. For example, Staples's headquarters are in Massachusetts. The Staples company is self-insured with Blue Cross Blue Shield of Massachusetts and is part of the Blue Card system; Staples has a distribution center in Rialto, California. When a member in California accesses services, Anthem Blue Cross pays the claim because Anthem is located in California and the member has Blue Card services.

files.  That investigation, which began in 2009, is important because as Anthem began to request back-up documents from defendant to substantiate the claims, defendant personally sent in many signed letters with various altered documents attached.[11]

- Blue Shield of California: Like Anthem, Blue Shield of California is both a third party administrator for self-insured plans and has direct individual family plans.  From July 2007 to February 2011, Morrow billed approximately $13,000,000 to Blue Shield of California, of which approximately $2,200,000 was paid.  Blue Shield involved the following entity:

    o  CVWD: The Coachella Valley Water District used Blue Shield of California as its third party administrator.

- Cigna: Like Anthem, Cigna is both a third party administrator for self-insured plans and has direct individual family plans.  From January 2009 to February 2011, Morrow billed approximately $8,700,000 to Cigna, of which approximately $2,200,000 was paid.  Cigna processed claims for the following entities: Fed Ex and Cardinal Health.

- Principal Life Insurance Company: TMI billed Principal life insurance company for procedures for approximately five patients, which totaled approximately $400,000.

In general, one of the reasons defendant's scheme was undetected for years is that he designed it so that the procedures he billed to insurance were considered "out of network" transactions, because TMI was not party to the insurance contracts, and thus not subject to

---

[11] In March and April 2010, the Medical Director for Anthem Blue Cross, sent several letters to Morrow, requesting additional records for approximately 40 patients for whom Morrow/TMI had billed procedures.

1  allowable maximums that would otherwise apply to the surgery-center
2  and other fees.

3       As discussed above, Anthem Blue Cross is a third party
4  administrator to groups that are self-insured as well as a direct
5  provider of insurance to members.  A physician or medical provider
6  will then be either a participating or non-participating entity with
7  Anthem Blue Cross.  A participating entity has a contract with Anthem
8  for a negotiated price for all services, whereas a non-participating
9  entity falls into what is known in the insurance industry as
10 "reasonable and customary" billing practices.  Services are
11 additionally categorized as "capped" and "non capped" for a specific
12 service and group.  For example, REEP had no daily cap for an ASC
13 facility fee prior to July 2010, so because TMI was a non-
14 participating medical provider for REEP, the prices for fees were not
15 negotiated.  However, PSPD was part of the City of Palm Springs group
16 that was insured through Anthem Blue Cross directly, but prior to
17 January 2010, Anthem had no daily cap for the ASC facility fee, so
18 because TMI was a non-participating facility, again, the prices for
19 fees were not negotiated ahead of time.  TMI's "out-of-network"
20 status thus allowed defendant to continue to bill progressively
21 higher facility fees.  Due to "prompt pay" laws and other factors,
22 insurance companies often pay claims as they would for any traveler
23 who has been diagnosed with a medical problem while away from home.

24      As shown *infra*, the amounts defendant/TMI billed for surgery
25 center/ASC fees were quite disproportionate to what was the capped
26 amounts for in-network ASCs.  For example, CVWD had a daily cap or
27 maximum allowable amount of $350 for an ASC, which was raised to $600
28 in 2010.  In comparison, TMI/Morrow would routinely bill more than

$75,000 for just the ASC fee for each procedure.   The professional services (doctors' fees) fees were also quite large.

For example, **in 2009 alone**, defendant billed more than $25,000,000 to insurance, with approximately $8,000,000 paid out:

| BILLED AMOUNTS IN 2009 | | |
|---|---|---|
| INSURANCE COMPANY | BILLED AMOUNT | AMOUNT PAID |
| Anthem Blue Cross | $15,624,071 | $6,446,594 |
| AETNA | $422,565 | $126,369 |
| Blue Shield of California | $7,359,191 | $483,081 |
| CIGNA | $1,951,107 | $961,851 |

And, as mentioned above, from February 2008 to January 2011, defendant billed approximately $57,000,000 to Anthem, of which approximately $15,500,000 was paid.   From July 2007 to February 2011, defendant billed approximately $13,000,000 to Blue Shield of California, of which approximately $2,200,000 was paid.   From January 2009 to February 2011, defendant billed approximately $8,700,000 to Cigna, of which approximately $2,200,000 was paid.

Thus, during four years, from July 2007 to February 2011, defendant billed more than $75 million to insurance companies, of which more than $20 million was paid.

ii.   *Overview/Background: insurance billing procedures*

In general, insurance companies rely on the information given to them by the treating physician and/or hospital/surgery center facility when determining whether to pay an insurance claim.   In this case, the types of fraudulent documents sent to the insurance companies included consultation reports (used to pre-authorize

procedures), operative reports, anesthesia and nurses' notes, and underlying intake documents.  An operative report is supposed to be an accurate depiction of what took place during a surgery.  The operative report is a critical document in a patient file.

The American Medical Association ("AMA") has developed a listing of descriptive terms and identifying codes for reporting medical services and procedures that are performed by physicians.  This listing is known as the Physician's Current Procedural Terminology ("CPT") and it is published in an annually updated book that is referred to as the CPT Code Book.  The purpose of the CPT Code Book is to provide a uniform language that accurately describes the medical, surgical, and diagnostic services performed by or provided by physicians, creating an effective means for reliable nationwide communication among physicians, patients, and third parties, such as insurance providers.  For example, if a physician provided a patient with a "breast reduction," the corresponding CPT code the physician would use to describe the service provided would be CPT code 19318, under the heading of "Repair and/or Reconstruction:" "19318 Reduction mammaplasty."

Additionally, the International Classification of Diseases, also known as the ICD 9 CM, published by Practice Management Information Corporation, is used by physicians as the standard for Medicare and subsequently Medicaid and private insurance carriers to assist in accurate diagnosis throughout the United States for "morbidity coding and billing purposes."  As an example, a physician may diagnose a patient who needed a breast reduction (in the example above) using the ICD 9 CM, with a diagnosis of ICD-9-CM 611.1, under the heading of "Hypertrophy of breast," as follows: "611.1 Hypertrophy of breast

1  Gynecomastia   Hypertroyphy of breast:  NOS massive pebertal."

2       Physicians, or the physicians' employees or agents, frequently

3  submit claims to insurance providers to bill for services provided to

4  the beneficiaries of the insurance providers' insurance plans.  The

5  claims use CPT codes and ICD 9 CM codes to identify the services

6  provided to the physician's patient.  Continuing the above example of

7  a breast reduction, in order for the physician to bill an insurance

8  provider for the noted surgery, the physician would submit a claim

9  for the payment listing "19318" as the services provided to the

10  patient and the diagnosis might be "611.1." When a physician provides

11  medical services to a patient, the physician generates some type of

12  documentation detailing the services provided.  In a typical medical

13  practice, the physician or the physician's employees utilize this

14  documentation to prepare a charge document, typically referred to as

15  a "suberbill," which lists the CPT codes associated with the

16  documented services provided by the physician and the diagnosis ICD

17  9-CM code(s).

18       Once created, these superbills are typically given to an outside

19  billing company, which uses the information provided on the superbill

20  to generate a claim form for billing.  However, the physician can

21  also do their own billing without using an outside billing company.

22  The standard form used to submit a claim for payment, known as a CMS

23  1500 form, identifies the patient receiving the medical service, the

24  patient's medical insurance provider, the physician providing the

25  service, the CPT codes for the services provided, the ICD 9 CM

26  diagnosis, the date or dates on which the services were provided, the

27  amount billed by the physician for each CPT code listed on the claim

28  form, and the location where the medical services were provided.  The

completed claim form is submitted, either through the mail or
electronically, to the insurance provider in order to receive payment
for the services listed on the form.  When a claim is paid by an
insurance provider, payment typically is made in the form of a check
sent through the mail.  Attached to or accompanying the check is
documentation indicating which claims are being covered by the
payment.  This documentation is commonly referred to as an
"Explanation of Benefits," or "EOB."

     Physicians and physicians' employees involved in the billing
process pay close attention to the CPT codes billed in relation to
the procedures that are performed in the physicians' offices.  This
attention is required, because the proper use of the CPT codes
related to the physicians' services is the only way to ensure that
the medical practice receives the maximum payment to which the
practice is entitled for any services provided.  Information related
to the proper coding of physician services is readily available to
medical providers and their employees through reference materials
written specifically for the purpose of aiding medical providers in
correctly coding their services in a manner that provides them with
the maximum reimbursement to which they are entitled.
Physicians and/or their office management and billing related
personnel who are engaged in a specialized field of medicine such as
cosmetic surgery and general surgeons, generally receive training and
develop expertise in the selection of the correct CPT codes and ICM 9
CM diagnosis codes used to describe the procedures typically
performed in relation to that medical specialty.  The form that this
training takes could vary greatly, but would at minimum, include a
review of the descriptions listed in the CPT Code Book for the CPT

codes submitted to the billing service or directly to insurance

provides on patient claim forms.  Documentation related to this

training and expertise, such as copies of the CPT Code Book, medical

coding and reimbursement guides, and other reference materials

related to proper billing and coding procedures are typically

maintained in the office where the superbills are created so that the

documentation can be easily referenced.  Additionally, these

documents are typically retained in the medical office so that they

can be used to train new office personnel regarding the conversion of

the physician's descriptions of his or her services into CPT codes on

superbills.

### e.   Search warrant evidence

FBI and the California Department of Insurance executed a

federal search warrant at TMI on March 8, 2011.  Agents seized both

hard evidence such as patient files, as well as TMI servers and other

digital evidence.  The following describes some of that evidence.

### i.   *Patient Files*

Agents seized hundreds of hard copy patient files.  As discussed

*infra*, the seized patient files had various altered documents,

including blacked-out sections of intake forms, whited-out parts of

medical records, or re-printed versions of medical records with the

parts that showed the cosmetic nature of the procedures had been

omitted.  In addition, often two versions of the same document were

found, with the original version found as hard copy, and the altered

(or sometimes re-written one) in the electronic files.

As discussed in depth below, those documents from the patients'

files were shown to them during their grand jury appearance, where

they then testified what had been originally written under the

covered up sections, or what they had originally written before being asked by defendant, Linda, or others at TMI to re-do the forms after the insurance companies began to investigate defendant's billings.

### ii. *Digital Evidence: Electronic Medical Records (EMRs) and email messages*

Agents seized hundreds of EMRs of TMI patients.  In those files, various altered documents were found, including PDFs with white boxes inserted over cosmetic terms or re-scanned versions of the hard copy originals, with the cosmetic terms written over.

The agents seized more than a million email messages from the TMI server (that were filtered), which help to establish multiple parts of defendant's fraud.  For example, there are many email messages between defendant and Dr. Wu that demonstrate defendant's intent to defraud the insurance companies:

- *07/06/09 email chain between defendant and Dr. Wu, and others, entitled "RE: RE TT and NOSE MEDS. as per Wu,"* where defendant directs everyone to "[p]lease be careful with the lingo in case of an insurance question: Please refer to these procedures as 'abdomen' 'breast' 'nose' 'eyelid' and add if possible the words 'reconstructive surgery.'" (Exh.-5 (rep309/sub36/2791193));

- *08/10/2009 email chain between defendant and Dr. Wu, entitled "RE: RE. Rosalba 8/11:"* defendant directs Dr. Wu, who had already indicated that the procedure was a tummy tuck, not to use that term: "Please do not use TUMMY TUCK, it is abdominal reconstructive surgery, even in emails."[12]

---

[12] In multiple other emails with TMI staff, defendant also discussed the cosmetic vs. "medically necessary" language, such as

1    (Exh.-6 (rep309/sub36/3064987));

2    - *08/28/2009 email from defendant to TMI staff and Dr. Wu,*

3    *entitled "CODE NOT TO USE,"* where defendant sends email to

4    Dr. Wu and two others noting that one code they were using

5    was a "red flag:" **<span style="color:red">DO NOT USE THIS CODE: IT IS A RED FLAG</span>**

6    **<span style="color:red">FOR abdominoplasty (cosmetic) 15847…"</span>**

7    (Exh.-7 (rep309/sub15/2788019) (bold red font in

8    original));

9    - *08/29/09 email between defendant and Lisa C., entitled*

10   *"lisa COMMENTS ON MBC"*, where they discuss which codes work

11   to have the insurance pay: "I can tell you that if you have

12   not received payment for the 9/1/08 charge, it's because of

13   the 15847 code …  it's a RED FLAG code and should NEVER be

14   billed.  **For tummy tucks stick with the hernias only.**"

15   (Exh-8 (rep303-304-306/3191558) (emphasis added));

16   - *06/30/2010 email from Dr. Wu to defendant entitled "Order*

17   *of 7/1 Staples patients."*: Dr. Wu discusses with defendant

18   the order they should perform the surgeries, so that they

19   get paid most easily, with the "red flag" surgeries not

20   performed until the last procedure (Exh.-9

21   (rep309/sub23/2881643));

22   - *01/01/2010 email from defendant to multiple, entitled*

23   *"LANGUAGE IN CONSENTS"*: defendant emphasizes that "Words do

24   matter very much especially when we are dealing with ins.

25   co." and gives cosmetic terms that should not be used and

26   "[a]lways think to phrase it like abdominal reconstructive

27

28   changes to consent from cosmetic terms to "medically-necessary" ones,
     *e.g.*, "tummy tuck/abdominoplasty to Abdominal reconstruction."

surgery…" (Exh.-10 (rep309/sub14/2773533));

- *07/13/2010 email message from defendant to Dr. Wu, entitled "FW: OR RECORDS AND CHARTS:"* defendant asks Dr. Wu "[a]re these new procedures being carried out?", which refers to directing the nurse in the operating room to write down only what the doctor says, as opposed to what the nurse witnessed, as well as to basically do a second set of operative reports: "Weights of flaps, liposuction aspirate volumes, breast implant data… are broken out to a separate documentation sheet from the standard intraop note (**in this way I do not need to heavily edit**… see L. A[]'s AnP repair OR record as an example.)" (Exh.-11 (rep309/sub35/3059419) (emphasis added));

- *01/17/10 email message from defendant to Dr. Wu re: altering operative reports and using the "Spigelian" hernia code* (Exh.-1 (rep309/sub31/2995114)):

## RE: revis S█████, Dana HERNIA ARS 062409.doc

| From: | David Morrow |
| Sent: | 1/17/2010 9:19:49 PM +00:00 |
| To: | Allan Wu |
| CC: | David Morrow |
| Subject: | RE: revis S███, Dana HERNIA ARS 062409.doc |
| Attachments: | image002.gif |

Hi Allan, I further modified your revised op note, so do not use the one you attached in prior email. Use the one in her electronic medical record. Also, I need to discuss the case with you in particular, amongst other things:

1/ Note in her general hist form she states 1997 gall bladder surgery! No mention of any left lower abdominal incisional surgery which would cause a Richeter hernia.

2.   I need you to fill me on exactly what is a Richeter's hernia

3.   I added some critical points to the op note which Anthem BCBS want to have for auth of a pannus excisions: bmi =or <than 30. Also, it will save us time and trouble to include the pre-auth # on the op note which I did.

4.   Call me when you can today/tonight to discuss this case and others going forward.

Thank you,

David M. Morrow, MD, FAAD, FAACS

Medical Director

---

**From:** Allan Wu
**Sent:** Thursday, January 14, 2010 8:03 PM
**To:** David Morrow
**Subject:** revis S████, Dana HERNIA ARS 062409.doc

I like the op note now. Please review. If you like too, I will align codes with superbill.

Note: everyone having ARS will have on "sort" of ventral hernia or another. I will try to "rotate" thing a little to not make us look one dimensional or "fake".

Futher note: I think I will be using Spigelian dx code a little more frequently since it is a type of hernia that by nature does not always present with a discernable mass on photography or even physical exam.

We really should try to get our hands on the ACS article on hernias and study it. Please email me the date and page of the article or let me peek at the scratch sheet again and I will try to obtain off of Ariella's G████ account.

Thanks.

- *01/19/10 email from Wu to defendant with attachment "revis H[.], Brenda ABDOMEN HERNIA 082309.doc" (Exh.-12 (rep309/sub36/3071698) USA_DMORROW_00009175):*

| From: | Allan Wu |
|---|---|
| Sent: | 1/19/2010 9:40:51 PM +00:00 |
| To: | David Morrow |
| Subject: | r<null>e<null>v<null>i<null>s<null> <null>H<null>e<null>n<null>I<null>e<null>y<null>,<null> <null>B<null>r<null>e<null>n<null>d<null>a<null> <null>A<null>B<null>D<null>O<null>M<null>E<null>N<null> <null>H<null>E<null>R<null>N<null>I<null>A<null> <null>8<null>2<null>3<null>0<null>9<null>.<null>d<null>o<null>c |
| Attachments: | revis H████, Brenda ABDOMEN HERNIA 082309.doc |

OP NOTE CLEAN NOW. PLEASE SEND FOR BILLING.

### 4.   To further defendant's health care fraud scheme, defendant and other doctors fabricated diagnoses.

Defendant and other doctors he controlled fabricated symptoms and diagnoses so that the insurance companies would pay for the

1  surgeries, even though they were cosmetic in nature.  Several

2  examples follow:

3          a.   Patient Thelma A.:

4      The following 07/13/09 Pre-operative Consultation Letter of

5  Medical Necessity, digitally signed by defendant and received by the

6  insurance company, contains multiple false statements:

**HISTORY OF PRESENT ILLNESS:** Height 5'2"; weight 163 lbs; bmi 29.8
This 44 yr. female.  Patient complains of large overhanging abdominal pannus which causes constant back pain and fungal infections since it is difficult to keep dry living in the hot Coachella Valley desert despite the use of topical anti-fungals and drying measures for the past 1 yr under care of family doctor.  This has resulted in persistent itching of the skin yielding thickening of the skin.  Patient lost approx 20 pounds through diet and exercise (no surgery) and has maintained her weight stable for the past 18 months.

        o  Thelma A.



6(e)

**6(e)**

      b.   <u>Patient Annette F.</u>:

    Annette F. is listed as patient "AF" on the plea agreement's restitution/loss spreadsheet, and defendant's conduct involving her is charged in count 2 of the Indictment.

    Annette F., at the time a Staples manager,

**6(e)**

**6(e)**

Date:     1/21/2009
Patient: Fl[REDACTED], ANNETTE
**Chief Complaint(s):**
   1.  Difficulty breathing: continually; left side obstructed more than right
   2.  Frequent sinus infections, 3-4/yr.
   3.  Snoring, severe

History: 51 year old female has complaints as noted above. History of nasal trauma early
adulthood. No prior nasal surgery.  No help from OTC and daily prescription nasal topical and
oral medications treatments.

**6(e)**

        c.    Patient Michelle B.:

     Michelle B. is listed as patient "MB" on the plea agreement's

restitution/loss spreadsheet, and defendant's conduct involving her

is charged in count 20 of the Indictment.   Michelle B. **6(e)**

**6(e)**.  At TMI, Michelle B. underwent 6

procedures (eye, breast, abd, nose, breast revision, gyn) and had 6

pre-auths (eyes, nose, abd, breast, breast, gyn).

**6(e)**



**6(e)**

     **5.**   <u>**Defendant would alter medical records and other**</u>
          <u>**documents as part of his fraudulent scheme.**</u>

    In addition to fabricating symptoms and diagnoses as discussed above, defendant also altered multiple official medical records to conceal the fact that cosmetic procedures were being performed and billed as medically necessary at TMI.  Often, defendant would send those documents to the insurance companies, after the insurance companies had asked for more proof regarding the surgeries before paying for them.  There were three main methods that defendant would use to alter the medical records: (1) write over the original text on

the medical records; (2) "white out" or place a blank text box over the original text on the medical records;[13] and (3) have patients re-do intake forms.  Several examples of those fabricated or altered documents follow.

> *a.* <u>Defendant would hand write on top of the existing text on the original medical records to conceal the cosmetic nature of the procedures billed to insurance as medically necessary.</u>

To cover up that cosmetic procedures were being performed and billed by TMI to insurance as medically necessary, defendant would alter the medical records to re-write over the original information on the medical records, because the original information indicated that the procedure had been cosmetic in nature.

> i.   *Patient Rosario O.:*

Patient Rosario O. is listed as patient "RO" on the plea agreement's restitution/loss spreadsheet, and defendant's conduct involving her is charged in count 15 of the Indictment.  At TMI, Rosario O. underwent 6 procedures (abd, vein, 2 gyn, nose, breast aug).

Pursuant to Anthem's request for additional documentation regarding a procedure that TMI had billed for Rosario O., on March 23, 2010, defendant sent a letter to Anthem (digitally signed by defendant on 03/24/10), with approximately 18 pages of documents attached.  One of those documents is the "Anesthesia Record" to justify the abdomen procedure billed for Rosario O.:

---

[13] As Dr. Wu demonstrated to the grand jury, a blank white text box would be inserted on the PDF on top of the words that defendant wished to "erase" from the medical records or other documents, so all that could be seen was white.



(Exh.-16 (defendant 03/23-24/10 letter to Anthem re: patient Rosario O.) at 18.).   However, defendant had altered that document before sending it to the insurance company.   When comparing these two documents, the above one is clearly altered in the "procedure" box, *i.e.*, compare the surgeon's handwriting to the procedure and the line breaking.   The document below is the original, where the procedure that was performed, "abdomioplasty" (tummy tuck), is listed:

(Exh.-17 (1B27scan0002) at 11.)

**NOTE**: On page 9 of the plea agreement in the Factual Basis, defendant specifically admitted that he was the individual who had done the above alteration: "For example, defendant submitted to an insurance company an Anesthesia Form dated 07/02/09 for patient R.O. where defendant had written "umbilical & ventral hernias" over the original text of "Abdominoplasty" in the procedure section of that form."

In addition to writing over the procedure on the anesthesia record, a couple of other medical records were also either doctored or omitted.   For example, the original TMI "Surgical Pre-Operative History and Physical" listed a cosmetic procedure, "rectus

Page **44** of **157**

diasthesis," which was deleted from the version of the document that
Morrow sent to the insurance company - on the end of the line
entitled "Chief Complaint:"



(*Id.* at 1.)



(Exh.-16 (defendant letter to Anthem re: patient Rosario O.) at 15.))

The probable reason that defendant concealed the "rectus
diastasis" language was that the applicable insurance policy for that
procedure stated that such procedure would never qualify as medically
necessary: "not medically necessary for all indications":

Repair of diastasis recti is considered **cosmetic and not medically necessary** for all indications.

(Exh.-18 (Medical Policy #SURG.00048 - Panniculectomy and
Abdominoplasty) at 2.)  These documents match the same types of

1   alterations from some of the other patients discussed *supra*.[14]

2                    ii.   *Patient Thelma A.*:

3        Thelma A. is listed as patient "TA" on the plea agreement's

4   restitution/loss spreadsheet, and defendant's conduct involving her

5   is charged in count 5 of the Indictment.  Defendant submitted several

6   fraudulent documents to the insurance company when making the claims

7   for payment for the surgeries on Thelma A., as well as had altered

8   documents in her EMR.  Her Medical History form has "163#" for weight

9   in different writing than Thelma A.'s.  Thelma A. ███████████████

10  ████████████████████████████████████████████████████████████

                              **6(e)**

11  ████████████████████████████████████             This hard copy form was

12  seized during the search warrant, but not submitted to insurance.

13  The hard copy form has white out on it, with the "163#" written over

14  it; according to the agents, one can see the "180" written on the

15  original form by looking at the back of the page.

16  (*Id.* at exh. TA-1.)

17                  **GENERAL PATIENT MEDICAL HISTORY**

18      Please complete this form as accurately as possible. The information it contains will enable The Morrow
        Institute to deliver the highest standard of care to you.

19      NAME: _Thelma A A███████_    DATE: _7/12/05_

20      HEIGHT: _5'2"_    WEIGHT: _163#_

21

22              b.   Defendant would insert white text boxes over the

23                   information on various original medical records,

24                   in order to conceal the cosmetic nature of the

25                   procedures.

26      Several of the following examples demonstrate different types of

27

28  ───────────────
         [14] Rosario O.'s "Patient Information" form also appears to have
    been written over on the nature of visit line.

documents that were altered at TMI by covering up cosmetic terms, which documents were often then sent to the insurance companies and/or placed in the patients' EMR at TMI.  As with the write-overs discussed directly *supra*, information on the medical forms that would be covered up was information showing that the procedures were cosmetic in nature.  The official medical records that were altered as part of defendant's multi-million dollar health care fraud scheme included patient intake forms, General Medical History forms, Anesthesia Records, Nurses Notes, and Hospital test reports.

           i.    *White text box (patient Jessica B.)*:

Jessica B. (the daughter of patient Angie B.) is listed as patient "JB" on the plea agreement's restitution/loss spreadsheet, and defendant's conduct involving her is charged in count 17 of the Indictment.  In March 2010, defendant mailed a letter (digitally signed by him) to the insurance company, which among other documents attached an altered intake form that concealed that when initially coming to TMI, Jessica B. had wanted a breast enhancement there:

      ***Submitted to insurance company:***



(Exh.-19 (letter from defendant re: patient Jessica B.) at 3.)

      ***Original:***

IF **PATIENT IS A MINOR**, NAME OF RESPONSIBLE PARENT _Angie B_
NAME OF PARENT'S EMPLOYER ▓▓▓▓▓▓▓▓▓  _____ **BUSINESS PHONE** ▓▓▓▓
**BUSINESS ADDRESS** ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

**HOW** DID YOU HEAR ABOUT *THE MORROW INSTITUTE?* _Mother  Angie B_
**WHAT** IS THE NATURE OF YOUR VISIT? _Breast enhancement_

DO YOU HAVE **HEALTH INSURANCE**? [✓] YES   [ ] NO

This original document (Exh.-20 (rep309/sub1/467122)), a digital
file, was seized during execution of the TMI search warrant.  The
covered-up part ("Breast enhancement") is hidden by a white text box
on the PDF, which one can observe when placing the cursor over that
area of the form.[15]

As shown by the plea agreement's restitution/loss spreadsheet,
insurance paid out approximately $60,000 of the $84,500 that
defendant had billed for the breast job for patient Jessica B.

              ii.   *White text box (patient Angie B.)*:

Angie B. is listed as patient "A.B." on the plea agreement's
restitution/loss spreadsheet, and defendant's conduct involving her
is charged in counts 3, 4, 13, and 14 of the Indictment.  At least
one document from Angie B.'s medical records was altered.
Specifically, the "General Patient Medical History" form was altered
to cover up her weight of "190" and a white text box was placed over
it, so that the weight line was blank.

Please complete this form as accurately as possible. The information it contains will enable The Morrow
Institute to deliver the highest standard of care to you.
NAME: _Angie B_▓▓▓▓  _____  DATE: _07·14·09_
HEIGHT: _5'3"_  _____  WEIGHT: _190_

(Exh.-21 (Angie B. GJ) at exh. AB-6.)

---

      [15] On the PDF (Exh.-23 (rep309/sub1/467122)), when the cursor is
placed over the document area with the red circle, the white text box
can be seen, which when moved reveals the words "breast enhancement."

1

2

3

4

> Please complete this form as accurately as possible. The information it contains will enable The Morrow Institute to deliver the highest standard of care to you.
>
> NAME: *Angie B▪▪▪▪▪*      DATE: *07·14·09*
>
> HEIGHT: *5' 3"*      WEIGHT: _____

5   (Exh.-22 (05/05/10 letter from defendant to Anthem re: patient Angie

6   B.) at 5.)

7       As discussed in depth below under the "abuse of position of

8   trust" section, Angie B. also was victimized by defendant, because

9   her nose surgery entailed taking cartilage from her ear to form the

10  nose, of which she testified that she was never informed, and to

11  which she would never have consented.

12              iii.    *White text box (patient Ruben G.):*

13      Ruben G. is listed as patient "RG" on the plea agreement's

14  restitution/loss spreadsheet, and defendant's conduct involving him

15  is charged in count 19 of the Indictment.  TMI had altered documents

16  regarding Ruben G.  When he filled out the patient info form at TMI,

17  Ruben G. indicated that the nature of his visit was "lap band."

18  (Exh.-24 (rep309/sub33/3030392).)  However, in his EMR at TMI, the

19  nature of his visit on the identical form is blanked out.  (Exh.-25

20  (rep309/sub7/666763).)

21      In July 2010, defendant mailed a letter (digitally signed by

22  defendant) to Blue Cross/Blue Shield of Mass, with 19 pages.  Item

23  #6, "anesthesia record: proving procedure performed and times," is on

24  page 12/19 and lists the procedure as "Endoscopy Hiatal Hernia

25  Repair:"

26

27

28

PG 12 OF 19

(Exh.-26 (07/19/10 letter from defendant re: patient Ruben G.) at 12.) However, the original Anesthesia Record appears a little different because it also includes the gastric banding in the procedure box:



(Exh.-27 (rep309/sub33/3030736) at 5.) Another document, the Intra-Operative Nurses Notes (page 14/19), was also altered to conceal that a lapband procedure had been performed, as can be seen when comparing to the original, which lists "Incidental lap band placement" to the altered document, which does not:

(Id. at 7.)

1    Both of those alterations attempted to conceal "lap

2    band"/"gastric banding" from the medical records, because the

3    insurance companies often classified the lap band procedure as

4    cosmetic, or if that procedure were present, the insurance companies

5    would look more carefully at the entire surgery that was being

6    billed, to make sure there were no other cosmetic components (or that

7    they had not been billed for the entire surgery time for both

8    procedures).

9              iv.    *White text box (Patient Tiffany S.):*

10    Tiffany S. is listed as patient "TS" on the plea agreement's

11    restitution/loss spreadsheet, and defendant's conduct involving her

12    is charged in counts 1 and 18 of the Indictment.  The EMR for Tiffany

13    S. was altered to conceal that she had received a breast augmentation

14    on 09/30/09, which Morrow billed for $92,350 to insurance as a

15    "breast reconstruction," for which the insurance company paid out

16    $88,750.[16]  Specifically, under the procedure section of the

17    anesthesia record for that surgery on 09/30/09, the word

18    "augmentation" in the procedure section was covered up with a white

19    text box on the anesthesia record saved in the EMR:

20

21

22    

23

24

25

26

27

28    _____
     [16] TMI billed insurance a total of almost $1,000,000 for all of
     the surgeries performed on Tiffany S.

1  (Exh.-28 (rep309/sub5/578262) at 5.)[17]   However, when on the same

2  document the white text box is moved, the true procedure of

3  "augmentation" can be seen:



10          v.       *White text box (patient Sean W.):*

11      Sean W. is listed as patient "SW" on the plea agreement's

12  restitution/loss spreadsheet, and defendant's conduct involving him

13  is charged in count 6 of the Indictment.   Sean W., an assistant high

14  school principal,



6(e)

---

26      [17] Defendant further risked the health of his patients, because
when concealing the breast implants procedures, he sometimes altered
27  medical records to hide the breast implant serial numbers.   However,
were there a recall of those breast implants as is sometimes the
28  case, there would be no official medical record to document the
serial numbers.

(Exh.-29 (rep309/sub5/596809) at 1.)  During the search of the TMI's digital evidence, a copy of that medical report from Eisenhower Medical Center was found, where a white text box had been placed on top of the lap-band language, apparently to conceal that Sean W. was being considered for such procedure:



(Exh.-30 (rep309/sub5/596811) at 1.)  That digital version of the altered report shows that defendant was the individual who altered it, because there is a time/date stamp box that says "ok.dmm" ("DMM" is defendant's initials), as well as he digitally signed the document

1 | itself.

2 |     Further, that 06/18/09 UGI found that there was "[n]o evidence

3 | of hiatal hernia."  But, of course, TMI then performed a surgery on

4 | Sean W. approximately two months later on 08/16/09, and billed it as

5 | "laparoscopic hiatal hernia repair" for $88,500 in surgery center

6 | fees.

7 |     Therefore, not only did defendant alter a medical record of a

8 | hospital's test results to attempt to conceal from the insurance

9 | company that Sean W. was undergoing a lapband procedure – which would

10 | have caused the insurance company to look more carefully at the

11 | billing – but also, he billed for a "hernia" procedure, even though

12 | the report of that patient from an examination two months' earlier

13 | concluded that "there was no evidence of hiatal hernia."



6(e)

          vi.     *White text box (patient Alma Z.):*

25 |     Alma Z. is listed as patient "AZ" on the plea agreement's

26 | restitution/loss spreadsheet, and defendant's conduct involving her

---

    [18] Another TMI patient who was an attendance employee at Desert Sands USD stated that there were changes in their costs to insurance, with PPO increasing from $180/month to $545/month.

1   is charged in count 8 of the Indictment.  At TMI, Alma Z. underwent 7

2   procedures (abd, breast, 3 gyn, 2 YAG).

3       By letter dated March 25, 2010 (digitally signed on 03/25/10),

4   defendant submitted an altered document to the insurance company for

5   Alma Z.'s abdominal surgery.

6       The original document includes the cosmetic term

7   "abdominoplasty" (tummy tuck):

8

9   

10

11

12

13   (Exh.-32 (Z., Alma 7-03-2009 1B28) at 13.)  But, the same form for

14   the same procedure, located in the EMR and submitted to insurance,

15   has a white box covering the cosmetic term "abdominoplasty," making

16   it appear as if only a hernia surgery ("ventral hernia repair") had

17   been performed:

18

19   

20

21

22

23

24   (Exh.-33 (rep309/sub5/603651) at 4.)

25       Thus, the above several examples exemplify the types of official

26   medical records that were altered in defendant's scheme.

27

28

c.  <u>Patients would be directed to re-do their intake</u>
<u>forms to conceal the fact that they had gone to</u>
<u>TMI for cosmetic procedures, including</u>
<u>defendant's personally sitting down with them.</u>

Dr. Wu testified

**6(e)**

Several examples of altered or re-done patient intake forms follow:

i.  *Patient Kathryn D. (now Kathryn H.):*

Kathryn D., a school counselor, is listed as patient "KD" on the plea agreement's restitution/loss spreadsheet, and defendant's conduct involving her is charged in counts 11 and 12 of the Indictment.  At TMI, Kathryn D. underwent 2 procedures (nose, breast) and had 1 pre-auth (breast).

Kathryn D.

**6(e)**

Unlike some of the other patients' files, where the patient intake form was altered to cover up a line or two, Kathryn D.

**6(e)**

**Original intake form:**



(*Id.* at exh. KD-1.)  Kathryn D. confirmed that on the covered up writing on that form most likely had read "breast augmentation."  (*Id.* at 7.)

**One sent to insurance, by letter dated: 03/29/10:**



(*Id.* at exh. KD-2.)

**6(e)**

**6(e)**

ii.    *Patient Anna G.:*

**6(e)**. At TMI, Anna G. underwent 5 procedures (nose, abd, 2 gyn, breast) and had 3 pre-auths (nose, 1 gyn, abd).

**6(e)**

d.    <u>Defendant would direct doctors to re-do (or</u>
      <u>split) their operative reports, in order to</u>
      <u>conceal from the insurance companies that a</u>
      <u>cosmetic procedure had been done.</u>

Another way that defendant attempted to conceal the cosmetic nature of the procedures that he was billing as medically necessary to the insurance companies was to direct the itinerant doctors (doctors paid per surgery) and others to re-do their operative

**6(e)**

1  reports to omit the cosmetic procedures in the surgeries that were

2  billed to insurance.

3      For example, to further conceal that the true purpose of the

4  surgery was for cosmetic gastric banding, defendant directed the

5  doctor who had performed the gastric band surgery on patient Sean W.

6  to re-do the doctor's previously-dictated operative note (which

7  listed both a hernia and gastric band procedures) into two separate

8  operative notes, so defendant could submit only the note that

9  mentioned hernia to the insurance, and withhold the operative note

10  that mentioned the lap band procedure:

> **From:** David Morrow
> **Sent:** Monday, August 24, 2009 11:35 AM
> **To:** Dr. John Coon
> **Cc:** David Morrow
> **Subject:** FW: MISSING OP NOTE Sean W██ DATE: August 16, 2009
>
> John,   Please re-dictate or revise the attached op note such that I will have on hand an op note to give ins co that only mentions the Hiatal hernia repair and a separate one to keep on had that covers the gastric banding.  Please confirm.
>
> Thank you,
>
> David M. Morrow, MD, FAAD, FAACS
> Medical Director

18  (Exh.-37 (rep309/sub15/2787962) at 1.)  Defendant and Dr. Wu would

19  also openly discuss changing the consultation and operative reports

20  and the diagnoses so their fabricated records did not look "fake:"

## RE: revis S██████, Dana HERNIA ARS 062409.doc

| | |
|---|---|
| **From:** | David Morrow |
| **Sent:** | 1/17/2010 9:19:49 PM +00:00 |
| **To:** | Allan Wu |
| **CC:** | David Morrow |
| **Subject:** | RE: revis S██████, Dana HERNIA ARS 062409.doc |
| **Attachments:** | image002.gif |

Hi Allan, I further modified your revised op note, so do not use the one you attached in prior email. Use the one in her electronic medical record. Also, I need to discuss the case with you in particular, amongst other things:

1/ Note in her general hist form she states 1997 gall bladder surgery! No mention of any left lower abdominal incisional surgery which would cause a Richeter hernia.

2. I need you to fill me on exactly what is a Richeter's hernia
3. I added some critical points to the op note which Anthem BCBS want to have for auth of a pannus excisions: bmi =or <than 30. Also, it will save us time and trouble to include the pre-auth # on the op note which I did.
4. Call me when you can today/tonight to discuss this case and others going forward.

Thank you,

David M. Morrow, MD, FAAD, FAACS

Medical Director

---

**From:** Allan Wu
**Sent:** Thursday, January 14, 2010 8:03 PM
**To:** David Morrow
**Subject:** revis S████, Dana HERNIA ARS 062409.doc

I like the op note now. Please review. If you like too, I will align codes with superbill.

**Note: everyone having ARS will have on "sort" of ventral hernia or another. I will try to "rotate" thing a little to not make us look one dimensional or "fake".**

Futher note: I think I will be using Spigelian dx code a little more frequently since it is a type of hernia that by nature does not always present with a discernable mass on photography or even physical exam.

We really should try to get our hands on the ACS article on hernias and study it. Please email me the date and page of the article or let me peek at the scratch sheet again and I will try to obtain off of Ariella's G███ account.

Thanks.

```
(Exh.-1 (rep309/sub31/2995114) at 1 (emphasis added).)
```

      **6.   Defendant and others at TMI would create and pressure**
            **patients to sign declarations with false information.**

      Once the insurance companies began to investigate the huge billings by defendant/TMI and began to reject defendant's billings for the surgeries, defendant began to have patients sign declarations that falsely stated that the surgeries were medically necessary. Defendant would sometimes personally meet with the patients and give them incentives to sign the declarations, or alternatively, threaten them if they failed to agree to sign. Many of those declarations or letters were ultimately sent to the insurance companies. Several patients stated and/or testified that the declarations in their names prepared by Morrow/TMI were false. In at least one case, defendant

submitted to insurance a letter from a patient, even though the patient had refused to sign it, and did not authorize him to send it. Several examples follow.[20]

a.   Patient Blanca M.

Blanca M. is listed as patient "BM" on the plea agreement's restitution/loss spreadsheet, and defendant's conduct involving her is charged in count 16 of the Indictment.  Blanca M. was interviewed, and also ███████ 6(e) ███████ Blanca M. was an employee of the DSUSD, who went into TMI for a free facial.  While at TMI, defendant met with Blanca M. and told her she needed surgery on other body parts.  Eventually, Blanca M. underwent 4 surgeries at TMI over a two-week period: (1) nose; (2) abdomen; (3) breast; and (4) bladder.

In response to Anthem's request for additional documents to substantiate the billed procedures, in March 2010, defendant mailed a letter (digitally signed by him) with attached documents relating to patient Blanca M.  In that letter, defendant wrote: "Attached is also a brief letter of testimonial from the patient." (Exh.-38 (letter from defendant re: patient Blanca M.) at 2.)  The first page of attached documents to that letter, page 2 of 82, is a letter dated 3/25/10, purporting to be from Blanca M.:

---

[20] Currently, there is ongoing litigation over email messages and other documents related to defendant's cover up/declaration process, based upon the attorney-client privilege.  (DE 154.)

March 25, 2010

To Anthem Blue Cross:

It is with great pleasure that I write a letter of support on behalf of The Morrow Institute and its great doctors and nurses.

I went to The Morrow Institute because they have had an excellent reputation in the Valley for decades for providing excellent care. Therefore, I consulted with them for several medical problems which I will explain in part below.

I had problems with my nose. I had frequent sinus infections, snored, and difficulty breathing. They operated on my nose and relieved my problems. I now breathe well, have no more sinus infections and rarely snore at all.

I had a C-section years ago and developed a painful hernia under the scar. I also had a large belly button hernia. Both of these caused me pain, discomfort, and bloating. Further, after having children I developed a lot of bulky excess skin hanging over my panties. I would always develop rashes under the skin especially in the heat which is most of the year here in the Desert. The excess skin coupled with the rashes really made it hard to wear pants and exercise. The Morrow Institute operated on my abdomen fixing my hernias and took away all the excess skin. It really changed my life. I do not have the discomfort and pain from the hernias, no more rashes, wear pants, and exercise.

In terms of gynecology, I really had some problems. When I coughed or sneezed, I would pass urine which was very bothersome and at times embarrassing. I also had problems passing my bowels. The Morrow Institute did surgery through the vagina on my bladder and rectum with wonderful results. I no longer pass urine when I cough or sneeze. Further, I can pass my bowels without my prior problems.

I am really happy with the results and care given me at The Morrow Institute. They are professional, thorough, caring, and competent. I am delighted to recommend them. In terms of costs, I believe there charges to be reasonable.

Sincerely,

Blanca M███

(*Id.* at 3.)  Blanca M.

**6(e)**

The FAX sent by Blanca M was obtained by the government:



6(e)

Defendant's mailing of this fraudulent letter purportedly from Blanca M., which also constitutes identity theft in violation of 18 U.S.C. §§ 1028(a)(7) and 1028A, is charged as substantive mail fraud in count 16 of the Indictment.

b.   Patient Alma Z.

Patient Alma Z.

6(e)

**6(e)**

        c.   <u>Kathryn D. (formerly Kathryn H.)</u>

Kathryn D.

**6(e)**

       7.   <u>Evidence of defendant's tax fraud: tax years 2008,</u>
<u>2009, and 2010</u>

Defendant siphoned off more than $6,000,000 in TMI receipts that
he deposited into his personal bank accounts, which he then used for
personal expenditures.  He did so for tax years 2008, 2009, and 2010,
and filed false tax returns for tax years 2008 and 2009.  The
applicable tax loss for tax years 2008 and 2009 is $631,840.[21]  The
applicable attempted tax loss for tax year 2010 is $2,076,221.  Thus,
as discussed in depth below, the total attempted tax loss for
Guidelines purposes for tax years 2008, 2009, and 2010 is
approximately $2,700,000.

---

[21] In the plea agreement, the parties agreed that the applicable
tax loss was approximately $650,000.

a. <u>Tax facts admitted by defendant in plea agreement</u>

In the plea agreement, defendant admitted that during 2008 and 2009, defendant deposited checks made payable to his surgery center and to him into bank accounts and Bank of America and Wells Fargo that were in his name, which checks constituted income for him during those respective years.  (DE 42 at 10.)  Defendant admitted that during 2008, he deposited more than $100,000 in such income, and during 2009, he deposited more than $1,500,000 in such income.  (*Id*.)  For those two years, defendant filed false tax returns that failed to report as income those siphoned funds.  Specifically, in the plea agreement, defendant admitted that on September 11, 2009, defendant filed a false tax return for 2008, which failed to report more than $100,000 in income, and that on October 12, 2010, defendant filed a false tax return for 2009, which failed to report more than $1,500,000 in income.  (*Id*. at 10-11.)

In the plea agreement, defendant admitted that when defendant's tax return preparer was preparing the federal income tax returns for him and his surgery center for tax years 2008 and 2009, defendant never told his tax return preparer that he was depositing business income into his personal bank accounts, rather than into the business bank accounts.  (*Id*. at 10.)  Accordingly, defendant's tax return preparer prepared tax returns for tax years 2008 and 2009 for himself and his surgery center that were false, because the tax returns failed to report the amount of income that defendant had failed to tell his tax return preparer about for each of those years.  (*Id*.)

b. <u>Tax year 2008: unreported income of $160,244 (tax loss ≈ $57,444)</u>

Defendant filed two false federal tax returns in 2008: the S-

corporation return (Form 1120S) for TMI and the individual tax return (Form 1040) for himself and his wife, both of which he subscribed.[22] He signed the hard copy 1120S tax return, but the 1040 tax return is filed electronically, so for that return, Morrow signed IRS Form 8879, IRS e-file signature authorization.  That is sufficient for a 7206(1) charge.

TMI's 2008 Form 1120S tax return was filed on September 11, 2009, and reported $3,465,348 in gross receipts and $3,413,239 in gross income.  However, those numbers are false because they do not include the money that defendant had diverted into his separate bank accounts that he did not disclose to Lori W., his regular tax return preparer.  That underreporting flows through to defendant's 2008 individual income tax return, because TMI issued a K-1 for $133,226 in income to defendant as a 100% shareholder, so his 2008 tax return reported only $420,475 in total income and only $3,133 in total tax. (Exh.-41 (2008 Form 1040) at 1-2.)

According to the IRS agent's review of the concealed bank accounts, the unreported income for 2008 from the two separate bank accounts is approximately $160,000.  Based on the agent's analysis and defendant's amended 2008 tax return, the tax loss applicable to defendant's false tax return for 2008 is $57,444.

           c.   <u>Tax year 2009: unreported income of $1,686,037</u>
                  <u>(tax loss ≈ $574,396)</u>

As with tax year 2008, defendant filed two false federal tax

---

[22] On April 18, 2011, about one month after FBI executed the search warrant at TMI, Morrow filed amended tax returns for 2008 for TMI and his personal taxes, which appear to report the omitted income, increasing TMI's gross receipts by $160,304, and defendant's tax due by $57,444.  (Exh.-42 (2008 Form 1040X amended tax return) at 1.)

returns for tax year 2009: the Forms 1120S for TMI and the Forms 1040 for himself and his wife, both of which he subscribed.  He signed the hard copy Form 1120S, but the Form 1040 is filed electronically, so he signed IRS Form 8879, IRS e-file signature authorization.

TMI's 2009 Form 1120S reported $4,494,497 in gross receipts.  However, that number is false, because that figure includes only the amount deposited into TMI's business bank account.  The IRS agent reviewed the bank accounts at Bank of America and Wells Fargo in defendant's name, into which defendant had deposited a total of approximately $1,761,619, none of which was ever reported to his CPA or initially to the IRS.  Most of the money in those two bank accounts was spent (in 2009 and 2010) on personal expenditures such as thousands of dollars in checks directly to his children.  (*E.g.*, Exh.-43 (08/09/09 check for $12,500 to A. Morrow and 12/09/09 check for $10,000 to D. Morrow, $26,087 to Brandeis University for tuition for one of his children, and large amounts such as $15,000 and $20,000 for American Express bills).)

Defendant's 2009 Form 1040 tax return reported only $73,920 in flow-through income from TMI, and reported total income of only $556,413 and total tax of only $51,589.  (Exh.-44 (filed 2009 Form 1040 tax return) at 1-2.)  Those numbers are false, because defendant tax return failed to report the $1,593,042 that was diverted from TMI into defendant's personal bank accounts, which defendant then spent on personal expenditures.

According to the IRS agent's review of the concealed bank accounts, the unreported income for 2009 from the separate bank accounts is approximately $1,680,000.  Based on that unreported income, the tax loss applicable to defendant's false federal tax

1  return for 2009 is $574,396.[23]

2           d.   Combined tax loss for tax years 2008 and 2009

3       Thus, for tax years 2008 and 2009, the applicable tax loss is

4  $631,840 ($57,444 for 2008 and $574,396 for 2009).

5           e.   Tax year 2010: siphoned income of $4,926,846

6                (attempted tax loss ≈ $2,076,211)

7       Defendant did the same thing for tax year 2010 as he did for

8  2008 and 2009, i.e., he diverted TMI business income into defendant's

9  slush-fund bank accounts at Bank of America and Wells Fargo.  During

10 2010, defendant deposited $3,645,340 in income into his Wells Fargo

11 bank account and $1,281,506 into his Bank of America bank account.

12 Defendant did not tell his regular tax return preparer about those

13 two bank accounts or that he continued to use those bank accounts for

14 his personal expenditures, as he had done during tax years 2008 and

15 2009.  For example, defendant continued to make huge withdrawals in

16 cash, as well as pay for his children's expenses.  (E.g., Exh.-43

17 (multiple checks for $8,666.66 to "YULA" (Yeshiva University of LA)

18 on behalf of his son J. Morrow).)

19      Just like for tax years 2008 and 2009, defendant's regular tax

20 return preparer prepared 2010 tax returns for TMI and defendant's

21 using the information given to her by defendant, which did not

22 include the two hidden bank accounts.  So, the tax return she

23 prepared for TMI reported only $8,647,699 in income, as opposed to

24 the true amount that included the two other bank accounts, i.e.,

25

26      [23] On April 18, 2011, about one month after FBI executed the
   search warrant at TMI, defendant filed amended 2009 tax returns for
27 TMI and his personal taxes, which appear to report the previously-
   omitted income, increasing TMI's gross receipts by $1,714,535, and
28 increasing tax due for defendant by $574,396. (Exh.-45 (2009 Form
   1040X amended tax return) at 1.)

approximately $5,000,000 in missing income.  Likewise, as to Morrow's 2010 individual income tax return, which showed total income of $4,384,124 and total tax of $1,133,611.

However, unlike tax years 2008 and 2009, those false tax returns for tax year 2010 were never filed with the IRS.

Why?  Not because defendant suddenly developed a conscience. Not because defendant suddenly felt bad about lying to the federal government about his income, to the tune of millions of dollars a year.  It's because the FBI had executed the search warrant in March 2011 – before the April 2011 tax deadline, so defendant was put on notice that the government was onto him.  So, defendant then went to a second tax return preparer to prepare corrected tax returns not only for 2010, but also for the prior 2 tax years.  That alone constituted an admission of the tax loss applicable to tax years 2008 and 2009.

On the 2010 tax return prepared by the original preparer (but not filed with the IRS), the total income reported was $4,384,124 with total tax of $1,133,611.  (Exh.-46 (2010 Form 1040 draft return) at 10-11.)  However, on the 2010 tax return defendant filed after the search warrant, the total income he reported increased by approximately $6,000,000 to $10,383,818, with total tax increased to $3,209,832.  (Exh.-47 (2010 Form 1040 filed return) at 1-2.)

The increase in income from the false tax return that defendant had had prepared to the amount of income that defendant reported on his filed 2010 return was $5,999,694, with corresponding $2,076,221 increase in tax due and owing.

Of course, in the course of having the amended tax returns prepared, defendant had to go to his prior tax return preparer to

obtain the business/tax records he had given to her, so he could
provide those to the new tax return preparer.  What defendant did
there - lying to her - gives more insight into his character - or
more specifically, the lack thereof.

**6(e)**

**6(e)**

    f.   <u>Examples of personal expenditures from the</u>

<u>siphoned funds</u>

The IRS agent identified various checks from defendant's bank accounts where the siphoned funds were deposited, which he used for personal expenditures.  For example, on March 16, 2009, he wrote check number 1045 payable to American Express in the amount of $15,000.  On April 1, 2009, he wrote check number 1046 in the amount of $4,100 to pay for a trip to Israel for one of his sons. On August 9, 2009, he wrote check number 1055 in the amount of $12,500 payable to A. Morrow. On August 20, 2009, he wrote check number 1052 in the amount of $8,333 payable to YULA (Yeshiva University of Los Angeles) on behalf of J. Morrow. On November 20, 2009, he wrote check number 1053 in the amount of $8,333 payable to YULA on behalf of J. Morrow. On December 7, 2009, he wrote check number 1059 payable to American Express in the amount of $20,000. On December 9, 2009, he wrote check number 1061 in the amount of $10,000 payable to D. Morrow.  Defendant also had cash withdrawals in excess of $300,000.

    g.   <u>Tax conclusion</u>

Defendant siphoned millions of dollars in business income that he failed to report to his tax return preparer, and filed false federal tax returns for 2008 and 2009 that failed to report a total of more than $1.5 million dollars in income, which results in a tax loss of approximately $631,000 for 2008 and 2009.  However, what

defendant's conduct for the 2010 tax year shows is that the $631,000 tax loss for just tax years 2008 and 2009 is artificially low in measuring defendant's tax offenses.

In other words, but for the FBI search warrant in March 2011, defendant would have filed the already-prepared false tax returns for 2010, which would have increased his tax loss by millions of dollars, from approximately $630,000 to approximately $2,707,000 ($631,000 + $2,076,000), which would accordingly have raised the offense level for the tax fraud by 2 levels, from 22 to 24.  But, because defendant was altered to federal law enforcement before he filed the false tax returns he had prepared for 2010, he never filed those false tax returns, so under the tax law, the government could not charge him with false return for 2010.  However, that does not mean that the Court cannot hold him responsible for his 2010 conduct.

Defendant's conduct of siphoning almost $6,000,000 in income during 2010 by using the same techniques as 2008 and 2008 is relevant conduct to the tax year 2008 to which he pleaded guilty, so it falls within the total tax loss attributable to the offense.  See U.S.S.G. § 2T1.1 Application Note 2 (giving examples of conduct encompassed as part of the tax loss attributable to the offense: "the defendant uses a consistent method to evade or camouflage income," "the violations involve the same or a related series of transactions," or "the violation in each instance involves a failure to report or an understatement of a specific source of income").  Even though the tax loss for tax years 2008 and 2009 totals only approximately $630,000, the total attempted tax loss is $2,707,000, which is the applicable loss to calculate the Guidelines offense level for the tax offense to which defendant pleaded guilty.  That loss amount falls within the

$1.5M to $3.5M range, which results in an offense level of 22.

Thus, the applicable Guidelines offense level for the tax offense is 24 (22 for the loss and +2 for criminally-derived income).

Last, what the tax fraud also shows is that defendant was not only cheating the insurance companies by orchestrating and leading an extensive health care fraud, but also, he was cheating the U.S. Treasury by hiding millions of dollars in income from the IRS, even though he was already a very rich and privileged physician.

## III. SENTENCING GUIDELINES

### A.    Summary of Guidelines calculation

The government believes that the final applicable Guidelines level is **41**.  The applicable loss amount is based on an intended loss of approximately $42,000,000, which falls in the Section 2B1.1 range of more than $25,000,000 but less than $65,000,000.  In addition to the loss amount, as described in detail in each of the subsections below, the government believes that the following additional Guidelines factors/enhancements apply: (1) aggravating role (U.S.S.G. § 3B1.1); (2) abuse of position of trust (U.S.S.G. § 3B1.3); (3) more than 10 victims (U.S.S.G. § 2B1.1(b)(2)(A)); (4) sophisticated means (U.S.S.G. § 2B1.1(b)(10)(C)); and (5) obstruction of justice (U.S.S.G. § 3C1.1).  Applying those enhancements, as well as the grouping rules under Section 3D1.1, yields the following:

**Count 21: mail fraud**

| | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| $25M < Loss < $65M: | +22 | U.S.S.G. § 2B1.1(b)(1)(L) |
| More than 10 victims: | +2 | U.S.S.G. § 2B1.1(b)(2)(A) |
| Sophisticated means: | +2 | U.S.S.G. § 2B1.1(b)(10)(C) |
| Aggravating role: | +4 | U.S.S.G. § 3B1.1(a) |

Abuse of position of trust:      +2        U.S.S.G. § 3B1.3

Obstruction of justice:          +2        U.S.S.G. § 3C1.1

**Total for count 21:**          41

### Count 22: false tax return

Base Offense Level:        22   U.S.S.G. § 2T1.1(a)(1); 2T4.1(I)

($1.5M < loss < $3.5M)

>$10K criminal activity:        +2   U.S.S.G. § 2T1.1(b)(1)

**Total for count 21:**          24

Because as described below, these two offenses do not group, the combined offense level must be calculated:

### Combined Offense Level

Group-1 (count 21):       1 Unit    U.S.S.G. § 3D1.4(a)

Group-2 (count 22):       0 Unit    U.S.S.G. § 3D1.4(c)[24]

**TOTAL:**                1 Unit

### FINAL COMBINED OFFENSE LEVEL

Total Offense Level for Count 21:  41

Increase From Grouping:           +0   U.S.S.G. § 3D1.4

Acceptance of Responsibility:      -0   U.S.S.G. § 3E1.1

**Combined Offense Level:**        41

Thus, the final offense level is **41**. Accordingly, for that offense level with Criminal History Category of I, defendant's advisory Guidelines sentencing range is 324-405 months' imprisonment.

### B.   Applicable loss amount

The parties agreed in the plea agreement to an attempted loss

---

[24] Count 21 has an offense level of 41, while count 22 has an offense level of 24, which is a difference of 17 levels (41-24). Under Section 3D1.4(c): "Disregard any Group that is **9** or more levels less serious than the Group with the highest offense level.  Such Groups will not increase the applicable offense level but may provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level."

amount of $3.49 million (DE 42 at 9, 11), which was a purposely cabined attempted loss amount that the government could at that time prove beyond a reasonable doubt.  As discussed below, the government can prove by a preponderance of evidence that the applicable attempted loss amount is $42,000,000.  Based on that attempted loss amount, which falls between $25,000,000 and $65,000,000, Section 2B1.1(a)(1)'s base offense level of 7 for loss should be increased by 22 levels under U.S.S.G. § 2B1.1(b)(1)(L).

### 1.   Actual loss amounts formally claimed by victims

By victim letters to the Court or the USAO, the following victim insurance companies have formally claimed actual loss figures of:

- Anthem (12/02/16):          $17,885,290[25]
- REEP (02/08/17):            $7,033,222[26]
- BC/BS of Mass. (07/28/16):  $5,004,554

### 2.   Attempted loss agreed to in plea agreement

The parties agreed that for purposes of the plea agreement, the intended loss from defendant's fraudulent scheme was $3,491,053.65. The method the parties used to estimate this limited loss amount consisted of the following:

- Start with the intended loss amount from the 20 substantive counts of mail fraud in the Indictment (Counts 1-20);

- Add to that amount all other procedures billed for those same patients from those 20 counts; and

- Subtract various procedures from those patients where the proof was less than beyond-a-reasonable-doubt and/or no fabricated

---

[25] This amount includes approximately $6,485,457 paid on behalf of REEP.

[26] This amount includes $6,485,457.47 in medical claims paid, $197,765 in attorney's fees, and $350,000 in consulting fees.

1    documents were identified.

2    In the first half of the columns on the parties' agreed-to

3    spreadsheet, the spreadsheet lists by name, date of service ("DOS"),

4    the type of surgery/procedure, the amounts billed for facility fee,

5    professional fee, and total for the procedure, and then the total for

6    all the applicable procedures, which total to the intended loss of

7    $3,491,053.65.  The second half of the columns on the spreadsheet

8    lists the amount actually paid out, for restitution of $1,494,647.65.

9    Thus, this is the calculation the government made with the

10   defense to come up with the $3.49M attempted loss amount:

11   $1,628,485    Total amount billed for procedures listed in counts 1-

12                 20 of the Indictment;

13   $3,367,928 +  Additional procedures billed for those same patients

14                 from counts 1-20;

15   $4,996,413    Subtotal of total amounts billed for all procedures on

16                 patients from counts 1-20;

17   $1,505,360 -  Deducted procedures as part of plea negotiations, due

18                 to less than beyond-a-reasonable-doubt evidence or no

19                 found fabricated documents

20   **$3,491,053**    Final attempted loss amount agreed to by the parties

21   However, that loss amount was a negotiated amount that was

22   purposely cabined to the patients listed in substantive counts of the

23   Indictment and meant to be a loss amount that the government could

24   prove beyond a reasonable doubt at that time, as opposed to the

25   entire loss amount that can be proved by a preponderance of evidence.

26   Because defendant has breached the plea agreement, the

27   government is not bound by that limited loss amount.

28

### 3.   **Updated attempted loss amount**

The government bears the burden to prove the intended loss by a preponderance of the evidence: "Ordinarily, a district court uses a preponderance of the evidence standard of proof when finding facts at sentencing, such as the amount of loss caused by a fraud." United States v. Treadwell, 593 F.3d 990, 1000 (9th Cir. 2010).  Even though in some cases the standard of proof may rise to "clear and convincing," that is not the situation here, when the losses are based on the extent of the fraud conspiracy, as opposed to uncharged conduct.  E.g., United States v. Berger, 587 F.3d 1038, 1049 (9th Cir. 2009).[27]

"The court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 app. n.3(C).  A district court's method for calculating the amount of loss must be reasonable, but it "need not make its loss calculation with absolute precision." United States v. Showalter, 569 F.3d 1150, 1161 (9th Cir. 2009); see also United States v. Santos, 527 F.3d 1003, 1007 (9th Cir. 2008) ("the district court is not required to calculate loss 'with absolute precision,' but 'need only make a reasonable estimate of the loss,'"); United States v. Norman, 776 F.3d 67, 79 (2d Cir. 2015) ("The sentencing court is not required to calculate the amount of loss with certainty or precision but 'need only make a reasonable estimate of the loss' that is 'based on available information.'")

---

[27] "Here, like in Riley, Armstead, and Garro, the enhancement under U.S.S.G. § 2F1.1 is based entirely on the extent of the fraud conspiracy for which Berger was convicted. Applying the holdings of Riley, Armstead, and Garro to this case, we conclude that the district court did not err in using a preponderance of the evidence standard to determine the amount of loss for purposes of § 2F1.1."

For the approximately 250 patients' procedures that defendant billed to Anthem, approximately 20% underwent 4 or more surgeries:



For that same group of approximately 250 patients, there were 77 billed nose surgeries, 63 billed hernia surgeries, 59 billed gyn surgeries, 42 billed vein surgeries, and 36 billed breast surgeries:



As discussed directly below, the government believes that the applicable loss is more than $25,000,000, but less than $65,000,000, which equates to a +22-level adjustment under Section 2B1.1(b)(1)(L).

Defendant/TMI billed the following amounts:

| TOTAL BILLED AMOUNTS | | | |
|---|---|---|---|
| INSURANCE COMPANY | BILLED AMOUNTS | APPROXIMATE NUMBER OF PATIENTS | APPROXIMATE TIME FRAME |
| Anthem Blue Cross | $57,218,015 | 257 | 02/2008–01/2011 |
| AETNA | $5,024,991 | 38 | 01/2007–03/2011 |
| Blue Shield of California | $13,186,125 | 52 | 07/2007–02/2011 |
| CIGNA | $8,738,647 | 35 | 01/2009–02/2011 |
| Principal Life | $536,687 | 5 | 01/2007–10/2010 |
| **TOTAL** | **$84,704,465** | **387** | |

(Exh.-138 at exhs. 1-5; Exh.-138A through 138F.)[28]

Thus, based on the billing records provided by the various insurance companies, the amount billed by defendant to insurance companies from 2007 to the beginning of 2011 was at least approximately $84,000,000.  This number is still probably a bit low, because defendant continued to submit bills or re-bills through 2013.

However, to use a conservative method to estimate the total loss, the government took 50% of that total amount billed, which

---

[28] Anthem billed both for where Anthem was the primary insurer, as well as a third-party biller for REEP and Blue Cross/Blue Shield of Massachusetts.  And the number of patients for CIGNA does not include 44 patients for whom the amount billed was less than $1,000.

results in an intended loss amount of $42,000,000 ($84,000,000 *
0.50).  That estimate is low, given that of the approximately hundred
individuals who were interviewed by the FBI, California Department of
Insurance, IRS, or the insurance company representatives, or for whom
false documents were discovered, almost all admitted that some or all
of the procedures done at TMI were cosmetic.[29]  For just those
approximately 105 patients, the total billed was approximately
$48,500,000, and the approximate total paid $14,500,000.  (Exh.-139.)

Moreover, this amount is roughly double the actual amount paid,
which according to the next section is approximately $22,000,000.

Thus, the government believes that the intended loss of
defendant's criminal activity should be approximately $42,000,000 for
Guidelines purposes.[30]

### 4.   Updated actual loss amount

In the plea agreement, the parties agreed that the actual loss
amount for the purposes of restitution was $1,493,657.  Based on one
check that was issued but subsequently frozen/cancelled, that actual
loss/restitution amount was reduced to $1,396,062.  However, just as
with the attempted loss figure from the plea agreement, the plea
agreement's actual loss/restitution amount was purposely cabined to
some (but not all) of the procedures billed for the patients listed

---

[29] For those approximately 105 patients, 23 underwent 1 surgery,
14 underwent 2 surgeries, 11 underwent 3 surgeries, 18 underwent 4
surgeries, and 31 underwent 5 or more surgeries.  (Ex. 139.)  Also, a
whopping 79 of them had abdomen surgeries, 67 had gyn procedures, 65
had nose surgeries, and 62 had breast surgeries.  (*Id.*)
[30] The government argues that the applicable intended loss amount
now falls in the $25M to $65M range, instead of the $3.49M from the
plea agreement, which thus increases the Section 2B1.1(b)(1) loss
adjustment by 6 levels, from +16 to +22.  Also, based on defendant's
breach of the plea agreement, the government is no longer required to
recommend low-end, and could move for an upward departure.

1    in Counts 1-20 of the Indictment.

2         According to the documents received from the insurance

3    companies, the following insurance companies paid the following

4    amounts to defendant through early 2011:

5         Anthem:              $6,395,289[31]

6         AETNA:               $1,821,077

7         BC/BS Mass:          $5,004,544

8         CIGNA:               $2,226,339

9         Principal Life:        $80,900

10        REEP:                $6,485,457

11        **TOTAL:             $22,013,606**

12        Thus, the actual loss amount is $22,013,606.

13             5.   <u>Restitution</u>

14        In the plea agreement, defendant agreed to "[m]ake restitution

15   at or before the time of sentencing."  (DE 42 ¶ 2h.)  He also

16   acknowledged that he would "be required to pay full restitution to

17   the victims of the offenses to which defendant" pleaded guilty, as

18   specified in Exhibit A to the plea agreement.  (*Id.* ¶ 11.)  Defendant

19   further agreed "that the Court may order restitution to any victim of

20   any of the following for any losses suffered by that victim as a

21   result: (a) any relevant conduct, as defined in U.S.S.G. § 1B1.3, in

22   connection with the offense to which defendant is pleading guilty;

23   and (b) any counts dismissed pursuant to this agreement as well as

24   all relevant conduct, as defined in U.S.S.G. § 1B1.3, in connection

25   with those counts."  (*Id.*)

26

27        [31] This figure is obtained by taking the $17,885,290 total paid
     by Anthem, and subtracting the amounts of BC/BS of Massachusetts and
28   REEP, which have made their own separate claims, and were included in
     Anthem's claim under "OTHER BILLED."

As specified in the above section, the actual amounts that insurance companies paid defendant and his related entities is $$21,932,706.  Those payments were all for procedures at TMI from 2007 to 2011, which fall within the scheme time frame.  Thus, restitution should be ordered to the above listed entities in the above-listed amounts, for total restitution of $21,932,706.

## C.   U.S.S.G. § 3B1.3: Abuse of position of trust

The Revised PSR found that defendant abused a position of trust he had with the insurance companies.  (DE 149 ¶¶ 114-15.)

Defendant was a licensed physician at the time he orchestrated the fraud against the insurance companies.  In said position, defendant occupied a position of trust with: (1) his patients; (2) the insurance companies he billed; and (3) the doctors who worked for him at his surgery center.  Defendant abused his position of trust with each of them – *i.e.*, he abused the "mantle of trust" accorded to medical doctors in general – in a manner that significantly facilitated both the commission and concealment of his multi-million dollar health care fraud scheme.

The five different ways defendant abused his position of trust are: (1) performing procedures on patients without their knowledge or informed consent; (2) pressuring patients to undergo procedures or treatments that they did not need, so he could bill them to insurance; (3) reporting false symptoms and diagnoses to the insurance companies; (4) unlawfully using identification information of patients; and (5) violating HIPAA by disclosing patients' protected health information to cappers.  Defendant also violated the position of trust he had with the doctors working for him.

Thus, defendant's offense level should be increased by 2 levels

under U.S.S.G. § 3B1.3 based upon his abusing a position of trust. Any of the six following types of abuse of trust establish the Section 3B1.3 abuse of trust two-point enhancement.

1.  **To further his fraudulent scheme, defendant abused his position of trust by performing procedures on patients without their knowledge or informed consent, which sometimes resulted in ongoing medical problems.**

Defendant performed procedures or parts of procedures without patients' knowledge, *e.g.*, patients Angie B. and Blanca M.  A physician occupies a position of trust vis-à-vis his patients,[32] which defendant abused with this patients.  E.g., United States v. Sidhu, 130 F.3d 644, 656 (5th Cir. 1997) ("Having reviewed the record, we are convinced that compromising his patients' trust was a necessary component of Gifford's lucrative scheme to maximize his earnings.  Gifford's abuse of his patients' trust 'significantly facilitated the commission' of the offense.")

Patient Angie B. nose surgery: Angie B. is listed as patient "AB" on the plea agreement's restitution/loss spreadsheet, and defendant's conduct involving her is charged in counts 3, 4, 10, 13, and 14 of the Indictment.

6(e)

---

[32] The notes to Section 3B1.3 give as an example a doctor violating that position of trust.  See U.S.S.G. § 3B1.3 Application Note 1 (listing as an example of an abuse of a position of trust "the criminal sexual abuse of a patient by a physician under the guise of an examination.").



6(e)

    Defendant's actions regarding this patient, Angie B., are a
perfect example of abuse of a position of trust.  Because defendant
was a respected doctor, Angie B. trusted him when he told her that
she needed the nose surgery, even after her regular doctor had told
her that she should not do the surgery.  Pressuring her to undergo
that surgery when she did not need it would itself qualify as abuse
of trust.  However, defendant went further, and when that nose

surgery was performed, a piece of cartilage from Angie B.'s ear was taken to form the nose, which she was also not told beforehand. That's a clear abuse of position of trust.

Patient Blanca M. breast reduction: Blanca M. is listed as patient "BM" on the plea agreement's restitution/loss spreadsheet, and defendant's conduct involving her is charged in count 16 of the Indictment.

**6(e)**

2.  **To further his fraudulent scheme, defendant abused his position of trust to pressure patients to undergo procedures or treatments that they did not need, so he could bill insurance for those procedures.**

Defendant would both pressure patients to undergo procedures they did not need by scaring them with medical problems that he said would result if they did not undergo the procedures, as well as requiring almost all patients to undergo IV therapy after the surgeries, whether they needed it or not (because he could then bill the IV therapy to insurance).

a.  Defendant pressured patients to undergo **surgeries they did not need, so he could bill them to insurance.**

As these examples show, defendant would try to scare patients with a parade of horribles that would result if they did not get the surgeries that he wanted them to undergo (so he could then bill them to insurance).  In fact, in one case, defendant sought pre-authorization for a surgery, listing false symptoms, without even the

1   patient's knowledge or consent. (That patient wisely did not undergo

2   the nose surgery.)

3        Patient Kathryn D.: As discussed above, patient Kathryn D.

**6(e)**

        Patient Annette F.:

**6(e)**

**6(e)**

**6(e)**

However, as discussed above, defendant further abused his position of trust with her, in that defendant, without Annette F.'s knowledge or consent, had sought pre-authorization from the insurance company to perform nose surgery on her, even though she had no problems with her nose and told him that she was not interested in doing a nose surgery.

Patient Michelle B.: As discussed above, after Michelle B. received the check from a surgery she had undergone at TMI (eyelid surgery), she kept $10,000 for herself, which defendant discovered. Then,

**6(e)**

B. underwent 6 procedures at TMI (eye, breast, abd, nose, breast revision, gyn) and had 6 pre-auths (eyes, nose, abd, breast, breast, gyn).

Georgina E.: TMI pre-authorized 4 surgeries (abdomen, breast, nose, and veins) for Georgina E., but she underwent only two (abdomen and breasts), approximately 3 days apart.

**6(e)**

**6(e)**

b.   Defendant pressured patients to undergo
**treatments** that they did not need, so he could
bill them to insurance.

Defendant would have the majority, if not all, of the patients come in after the surgeries to receive post-operative IV antibiotic therapy, even though it was not necessary, because he could then bill insurance for those treatments.  Dr. Wu

**6(e)**

3.   **To further his fraudulent scheme, defendant abused his positon of trust to the insurance companies when he falsely reported symptoms from the patients and fake diagnoses.**

The Revised PSR found that defendant abused his position of trust with the insurance carriers when committing his fraudulent scheme.  (DE 149 ¶¶ 114-15.)  The government agrees.

When executing his scheme, defendant reported false symptoms and diagnoses and other false information about patients to the victim insurance companies.  In addition to the position of trust that defendant occupied with the patients because he was their doctor, defendant also occupied a position of trust with the insurance companies.  E.g., United States v. Liss, 265 F.3d 1220, 1229 (11th Cir. 2001) ("Of the other circuits that have addressed whether a physician occupies a position of trust in relation to Medicare, or a private insurance carrier, all have answered that question in the affirmative."); United States v. Sherman, 160 F.3d 967, 968-71 (3d

Cir. 1998) (affirming district court's application of abuse of trust enhancement for doctor who billed insurance companies for accident-related medical services that he did not provide); United States v. Iloani, 143 F.3d 921, 923 (7th Cir. 1998) ("We are persuaded by the reasoning of the Fourth and Ninth Circuits in these cases, and we therefore conclude that the district court did not err in concluding that Dr. Iloani abused a position of trust with the insurance companies in fraudulently billing such companies for medical care.") (citing cases); see also United States v. Fata, 650 F. App'x 260, 263 (6th Cir. 2016), cert. denied, 137 S. Ct. 2175, 198 L. Ed. 2d 244 (2017) ("Fata also occupied a position of trust vis-à -vis the insurers—both public and private—that he billed for fraudulent services.").

Here, defendant's position as a doctor allowed him to effectuate a fraudulent scheme that was difficult for the victim insurance companies to detect. Defendant was a licensed medical doctor. In this capacity, defendant was afforded discretion to make diagnoses and to determine the proper courses of treatment for his patients. His fraud consisted of creating false diagnoses and prescribing false procedures or courses of treatment. In addition, defendant falsified his patients' consultation and operative reports, medical charts, and other medical records, which are the documents that the insurance companies would most naturally request – and in fact in this case did request – in order to detect a fraud. Those falsifications made defendant's fraud that much more difficult to detect and to completely uncover. In other words, defendant tried to cover his tracks with his own falsified records. Accordingly, it would be almost impossible for someone to verify the accuracy of defendant's

medical records without an independent examination of each of the patients themselves.[35]

Thus, Section 3B1.3's enhancement for abuse of position of trust independently applies on this basis also.

4.   **To further his fraudulent scheme, defendant abused his position of trust to the patients by unlawfully using their identification information.**

Because of his position as a doctor, defendant had access to patients' means of identification, as well as had access to the means of identification of doctors whom he paid to perform surgeries at TMI.  As described in depth below, defendant abused such position to use without authority, as well as to obtain, transfer, or issue unlawfully, those means of identification (*i.e.*, committed identity theft).  Section 3B1.3's application notes provide that the abuse of position adjustment "shall apply to" "[a] defendant who exceeds or abuses the authority of his or her position in order to obtain, transfer, or issue unlawfully, or use without authority, any means of identification."  U.S.S.G. § 3B1.3 Application Note 2(B) (emphasis added).)[36]  Thus, Section 3B1.3's two-point enhancement for abuse of position of trust applies on this basis too.

a.   Patient Blanca M.

As described above, defendant sent a fraudulent patient testimonial letter to the insurance company when he used Blanca M.'s

---

[35]

**6(e)**

[36] The Application Note even gives as an example "a hospital orderly who exceeds or abuses the authority of his or her position by obtaining or misusing patient identification information from a patient chart."

name and sent a letter purportedly authored by her to the insurance company, without her authorization.  Defendant sent that fraudulent letter in response to the insurance company's request for additional documents, because they were holding up paying the claim.

b.   Patient Georgiana E.

Defendant did something similar for patient Georgiana E. Georgina E. is listed as patient "GE" on the plea agreement's restitution/loss spreadsheet, and defendant's conduct involving her is charged in counts 7 and 9 of the Indictment.

**6(e)**

March 24, 2010

To Anthem Blue Cross:

I am pleased to write a letter of support on behalf of The Morrow Institute and its doctors and nurses.

I went to the Morrow Institute to deal with several medical problems amongst them was my abdomen.  I had a belly button hernia and a hernia under my prior C-section scar.  Both of which caused me periodic pain and discomfort.  In addition, I had excess skin hanging over my private area causing me rashes and interfering with wearing clothes and other daily activities.  These problems were very troublesome and I am pleased to say that after the abdominal surgery done at the Morrow Institute, I no longer have those problems.  In addition, due to their great care, I had no complications or infections.

I am very pleased with the results and their outstanding and comprehensive care both before and after surgery.  I highly recommend them and believe their fees were reasonable and fair for the services provided.

Sincerely,

Georgiana L. █████                3/24/10
Georgiana L. █

**6(e)**

Further, agents confirmed that defendant's username had created the word version of that letter approximately 10 minutes before the PDF version with the cut-and-pasted signature was saved.[37]

Because defendant unlawfully used the means of identification of both patients and doctors who worked for him, Section 3B1.3's two-point enhancement for abuse of position of trust independently applies on this basis too.

----

[37] Various doctors would perform surgeries at TMI on an independent contractor basis.  Two of them, Drs. John Coon and Robert Hardesty, █████████████████████████████████

**6(e)**

1

     **5.**    **To further his fraudulent scheme, defendant abused his**

2

            **position of trust to patients by disclosing their**

3

            **protected health information to cappers, which also**

4

            **violated HIPAA.**

5

    In furtherance of defendant's health care fraud scheme, he

6

unlawfully disclosed HIPAA-protected patient information to cappers.[38]

7

By doing so, he abused his position of trust to those patients.

8

    Husband and wife Joe and Lisa C. acted as marketers/cappers for

9

_____

10

    [38] Among other things, HIPAA makes it a violation to "disclose[]
individually identifiable health information to another person."  42

11

U.S.C. § 1320d-6(a)(3).  If such disclosure is unauthorized, the
disclosure is punishable as a misdemeanor, 42 U.S.C. § 1320d-6(b)(1),

12

which does not require that a defendant know what he is doing is
illegal.  United States v. Zhou, 678 F.3d 1110, 1115 (9th Cir. 2012)

13

(holding that for obtaining health information violation, defendant
need know only that he obtaining individually identifiable health

14

information, not that what he was doing was illegal).  On the other
hand, if the disclosure "is committed with intent to sell, transfer,

15

or use individually identifiable health information for commercial
advantage, personal gain, or malicious harm, be fined not more than

16

$250,000, imprisoned not more than 10 years, or both."  42 U.S.C.
§ 1320d-6(b)(3).  Section 1320d(a) also provides that " a person

17

(including an employee or other individual) shall be considered to
have obtained or disclosed individually identifiable health

18

information in violation of this part if the information is
maintained by a covered entity (as defined in the HIPAA privacy

19

regulation described in section 1320d-9(b)(3) of this title) and the
individual obtained or disclosed such information without

20

authorization."
    42 U.S.C. § 1320d, "Definitions," which is located in Title 42,

21

United States Code, Chapter 7, Subchapter XI, Part C, defines
"individually identifiable health information:"

22

      The term "individually identifiable health information"
    means any information, including demographic information

23

    collected from an individual, that-
    (A) is created or received by a health care provider,

24

        health plan, employer, or health care clearinghouse;
        and

25

    (B) relates to the past, present, or future physical or
        mental health or condition of an individual, the

26

        provision of health care to an individual, or the past,
        present, or future payment for the provision of health

27

        care to an individual, and-
            (i) identifies the individual; or

28

            (ii) with respect to which there is a reasonable
    basis to believe that the information can be used to

defendant in his fraudulent scheme.   Joe testified in the grand jury

**6(e)**

Here, defendant sent an email message on 08/12/10 to Lisa C. and Joe C., who were the cappers he used to bring in patients.   In that email, with subject "RE: STAPLE'S PTS PRE-AUTHS LIST," defendant directs Lisa C. to call the patients and "see what is going on with getting them sch for surgery."

**6(e)**

identify the individual.

[39] In addition to participating in the scheme as cappers, Lisa C. (listed as co-conspirator 2) further conspired in the underlying health care fraud with defendant, because she advised him on how to code the cosmetic procedures so that they would appear as medically necessary, and how to avoid "red flag" terms and billing codes.



6(e)

(*Id.*)  That disclosed information falls within 42 U.S.C. § 1320d's definition of "individually identifiable health information," because that information was received by TMI (a health care provider),[40] it relates to the provision of health care to an individual (lists specific medical procedures), and it identifies the individual (by name).

Defendant further violated HIPAA in the email correspondence between him and Joe C. on July 22, 2010, where they discuss obtaining the signature for the one-page consent for patient Anna Marie G.,

---

[40] 42 U.S.C. § 1395x(u) defines "provider of services" and 1395x(s) defines "medical and other health services."

which consent Joe C. had sent the day before to Ms. G.'s husband.

**6(e)**

Thus, defendant also abused his position of trust by unlawfully using the identification information of 20 patients when he disclosed their names and HIPAA-protected information to cappers as part of his scheme.  Accordingly, Section 3B1.3's enhancement for abuse of position of trust independently applies on this basis also.

> 6.    **Defendant abused his position of trust with the other doctors by illegally signing operative reports using their names.**

Defendant signed many operative reports using the names of other doctors, which he then sent to insurance.  Dr. Hardesty

**6(e)**

- 10/07/09 operative report for breast procedure for Kimberly R. with digital signature purportedly by Hardesty (Exh.-55 (file 10259434910) at 10);

- 07/13/2009 operative report for abdomen procedure for Linda A. with digital signature purportedly by Hardesty (Exh.-56

(file 09260135933) at 6);

- 07/28/2009 operative report for abdomen procedure for Thelma A. with digital signature purportedly by Hardesty (Exh.-57 (file 09350121135) at 4);

- 08/12/2009 operative report for breast procedure for Kathryn D. with digital signature purportedly by Hardesty (Exh.-58 (file 10032432263) at 6);

- 07/24/2009 operative report for abdominal procedure for Renee I. with digital signature purportedly by Hardesty (Exh.-59 (file I. op report) at 14);

- 07/13/2009 operative report for nose procedure for Blanca M. with name (but no signature) for Hardesty (Exh.-60 (file Blanca M. op report) at 8);

- 10/07/09 operative report for abdominal procedure for Mary G., with Hardesty digital signature (Exh.-61 (file 504383) at 2).

The same occurred with Dr. Coon, who

**6(e)**

Thus, defendant also breached his position of trust with these two doctors by digitally signing operative and other reports in their names.

### 7.   Abuse of position of trust conclusion

As the above 15 pages detail, defendant abused his position of

trust in multiple ways to further his multi-million-dollar health care fraud scheme:

- Falsely reporting symptoms and diagnoses to the insurance companies;

- Performing procedures on patients without their informed consent;

- Pressuring patients to undergo procedures or treatments they did not need;

- Unlawfully using patients and other doctors' names and signatures;

- Unlawfully disclosing patients' HIPAA-protected health information; and

- Improperly signing operative reports in the names of other doctors.

Thus, defendant's offense level should be increased by 2 levels for abuse of position of trust, pursuant to U.S.S.G. § 3B1.3.[41]

**D.    U.S.S.G. § 2B1.1(b)(2)(A)(i): Defendant's scheme had more than 10 victims, which included insurance companies, patients on whom procedures were performed without authorization and suffered bodily injury, and patients whose identification or medically-protected information was unlawfully used or disclosed.**

Under Section 2B1.1, "[i]f the offense … involved 10 or more victims …, increase by 2 levels."  U.S.S.G. § 2B1.1(b)(2)(A)(i).

---

[41] Defendant also used his "special skill" of being a physician to facilitate the crime, because he knew what to change on the medical records to improve the chance that billed procedures would slip through and be paid by insurance.  However, because aggravating role already applies, the adjustment for use of special skill would not able to be employed in addition to the Section 3B1.1 aggravating role, while the abuse of trust adjustment is not so limited.

"'Victim' means (A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the offense." (U.S.S.G. § 2B1.1 app. n.1.)   In addition, when calculating the number of victims under Section 2B1.1(b)(2), "victim" also includes "any individual whose means of identification was used unlawfully or without authority." (*Id*. at app. n.4(E)).

Defendant's scheme had multiple types of victims, including: (1) insurance companies who sustained actual loss; (2) patients who sustained bodily injury as a result of the offense; (3) patients whose means of identification were used unlawfully or without authority; and (4) patients whose protected health information was unlawfully disclosed in violation of HIPAA.  All of those total to more than 10 victims.

As described immediately following, defendant's offense involved 10 or more victims.  Thus, his offense level should be increased by two levels pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i).

### 1.   Insurance company victims (7 victims):

There are at least seven insurance company victims who sustained actual loss: three on the admitted-to actual loss amount spreadsheet from the plea agreement and four additional identifiable insurance company victims.  As described in detail above, defendant defrauded insurance companies to the tune of more than $20,000,000 million dollars in actual loss, and attempted to steal many millions more from those victims.  Defendant did so by getting paid for cosmetic surgeries, because he tricked the insurance companies into believing that they were medically necessary.  The seven insurance companies/entities that directly paid (or suffered losses from)

1  defendant from fraudulently-billed procedures as part of defendant's

2  scheme include:

3         • Aetna;

4         • Anthem Blue Cross;

5         • Blue Cross/Blue Shield of California;

6         • Blue Cross/Blue Shield of Massachusetts;

7         • CIGNA;

8         • Principal Life; and

9         • REEP.

10        2.    **Patient victims - bodily injury (10 victims):**

11        There are at least 10 patient victims who sustained bodily

12  injury as a result of defendant's offense.  As described above,

13  defendant victimized many patients as part of the scheme.  The

14  following chart lists several of said victims, which includes

15  performing procedures without consent, as well as disfiguring

16  patients:

| VICTIM NAME | PROCEDURES | FACTS | SOURCE(S) |
|---|---|---|---|
| Angie B. | Nose | -Underwent total of **4** procedures at TMI (nose, abd, incontinence, veins) -Excruciating pain in her ear; -Can no longer blow her nose normally, but instead must use Q-tips. -Large piece of cartilage in nostril | Interview 09/24/12 (Exh.-62) Interview 10/04/12 (Exh.-63) **6(e)** |
| Michelle B. | Breast, Abd | -Underwent total of **6** procedures at TMI (eye, breast, abd, nose, breast revision, gyn) -Virus that left a hole in her stomach, after her abdominal surgery, which took her 4 months to recover.  Still sore and numb, with scar from hole. | Interview 4/13/11 (Exh.-64) Interview 06/20/11 (Exh.-65) **6(e)** |

| VICTIM NAME | PROCEDURES | FACTS | SOURCE(S) |
|---|---|---|---|
| | | -Breasts left deformed, with lump on right breast, with constant pain, and nipple displacement (in her words, she's "deformed looking") | |
| Anna G. | Breast | -Underwent total of **5** procedures at TMI (nose, abd, 2 gyn, breast) Nipple cut | Interview 09/13/11 (Exh.-66) |
| Ruben G. | Nose, Lapband | -Underwent total of **2** procedures at TMI, back-to-back surgeries -severe respiratory distress after coming home from surgeries, which required going to ER - 3 weeks after nose surgery, stiches came out, and he had to go back into TMI to have his nose flap "glued back on" - as a result of surgery, long term cartilage problem in nose | Interview 09/01/11 (Exh.-67) **6(e)** |
| Jill G. | Arms | -Underwent total of **15** procedures at TMI (gyn, nose, abd, breast, vein, arm, abd revision, breast revision, vein) -After undergoing those multiple un needed surgeries to other parts of body, underwent arm surgery (a type of surgery in which TMI was not experienced), which resulted in necrotic skin of her arms, and required her to undergo 21 days in a hyperbaric chamber, including very painful, and resulted in very large, painful scars | Interview 08/16/11 (Exh.-69) **6(e)** |
| Kristy H.[42] | Nose | -Nose surgery had to be re-done, and even after that | Interview 01/24/13 |

---

[42] Patient victim Kristy H. submitted a Victim Impact Statement dated 12/14/16. (Exh.-74.)

| VICTIM NAME | PROCEDURES | FACTS | SOURCE(S) |
|---|---|---|---|
| | | re-do, only one side of nose has air (nose surgery done without symptoms) | (Exh.-71) Interview 01/28/13 (Exh.-72) |
| Blanca M. | Nose | -After undergoing nose surgery at TMI, started to get massive nose bleeds 3-4 times (something she had never had before) and snoring "got three times worse." | **6(e)** |
| Debra R. | Nose | -After nose surgery, had to return many times to TMI with nosebleeds, and last time, had to be hospitalized due to exposed bone, and resultant treatment for embolization | Interview 02/06/13 (Exh.-73) |
| Silvia S. | Face | - after face surgery, contracted MRSA that required tubes in face to drain infection, and face still numb, and permanent scar from infection -Right after first surgery, had redness on arms, and reported to TMI, they didn't fix, so had to go to ER | Interview 06/14/11 (Exh.-75) |
| Shirley W. | Abdomen | -After abd surgery, more pain in additional locations, as well as more severe | Interview 04/12/12 (Exh.-76) |

There appears also to be victims who suffered bodily injury, but who are not included in the above list of 10 victims, because they were not interviewed.  (*E.g.*, Exh.-77 (02/22/11 email from Ardy K. (309/sub36/3064120), noting "My insurance has paid over 140,000$ so far and mindless of the cost incurred the issue is my stomach looks worse then I started. A normal tummy tuck in the state of Wa. and Ca. costs between 6-8 thousand. Like I said the cost you received however outrageous is not the issue what the issue is I am still left with a

1  horrible looking abdominal area.")

2      **3.**   <u>**Patient victims - unlawful use of identity**</u>

3         <u>**information/identity theft (2 victims):**</u>

4      There are at least <u>2</u> patient victims - Blanca M. and Georgiana

5  E. - whose means of identification were used unlawfully or without

6  authority as part of defendant's health care fraud scheme.

7      Specifically, as discussed above, defendant committed identity

8  theft when he illegally used Blanca M.'s name and sent a letter

9  purportedly authored by her to the insurance company, when trying to

10  get the insurance to pay for the procedures on Blanca M. that he had

11  billed.

12      Likewise, defendant did something similar when he created a

13  testimonial letter purportedly authorized and signed by Georgiana E.

14  As related above,

17  **6(e)**

21      **4.**   <u>**Patient victims - HIPAA violations/unlawful use of**</u>

22         <u>**identity information (20 victims):**</u>

23      There are <u>20</u> such victims.  As described above, defendant

24  unlawfully disclosed 20 patients' HIPAA-protected health information

25  to cappers in the scheme, which included unlawfully using their names

---

[43] As discussed *supra* under the abuse of position of trust
section, defendant also unlawfully used the identification
<u>information</u> of a couple of the doctors.  However, because those
doctors were also participants in the scheme, the government does not
believe it appropriate to also count them as victims of the offense.

and other health information to further his fraudulent scheme.

## 5. Victim conclusion

As described above, defendant's fraudulent scheme had at least **39** identifiable victims: (1) seven insurance companies; (2) 10 patients who suffered bodily injury; (3) two patients whose means of identification were sued unlawfully or without authority; and (4) 20 patients whose protected health information was unlawfully disclosed in violation of HIPAA.

Thus, defendant's scheme involved more than 10 victims, so Section 2B1.1(b)(2)(A)'s two-point upward adjustment applies.[44]

## E. U.S.S.G. § 2B1.1(b)(10)(C): Sophisticated Means

The PSR found that this two-point enhancement did not apply,[45] so the government objected to that conclusion, particularly because in the Ninth Circuit, "[c]onduct need not involve highly complex schemes or exhibit exceptional brilliance to justify a sophisticated means enhancement." United States v. Jennings, 711 F.3d 1144, 1145 (9th Cir. 2013). (DE 104 at 3-5.) As described in the government's objection, the sophisticated means enhancement should apply because defendant's scheme had many facets that demonstrate its complexity: (1) making the patients undergo multiple procedures in a short time frame; (2) fabricated diagnoses; (3) fabricated test results; (4) fabricated symptomology; (5) splitting operative reports into

---

[44] The two-point enhancement for "vulnerable victim" under Section 3A1.1(b)(1) also would appear to apply on the facts of this case, because patients are considered to be especially vulnerable victims in crimes committed by their doctors. E.g., United States v. Rutgard, 116 F.3d 1270, 1293 (9th Cir. 1997) ("That he took advantage of vulnerable victims and abused trust was established because, in a professional medical practice, trust between patient and physician is essential …").

[45] Probation noted in its Addendum that this was a "close issue," so deferred it to the Court for final resolution. (DE 150 at 1.)

cosmetic and non-cosmetic parts, and only submitting the non-cosmetic part to the insurance companies; (6) digitally altering medical files (e.g., by placing white text boxes to conceal parts of documents or reports) and official medical reports and other documents; (7) seeking pre-authorizations in advance as a shield against subsequent scrutiny (even when such pre-authorization was not required);[46] (8) instructing patients to cash checks; (9) creating fraudulent declarations/letters from patients; (10) creating fabricated signatures of some patients on said letters; (11) Directing staff on how to conceal the cosmetic terms; (12) rotating fake diagnoses; and (13) convincing some patients to come in and re-do intake forms. (DE 104 at 3-4.) Moreover, as noted in the government's objection on this basis, defendant's use of multiple nominee billing entities should by itself meet the sophisticated means enhancement. (*Id.* at 4-5.) But, as discussed throughout this memorandum, defendant's scheme was much more complicated than that, involving a "'complex series of fraudulent transactions.'" United States v. Kieffer, 621 F.3d 825, 835 (8th Cir. 2010) (quoting case); see also United States v. Jenkins, 578 F.3d 745, 751 (8th Cir. 2009) ("'[r]epetitive and coordinated conduct, though no one step is particularly complicated, can be a sophisticated scheme.'" (quoting case)).

**F.   U.S.S.G. § 3B1.1: Aggravating Role**

Defendant occupied the role of an organizer and leader of his multi-million dollar health care fraud scheme, which was both extensive and involved five or more participants. Thus, under

---

[46] In one email message, defendant wrote to Dr. Wu that "The Pas are cash in the bank!"

U.S.S.G. § 3B1.1(a), his offense level should be increased by 4 levels based on his aggravating role in his fraudulent scheme.

The Revised PSR also found that this four-point upward adjustment should apply.  (DE 149 ¶¶ 111-13.)

### 1.   Defendant was the organizer and leader of his fraudulent scheme.

"While the criminal activity must be found to have involved five or more participants, the defendant need not have been the leader of more than one other participant for this adjustment to apply." United States v. Chavez, 549 F.3d 119, 136 (2d Cir. 2008); see also United States v. Egge, 223 F.3d 1128, 1132 (9th Cir. 2000) ("The enhancement may thus be appropriate as long as Appellant managed at least one participant."); U.S.S.G. 3B1.1 Application Note 2 ("To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants." (emphasis added)).  As shown below, defendant directed all of the other participants in his criminal activity.

Defendant was the person who put together (i.e., organized) his fraudulent scheme and he was the only one in charge of running his large health care fraud scheme.  At TMI, he held himself out as the "Medical Director."  He made virtually all the money from the scheme, while the other doctors were generally paid a set salary (Dr. Wu) or a per-procedure fee (Drs. Coon, Hardesty, Pincus).  As shown above under the tax fraud section, defendant made millions of dollars each year from operating his fraudulent scheme.

Several examples of defendant's directing Dr. Wu, other TMI employees, or others participating in the scheme what to do follow:

- Email from defendant to one of the itinerant doctors who had

1    performed one of the fraudulent surgeries, directing that

2    doctor to re-do the doctor's operative note (which listed

3    both a hernia and gastric band) into two separate operative

4    notes, so defendant could submit only the note that mentioned

5    hernia to insurance, to further conceal that the true purpose

6    of the surgery was for cosmetic gastric banding, which

7    wouldn't have been paid by insurance:

8

9    **From:** David Morrow
     **Sent:** Monday, August 24, 2009 11:35 AM
     **To:** Dr. John Coon
     **Cc:** David Morrow
10   **Subject:** FW: MISSING OP NOTE Sean W█   DATE: August 16, 2009

11    John,   Please re-dictate or revise the attached op note such that I will have on hand an op
      note to give ins co that only mentions the Hiatal hernia repair and a separate one to keep
12    on had that covers the gastric banding.  Please confirm.

      Thank you,
13
      David M. Morrow, MD, FAAD, FAACS
      Medical Director
14

15   (Exh.-37 (Rep309/sub15/2787962) at 1);

16    • Email from defendant to Dr. Wu, directing Dr. Wu which

17       cosmetic terms not to put in operative notes:

18
     **RE: see me on verbiage in abd op notes**
19   **From:**   Allan Wu
     **Sent:**    9/4/2009 4:32:27 PM +00:00
     **To:**     David Morrow
20   **Subject:**  RE: see me on verbiage in abd op notes
     **Attachments:**        image001.jpg

21   Agree and will do.

22
     ════
23

     **From:** David Morrow
24   **Sent:** August 31 09 12:45 PM
     **To:** Allan Wu
25   **Subject:** see me on verbiage in abd op notes

     Do not put skin excision or liposuction or abdominoplasty verbiage in notes.
26
     http://www.morrowinstitute.com/
27

28   (Exh.-78 (Rep309/sub36/3064818));

- *07/06/09 email chain between defendant and Dr. Wu, and others, entitled "RE: RE TT and NOSE MEDS. as per wu:"* Defendant directs everyone at TMI to "[p]lease be careful with the lingo in case of an insurance question: Please refer to these procedures as "abdomen" "breast" "nose" "eyelid" and add if possible the words "reconstructive surgery." (Exh.-5 (Rep309/sub36/2791193) at 1);

- *08/10/2009 email chain between defendant and Dr. Wu, entitled "RE:* RE. Rosalba 8/11:" Defendant directs Dr. Wu, who had indicated that the procedure was a tummy tuck, "Please do not use TUMMY TUCK, it is abdominal reconstructive surgery, even in emails." (Exh.-6 (Rep309/sub36/3064987) at 1);[47]

- *08/28/2009 email from defendant to TMI employees Jennifer P. and Roselle M., and Dr. Wu, entitled "CODE NOT TO USE:"* Defendant sends email to Wu and two others noting that one code they were using was a "red flag," and directs them not to use it: "<span style="color:red">**DO NOT USE THIS CODE: IT IS A RED FLAG FOR abdominoplasty (cosmetic) 15847**</span>…" (Exh.-7 (Rep309/sub15/2788019) at 1 (bold red font and capital lettering in original));

- *01/01/2010 email message from defendant to Jennifer P., Roselle M., Liliana C., and Shirley W., cc'd to Drs. Wu and Marshak, re: "LANGUAGE IN CONSENTS"*, where defendant directs the TMI staff and the two doctors to leave off cosmetic surgery terms, and basically puts words into their mouths, even though they all knew what was going on:

---

[47] In another email with a TMI staff member, defendant also discussed the cosmetic vs. "medically necessary" language, e.g., "tummy tuck/abdominoplasty to Abdominal reconstruction."

> o **"Words do matter very much especially when we are dealing with ins co.** The fact is we are not billing for cosmetic surgery, and as such we must not include cosmetic surgery terms such as abdominoplasty, blepharoplasty, upper face lift, eyelid lift, vaginal rejuven (use vaginal reconstructive surgery), G-spot, breast augmentation, breast lift (use term mastopexy, breast reconstructive surgery) tummy tuck (use abdominal reconstructive surgery), thigh lift, arm lift, liposuction, sclerotherapy, breast lift, photo facial, IPL, tattoo removal. Rhinoplasty (septoplasty is great), and anything else that you think sounds like a cosmetic procedure.  When in doubt, ask or just leave it out."  (Exh.-10 (Rep309/sub14/2773533) at 2 (red font in original);

- *01/17/2010 email message from defendant to Dr. Wu re: altering operative reports and the Spigelian code*, where defendant directs Dr. Wu: "do not use the one you attached in prior email. Use the one in her electronic medical record." (Exh.-1 (Rep309/sub31/2995114));

- *04/21/2010 email message from defendant to Dr. Wu re: missing records for a patient*: "ALLAN, please see below and do up any additional supporting documentation that would help Aetna pay these claims.  Also, obviously as you are working, please print out the stuff requested.  Please advise when done." (Exh.-79 (file 3002802) at 1);

- *07/13/2010 email message from defendant to TMI nurse Shirley W. and Dr. Wu*, where defendant directs the employee to do things a certain way, and if she doesn't, it will be grounds for

dismissal:

**RE: OR RECORDS AND CHARTS.**

| | |
|---|---|
| **From:** | David Morrow M.D. |
| **Sent:** | 7/13/2010 6:14:57 PM +00:00 |
| **To:** | Allan Wu |
| **CC:** | 1. Shirley W▬<br>2. David Morrow M.D. |
| **Subject:** | RE: OR RECORDS AND CHARTS. |
| **Attachments:** | 1. image002.gif<br>2. image003.gif |

Shirley, this must get done the way Dr. Wu outlines. It is mandatory. Period. Not following these orders will be grounds for dismissal. That is how serious this is.

David M. Morrow, MD, FAAD, FAACS

Medical Director

(Exh.-11 (Rep309/sub35/3059419) at 1.)

All of these emails demonstrate that defendant was the leader of the scheme, and would direct others – including directing Dr. Wu, the itinerant doctors, and TMI employees – what to do in furtherance of his scheme.[48]

**6(e)**

In addition to directing the other participants in his fraudulent scheme, defendant would also attempt to calm them or other TMI employees down, when those people would become worried about getting into trouble for participating in defendant's scheme. For example, when TMI's office administrator, Dorothy B., was worried about the scheme, defendant wrote to her: "Just relax.  You have no consequences or liability.  DO NOT WORRY.  Leave now, go home, come in Sunday only to get things going, then leave.  Relax."  (Exh.-81

---

[48]    As discussed in depth below, the five or more participants in defendant's fraudulent scheme included, at a minimum: defendant, Linda Morrow (charged in the Indictment), Dr. Wu (listed as co-conspirator 1 in the Indictment), TMI capper Lisa C. (listed as co-conspirator 2 in the Indictment), Drs. Coon, Hardesty, Marshak, and Pincus, and TMI employee Rosell M.

1  (Rep309\sub26\2924582 (01/23/09 email from defendant to Dorothy B[],

2  subj. "RE: Sandra B[] – P.S. Police Dept. patient")) at 1.)  This

3  email shows both that defendant was in charge (go home, come back,

4  etc.), but that he was instrumental in continuing the fraud, by

5  assuaging any (obviously legitimate) concerns of TMI staff.

6  　　　Likewise, defendant would direct staff on how to deal with

7  patients who were worried about having insurance pay for cosmetic

8  procedures, including when those patients wanted written assurances:

9  "Maybe if she came in and saw other patients covered by insurance,

10  she would feel comfortable.  Be great to have her come in and see

11  some patients and me too.  She has to understand **there are some**

12  **things we cannot put in writing.**  Please advise." (Exh.-82

13  (Rep309/sub24/2890667 (01/12/09 email from defendant to Dorothy B.,

14  subj "RE: DIANA H[]")) at 1 (emphasis added).)

15  　　　Further, Dr. Wu testified that defendant was in charge of the

16  scheme and gave various examples.  In fact, Dr. Wu stated that he

17  referred to defendant as "boss," both when speaking to him and in

18  emails.  For example:

19  **PRESCRIPTIONS - IMPORTANT QUESTIONS AND CONCERNS FROM LINDA**

| From: | tmimlm@▮▮▮▮ |
|---|---|
| Sent: | 2/11/2010 7:05:33 PM +00:00 |
| To: | David Morrow |
| Subject: | prescriptions - important questions and concerns from Linda |

　　　Please read this email from allan. Very profound and insightful. He puts all in perspective. This is Jen's first big challenge in management. Maybe she will grow into it and maybe not. This is really where the problem started. We can work it out. I am not worried.
Sent on the Sprint® Now Network from my BlackBerry®

---

**From:** Allan Wu <awu@▮▮▮▮▮
**Date:** Thu, 11 Feb 2010 10:52:42 -0800
**To:** Linda Morrow (External)<tmimlm@▮▮▮▮
**Subject:** RE: prescriptions - important questions and concerns from Linda

Would not give in to Jennifer.  ==Neither you or== ==Boss== ==should fall into that trap.==  What is needed is a true "airing of grievances".  But Jennifer needs to understand that when someone walks, they never are allowed back into the pearly gates.  This is the policy of Milauska's group and has worked well for them over the

years.  It has also served me well too in my previous practice.  I don't think we should create a revolving door for anyone.  People need to understand that the threat of "quitting" by a formal tendering of resignation while at the same time bashing someone is VERY VERY SERIOUS and never appreciated around here… not to mention **highly** unprofessional and inappropriate.

(Exh.-83 (rep309/sub23/2879160) at 2(highlighting added).)  Dr. Wu

**6(e)**

And, other TMI employees also stated that defendant was in charge, with different aspects of the business.

**6(e)**

Another email message demonstrates how defendant would direct all of the TMI individuals regarding all aspects of the scheme, from insurance to booking surgeries; here, talking about "bad" insurance:

**CKING FOR BAD INS PAYMENTS BEFORE WE BOOK SURGERY**

| | |
|---|---|
| **From:** | David Morrow M.D. |
| **Sent:** | 9/20/2010 9:15:09 PM +00:00 |
| **To:** | 1. Allan Wu |
| | 2. Kristin G█████ |
| **CC:** | 1. Rosell M███████ |
| | 2. Anna Rosa C█████ |
| | 3. Theresa N█████ |
| | 4. David Morrow M.D. |
| **Subject:** | CKING FOR BAD INS PAYMENTS BEFORE WE BOOK SURGERY |

To avoid this kind of problem of patient with bad ins payments being booked, all surgery bookings must pass thru either Rosell, Theresa, or me to verify pts ins is paying well.  When in doubt, stop again and clarify.  Here is an instance where Theresa, Rosell, and Dr. Wu knew of bad ins payments.  I may have even put out an email to all relevant staff that this patient cannot have any more surgery till I say so.  We need to tighten this up.

1    As long as we are on the subject, the same pertains to patient B███████.  No further surgery.

2    Also, sorry, no freebies. We would love to, but cannot.

3    Please confirm.

4    David M. Morrow, MD, FAAD, FAACS
     Medical Director

5    (Exh.-86 (rep309/sub35/3060957) at 1.)  Defendant would specifically

6    direct all employees/doctors on how to target insurance and to

7    discuss with potential patients "what other additional surgery they

8    need to have done:"

9    **CALLING IN PTS TO PRE-AUTH**

10   | From: | David Morrow M.D. |
     |---|---|
     | Sent: | 9/2/2010 2:48:03 AM +00:00 |
     | To: | 1. Kristin G███████ |
     |  | 2. Rosell M███████ |
     |  | 3. Allan Wu |
     |  | 4. Anna Rosa G███████ |
     |  | 5. Shirley W███████ |
     | CC: | 1. Theresa N███████ |
     |  | 2. David Morrow M.D. |
     | Subject: | CALLING IN PTS TO PRE-AUTH |
     | Attachments: | image002.jpg |

16   Rosell,  please immediately compile a list of our patients who work for the following companies:

17       1. PS Police and other City of PS if they have the same ins as the Police and
         2. COSCO (the shipping co)

19   Then divide up the calls between Rosell, Kristin, and Anna Rosa to call them to inform that ==we would like them to come in ASAP to discuss what other additional surgery they need to have done== so that we can attempt to get them pre-authed and have their surgery completed by the time they MAY change their insurance.

20   We need to find out when their current ins is effective until and try to get things done by that time.

22   **If we already have pre-auths on them for certain procedures, let's get the pre-auths up to date and sch their surgeries.  I believe we already have some on these pts.  This is a very important matter and time sensitive, so let's give this top priority.**

24   **Please confirm.**

25   (Exh.-87 (rep309/sub35/3060708) at 1 (highlighting added).)

26   Moreover, defendant would direct how resources would be allocated in

27   this fraud, by having Dr. Wu work on pre-authorizations, while he

28   worked on the surgery center billings: "Work on the Pas, and I will

work on the surgery center stuff and we will re-confer after the Pas
are done.  The Pas are cash in the bank!!"  (Exh.-2
(Rep309\sub34\3053471) at 1.)

Defendant was not only *a* leader of this scheme – he was **the only**
leader of it, or as Dr. Wu and his wife referred to defendant: the
"boss."  All of the factors listed in the notes to U.S.S.G. § 3B1.1
directly support that conclusion:

- <u>Decision-making authority</u>: as shown throughout this
  memorandum, defendant made all the decisions regarding his
  fraudulent scheme.  Moreover, as the emails above show,
  defendant also made it clear he would fire people if they
  didn't do things in the fraud the way he wanted them to be
  done, *e.g.*, leaving certain things off medical charts.

- <u>Nature of participation in the commission of the offense</u>:
  Defendant participated in all aspects of his fraudulent
  scheme, from "soup to nuts," including:
  - Pressuring patients to undergo unnecessary procedures,
    so he could bill insurance;
  - Performing the cosmetic surgeries that were billed as
    medically-necessary;
  - Authoring the consultation reports with false
    information;
  - Authoring the operative reports with false information;
  - Altering medical records;
  - Unlawfully altering medical reports dictated by other
    doctors, and then unlawfully digitally signing in those
    other doctors' names;
  - Billing the insurance companies for the fraudulent

surgeries;

  o Sending additional fraudulent documentation to the insurance companies, to respond to the insurance companies' refusal to pay for certain surgeries; and

  o Meeting with patients and directing them to re-do their intake documents, so as to conceal the cosmetic nature of their visit.

- <u>Claimed right to a larger share of the fruits of the crime</u>: The Revised PSR found that defendant "received the majority of the money generated from the scheme as he either paid other participants a salary or market-rate for conducting surgeries." (DE 149 ¶ 39.)  Defendant made all the money from the scheme, with others either being paid a set salary (Dr. Wu) or a market-rate for the surgeries (the itinerant doctors).

- <u>Degree of participation in planning or organizing the offense</u>:

  o Defendant directed TMI staff and other doctors in the fraud, including what to put in operative reports, to not use terms related to cosmetic surgery, and what the nurses should put in the medical charts;

  o Defendant would also consult with medical coder Lisa C. (listed as co-conspirator 2 in the Indictment) to figure out which codes to use to avoid drawing attention from the insurance companies, because he did not know about coding;[49]

  o According to TMI employee and patient Jennifer Pineo, Morrow started to use 2 additional entities, Stellar Surgical Specialties and Specialty Surgeons, when billing

---

[49] Lisa C. would answer defendant's questions about which codes to avoid.

multiple surgeries for the same patient, to conceal that all the surgeries were actually being performed at TMI; and

- o Once the insurance companies started to question TMI and demand additional documents, defendant planned and executed the cover-up, including altering documents and having patients re-do their intake forms;

- The nature and scope of the illegal activity: As described elsewhere, defendant's scheme was extensive:
  - o Defendant admitted in the plea agreement to fraudulent billing just shy of $3,500,000 in procedures;
  - o Defendant admitted in the plea agreement to being paid over $1 million for those fraudulent billings;
  - o Defendant's fraudulent scheme involved many patients;
  - o Defendant's fraudulent scheme was intricate, focusing on patients with "good insurance" with no daily cap for the surgery center fee;
  - o Defendant's fraudulent scheme involvement multiple layers of falsities, from the original consultation report, to the operative report, to fraudulently altering multiple types of medical reports (e.g., intake form, anesthesia forms, nurses notes)
  - o Defendant went so far during the scheme as to alter medical reports dictated by other doctors, and to then digitally sign those altered reports in the names of those other doctors, without their knowledge or consent.

- The degree of control and authority exercised over others:
  - o Defendant directed everyone how to orchestrate the fraud;
  - o Defendant was in complete control at TMI and over his

1    fraudulent scheme – no one else gave directions;

2    o Defendant made it clear that he was in control, and would

3    fire others if they did not comply with his directives.

4    All of the above shows that defendant was truly the organizer

5    and leader of his huge health care fraud scheme.

6    **2.   Defendant's scheme both involved more than five**

7    **participants and was otherwise extensive.**

8    Under Section 3B1.1(a), in addition to being the leader of the

9    scheme, for the four-point enhancement to apply, the scheme needs to

10   either involve 5 or more participants, or be "otherwise extensive."

11   Either of these qualifies for application of the enhancement: "If

12   defendant was an organizer or leader of a criminal activity that

13   involved five or more participants <u>or</u> was otherwise extensive,

14   increase by 4 levels."   U.S.S.G. § 3B1.1(a) (emphasis added).

15   Section 3B1.1(a) and (b)'s "five or more participants" and "otherwise

16   extensive" requirements are phrased in the disjunctive, so either can

17   qualify for the adjustment.   <u>United States v. Rostoff</u>, 53 F.3d 398,

18   413 (1st Cir. 1995) ("Since the relevant language of subsections (a)

19   and (b) is disjunctive, either extensiveness or numerosity is a

20   sufficient predicate for a three- or four-level upward adjustment.").

21   Here, defendant qualifies for the aggravating role enhancement,

22   because his fraudulent scheme <u>both</u>: (1) involved five or more

23   participants; and (2) was "otherwise extensive."

24   a.   Defendant's scheme involved five or more

25   participants.

26   In addition to being the organizer or leader of a criminal

27   activity, for the three- and four-level increases under Section

28   3B1.1(a) or (b) to apply, the criminal activity must have involved

five or more participants or have been "otherwise extensive."
U.S.S.G. § 3B1.1(a)-(b).

As discussed directly below, defendant's criminal activity
involved five or more participants,[50] including at least eight
participants: (1) himself;[51] (2) his wife Linda; (3) Dr. Wu;[52] (4) Dr.
Coon; (5) Dr. Hardesty; (6) Dr. Marshak; (7) TMI capper Lisa C.;[53] and
(8) TMI employee Rosell M.  The Revised PSR found that defendant's
scheme involved at least five participants *other than* defendant,
identifying six other participants: Linda, Dr. Wu, Dr. Coon, Dr.
Hardesty, Dr. Marshak, and capper Lisa C. (DE 149 ¶ 113.)

### 1.   Linda

The government believes that the First Superseding Indictment
and facts above sufficiently establish for sentencing purposes that
co-defendant Linda was a participant in defendant's fraudulent
criminal activity.  Moreover, her recent flight is also evidence of
her guilt.  United States v. Rodriguez, 482 F. App'x 231, 234 (9th
Cir. 2012) ("Evidence of flight is generally admissible as evidence

---

[50] Section 3B1.1's application notes provide that "[a]
'participant' is a person who is criminally responsible for the
commission of the offense, but need not have been convicted."
U.S.S.G. § 3B1.1 app. n.1 (bold in original).

[51] In this and other federal circuits, defendant himself is
counted as one of the five required "participants" in the criminal
activity.  E.g., Egge, 223 F.3d at 1134 ("First, Appellant himself is
a participant.  Appellant clearly satisfies the Guidelines'
definition of a participant in that he has been held criminally
responsible for the commission of the offense. Furthermore, we have
held that the defendant may be included among the participants in the
criminal activity for purposes of section 3B1.1(a)."); Norman, 776
F.3d at 82 ("The defendant himself is to be counted as one of the
participants."); United States v. Beacham, 774 F.3d 267, 277 (5th
Cir. 2014).

[52] Dr. Wu is listed as unindicated co-conspirator 1 in the
Indictment.

[53] Lisa C. is listed as unindicated co-conspirator 2 in the
Indictment.

of consciousness of guilt and of guilt itself").

### 2.   Dr. Wu

Based on all the facts detailed throughout this memorandum, Dr. Wu was clearly a participant in defendant's fraudulent criminal activity.

### 3.   Dr. John Coon

The Revised PSR correctly concluded that Dr. Coon participated in defendant's criminal activity.  Dr. Coon participated in the fraudulent scheme with defendant to split operative reports from operations he had done, to generate two separate operative reports – one with the cosmetic procedure, and one without it.  There are multiple email messages showing that they were working together doing that:

- 12/19/07 emails between defendant and Dr. Coon, where defendant instructs Dr. Coon to leave out cosmetic information from an operative note: "As we discussed yesterday: We got pre-auth for **breast reduction**.  So, please call it that and have Tim doing the anesthesia call it that!!!  Not a mastopexy. Leave out the am't of grams excised from the op note" to which Dr. Coon responds "understood." (Exh.-88 (COON00496) at 1.)  In fact, in this email, not only does defendant direct Dr. Coon what to do himself as part of the scheme, but also, he directs Dr. Coon on directing the anesthesia nurse (Tim) what to do.

- 08/24/09 email between defendant and Dr. Coon, directing Dr. Coon to split op reports (Exh.-53 (Coon GJ) at exh. JC-

8);[54]

- 01/18/10 email chain between defendant and Dr. Coon re:
  patient S.S., with Dr. Morrow directing Dr. Coon to split
  op reports - "Yes, on this case please dictate 2 separate
  op notes, one to include the gastric band and one to
  include the hiatal hernia repair" – and Dr. Coon agrees to
  do what defendant tells him to do: "Will do. Later today."
  (Exh.-89 (rep 309_sub31_2995242) at 1);

- 02/2010 emails chain between defendant and Dr. Coon re:
  patient S.S., scheming about defendant's generating a
  facility billing, so that Dr. Coon could bill for the
  procedure.  (Exh.-90 (COON1059-61).)

- 07/06/10 email from dictating service to defendant and one
  TMI employee, which shows that Dr. Coon separated the
  operative reports for patient Ruben G.  (Exh.-53 (Coon GJ)
  at exh. JC-22);

- 12/17/07 email between Dr. Coon and defendant, early on in
  the scheme, discussing splitting operative reports and not
  letting insurance know about one of them, noting that if
  the insurance company finds out about both procedures,
  "insurance will try to reduce payment for the 'covered'
  surgery by saying that it was a part of a larger overall
  procedure and as such will want to pay only a portion of
  the bill instead of the entire bill for the 'covered' part
  of the operation."  (Exh.-91 (COON000504-05));

Dr. Wu also stated that he overhead calls between defendant and

---

[54] This email message is listed as Overt Act #3 on page 16 of the
Indictment.

Dr. Coon about their plan to not document the cosmetic procedure of

gastric band procedures.  (Exh-80 (05/21/15 Wu interview) at 4-5.)[55]

Last, Dr. Coon also wrote

**6(e)**

#### 4.   *Dr. Robert Hardesty*

The Revised PSR correctly determined that Dr. Hardesty was

another participant in defendant's criminal activity.  Dr. Hardesty

knew that defendant was illegally billing cosmetic procedures to

insurance, but nonetheless continued to perform cosmetic procedures

at TMI, which were billed to insurance as medically-necessary.  But

he went even further, because Dr. Hardesty assisted defendant in his

fraudulent scheme, both by bringing up the "tuberous breast"

justification to be able to bill breast implants/augmentations as

medically necessary, and by letting defendant alter his consults to

include false information.  Dr. Hardesty would also split operative

reports to conceal the breast augmentation from the insurance

companies.

Dr. Wu stated that Dr. Hardesty brought up tuberous breast

deformity as a type of diagnosis in which insurance would cover the

cosmetic procedure of breast implants.  (Exh.-80 (05/21/15 Wu

interview) at 7.)  Dr. Wu stated that Dr. Hardesty talked with

defendant about the type of patients and pictures that were needed to

---

[55] The Ninth Circuit permits a district court to rely on hearsay statements of co-defendants in enhancing a sentence under Section 3B1.1(a).  E.g., United States v. Berry, 258 F.3d 971, 976 (9th Cir. 2001).

1    qualify for tuberous breast deformity.  (*Id.*)  Dr. Wu stated that he

2    had specific recollections of patients and pictures that were

3    diagnosed with tuberous breast deformity, and did not have it, and

4    that Dr. Hardesty was part of the consult with patients that did not

5    have tuberous breast deformity.  (*Id.*)

6         An example of the false "tuberous breast" diagnosis was patient

7    Jessica B.  Dr. Hardesty participated with defendant in adjusting

8    consultation reports to fraudulently add symptomology so that the

9    patient would qualify for insurance payment.  For patient Jessica B.,

10   defendant and Dr. Hardesty exchanged emails with attachments that

11   showed that Hardesty knew that defendant was faking symptomology.  On

12   April 16, 2010, defendant sent an email message to Dr. Hardesty that

13   directed him "Please take care of this first thing in the morning,"

14   attaching multiple documents regarding patient Jessica B., which

15   defendant had billed for a breast procedure.  (Exh.-92

16   (rep309/24/2884629) at 1.)  One of those attachments, the pre-

17   authorization request sent by defendant to insurance, shows that

18   defendant had added false symptoms to the consultation note that Dr.

19   Hardesty had done previously, such as adding "complains of chronic

20   tight uncomfortable breasts which never developed normally" and

21   "complains of many breast nodules which are hard and painful in both

22   breasts." (Compare Exh.-93 (rep309\24\2884631) at 2 (fabricated

23   symptoms by defendant) with Exh.-94 (rep309\6\617950) at 1 (original

24   consult by Dr. Hardesty).)  Jessica B.

25                                    6(e)

26

27        Dr. Hardesty also split operative reports to conceal from the

28   insurance company that breast augmentation had been performed.  A

good example of Dr. Hardesty working together with defendant in the complete fraud of billing cosmetic procedures as medically necessary is patient Tiffany S.:

- Dr. Hardesty knew all along that the procedure was completely cosmetic.
  - o Clinic note he wrote states that "patient states that she wanted her breasts higher." (Exh.-96 (rep309\9\787329));
  - o Dr. Hardesty testified and admitted that the procedure was cosmetic. (Exh.-54 (Hardesty GJ) at 108-09);
- 08/31/09 consultation note written by defendant omits any reference to breast augmentation/lift, and instead refers to "[p]ersistant skin rashes under breasts" "and gets rashes frequently despite the use of topical anti-fungals and drying measures for the last 4 months."
- Dr. Hardesty's handwritten operative note has the two breast implant stickers with serial numbers (Exh.-97 (rep309\9\787331));[56]
- Even though it was a cosmetic procedure, Dr. Hardesty still after-the-fact splits the operative notes, between implant and non-implant procedures, which then conceals from the insurance company that a breast implant procedure was performed:
  - o Operative report for insurance that fraudulently fails

_____

[56] As discussed elsewhere in this memorandum, an additional risk to defendant's breast augmentation patients was that defendant often would hide or remove the evidence of the breast implants, which meant that if the patient needed to check the serial number due to a possible recall of the implant(s), that information would not be available.

1        to mention breast implants procedure (Exh.-98

2        (rep309\11\976445) at 1-2);

3       o Operative report that truthfully documents the breast

4        implants procedure: "Bilateral subpectoral or silicone

5        breast implant to restore upper pole fullness." (Exh.-

6        99 (rep309\11\976447) at 1);

7    • Documents submitted to insurance have a white text box over

8      word "augmentation" on anesthesia record (page 5/12), and

9      appear to have whited out implants stickers in "implants"

10     box on intra operative nurses notes (page 8/12).  (Exh.-28

11     (Rep309\sub5\578262) at 5, 8);

12   • 02/26/10 email message with defendant, Dr. Wu, and Dr.

13     Hardesty, which shows that they were all working/conspiring

14     together to give her a breast augmentation, even though

15     ultimately billing to insurance, where they discuss that

16     the procedure is all about lifting the patient's breasts:

17     "To my knowledge they don't make helium implants YET, but

18     she discussed the issue with DMM and we did explain to her

19     that it would be impossible to do so without some sort of

20     mastopexy and likely causing more exposure of the previous

21     inverted T, which she is comfortable with.  DMM wanted me

22     to forward the images to start the thinking process.  She

23     is fine with meeting you on the day of surgery for preop

24     consultation." (Exh.-100 (Rep309\sub24\2884610) at 1).

25   Even though Dr. Hardesty knew that defendant was billing to

26 insurance as medically necessary procedures that Dr. Hardesty was

27 performing that actually were cosmetic,

**6(e)**

**6(e)**

By providing defendant with one of the fake diagnoses (tuberous breast deformity), splitting operative notes, and continuing to perform and bill procedures to insurance that he knew were cosmetic, Dr. Hardesty constitutes a participant in defendant's fraudulent scheme.

### 5.   Dr. Harry Marshak

Like the other doctors listed above, Dr. Marshak

**6(e)**

Dr. Wu confirmed that Dr. Marshak was doing that: "MARSHAK broke out his operative notes. He would separate out the reconstructive from the cosmetic. The reconstructive was submitted to insurance by MORROW." (Exh.-80 (5/21/2015 Wu interview) at 6.)

Dr. Marshak also admitted

**6(e)**

Dr. Marshak kept

**6(e)**

Dr. Marshak also admitted

**6(e)**

Dr. Marshak also

Based on the above, Dr. Marshak also obviously qualifies as a
participant in defendant's fraudulent criminal activity.

### 6.   *Dr. Stephen Pincus*

Dr. Pincus was another participant in defendant's criminal
activity.  Dr. Wu provided several statements that indicate that Dr.
Pincus was participating in defendant's scheme:

- "PINCUS commented that everybody has insurance cases in

1         their practice, but nowhere near the amount MORROW had.

2         PINCUS said he had some insurance cases like that, cosmetic

3         cases through insurance. The issue was one of magnitude."

4         (Exh.-80 (05/21/15 Wu interview) at 28);

5      •   "PINCUS would tell the patient at the end of the consult

6         the, 'insurance companies don't really care how I close

7         things.'" (*Id*. at 27);

8      •   "PINCUS then asked if there was anything in particular the

9         patient wanted in the appearance of the nose. This was not

10        closure work, but cosmetic work." (*Id*.);

11     •   "Rosell M[.] had this procedure done. This procedure was

12        purely cosmetic, according to numerous ENT specialists. …

13        PINCUS was doing the Turkish role to perfect it. Rosell

14        went back in and it was billed to insurance. WU was not

15        aware of PINCUS ever canceling a case. PINCUS would tell

16        MORROW which codes to use." (*Id*.);

17     •   Dr. Pincus performed surgery on patient Angie B. that was

18        billed to insurance, and the notes indicated that the

19        patient "was interested in cosmetic results." (Exh.-104

20        (05/28/15 Wu interview) at 6);

21     •   Dr. Wu related that the nose surgery that Dr. Pincus

22        performed on capper Lisa C. was cosmetic (*Id*. at 9).

23     IN addition, two TMI patients also provided statements during

24 their interviews that show that Dr. Pincus was performing cosmetic

25 procedures at TMI that were billed to insurance:

26        On or about November 2008, [Jill G.] had

27        surgery on her nose.  PINCUS and WU conducted the

28        surgery.  [Jill G.] met PINCUS on the morning of

the surgery for the first time.  PINCUS was
supposed to have a practice in Beverly Hills and
frequently performed surgeries for the MI on the
weekends.  When [Jill G.] lost weight, her nose
took on a beak-like shape that was too long.
MORROW was going to bill insurance for the
medical procedure, but the cosmetic portion was
free.  The surgical 'tip-work' on the nose was
free.

(Exh.-69 (08/17/11 Jill G. interview) at 4; *see also* Exh.-105
(03/16/12 Sheila V. interview) at 2.)

### 7.   *TMI capper Lisa C.*

The Revised PSR found that Lisa C., unindicted conspirator 2,
recruited patients for TMI and assisted defendant in fraudulently
coding cosmetic procedures by claiming they were medically necessary.
(DE 149 ¶¶ 21, 29.)  It also listed her as one of the participants in
defendant's criminal activity.  (*Id*. ¶ 113.)  The government agrees.

Lisa C. admitted



6(e)

Last, Lisa C. participated in defendant's criminal activity by
also assisting defendant to further the scheme by choosing which

codes to fraudulently use with the best chance of slipping by unnoticed by the insurance companies, i.e., to avoid "red flags." For example, she sent an email message to defendant, where they discussed which codes were working to get insurance to pay: "I can tell you that if you have not received payment for the 9/1/08 charge, it's because of the 15847 code … it's a RED FLAG code and should NEVER be billed. **For tummy tucks stick with the hernias only**." (Exh-8 (rep303-304-306/3191558) (emphasis added)).

8.   *TMI employee Rosell M.*

Rosell M. also clearly qualifies as another participant in defendant's criminal activity.

**6(e)**

During an interview earlier this year, Rosell M. admitted that she "started altering certain areas on the Patient Intake form was to try and make it appear the patient went to TMI for a medically necessary reason." (Exh.-108 (01/13/17 Rosell M. interview) at 3.) She also discussed with defendant how to put a white text box on the intake form PDFs to conceal cosmetic information. (*Id.*) During her interview, she confirmed that she also called patients in to do the testimonial letters/declarations (which as shown above often contained false information). (*Id.* at 2.) Rosell M. sent an email message dated June 11, 2010 to two other TMI employees, which instructs those employees how the patient intake forms should be done "in order not to trigger any pre-existing questions for the insurance company," including post-dating the form, and how to answer the other questions, such as making sure the referral field did not mention capper Lisa C. (Exh.-109 (file

1    3305673) at 1.)

2              b.   Defendant's scheme was "otherwise extensive."

3         Section 3B1.1(a) and (b)'s aggravating role adjustment applies

4    when a defendant was an organizer, leader, manager, or supervisor "of

5    a criminal activity that involved five or more participants or was

6    otherwise extensive."  Section 3B1.1(a) and (b)'s "five or more

7    participants" and "otherwise extensive" requirements are phrased in

8    the disjunctive, so either can qualify for the adjustment.  Rostoff,

9    53 F.3d at 413.

10        The Revised PSR found that Section 3B1.1(a)'s four-point

11   adjustment applies on this basis also.  (DE 149 ¶ 113.)  The

12   government agrees.

13        Application Note 3 to Section 3B1.1 provides that "[i]n

14   assessing whether an organization is 'otherwise extensive,' all

15   persons involved during the course of the entire offense are to be

16   considered. Thus, a fraud that involved only three participants but

17   used the unknowing services of many outsiders could be considered

18   extensive."  U.S.S.G. § 3B1.1 app. n.3.  Various methods of

19   establishing that the criminal activity is "otherwise extensive"

20   include examining the number of persons connected to the conspiracy

21   (including unwitting), as well as the sophistication and scope of the

22   conspiracy.  United States v. Leung, 34 F.3d 1402, 1406-07 (9th Cir.

23   1994).

24        Based solely on the amount of fraudulent billings perpetrated by

25   defendant – more than $50,000,000, defendant's criminal activity

26   qualifies as "otherwise extensive" under Section 3B1.1.  E.g., United

27   States v. Farris, 585 F. App'x 934, 936-37 (fraud involving millions

28   of dollars, many employees, and victims across several states);

1  United States v. Guerra, 307 F. App'x 283, 289 (11th Cir. 2009)

2  ("First, it is of no import that we vacated the convictions of

3  certain of Guerra's co-conspirators, as the record demonstrates that

4  the conspiracy was 'otherwise extensive' since it involved submitting

5  millions of dollars in claims to Medicare and required the aid of

6  many beneficiaries.")

7      Add to that the number of patients with fraudulently-billed

8  surgeries and procedures, which is several hundred, and this is not

9  even a close issue.

10     Add that defendant's criminal activity continued for several

11  years, from at least 2007 to the date of the search in March 2011.

12     Defendant's health care fraud scheme was extensive: it was one

13  of the largest in history in California's Inland Empire area,

14  involving tens of millions of dollars in fraudulent claims and

15  complexity, and was permeated with fraud.  Defendant's extensive

16  fraud was complicated.  Defendant's extensive fraud involved

17  fabricated symptoms and diagnoses on official medical reports.

18  Defendant's extensive fraud involved altering official medical

19  records.  Defendant's extensive fraud involved altering medical

20  reports dictated by other doctors, and unlawfully signing (digitally)

21  in the names of other doctors.  And it involved a crafty defendant

22  who understood how to make all the moving parts work together to

23  steal millions of dollars.

24     Defendant designed his scheme to exploit the daily cap: As

25  described above, and in the victim letter from REEP, one of the main

26  ways that defendant was able to make so much money from his scheme

27  was exploiting the lack of a daily cap for outpatient surgery center

28  fees for out-of-network insurance plans.  So, defendant would make

sure to target companies/entities with PPO insurance that specifically had no daily cap for the surgery center fees.  Then, using TMI, defendant would bill huge amounts predicated on a cosmetic procedure that he illegally billed as medically necessary.

Defendant designed his scheme to exploit a weakness in the insurance companies' pre-authorization process: Defendant envisioned seeking pre-authorization from the insurance companies for procedures where pre-authorization was not required, because he figured out that once an insurance gave a pre-authorization, it would be more difficult for the insurance to deny the subsequent claim.  Dr. Wu explained that defendant started seeking the pre-authorizations because he believed it was the "golden ticket" because "it got the patient into the operating room; Nothing else really mattered." (Exh-110 (06/18/15 Wu interview) at 5.)  "Morrow's belief was that the preauthorization was defensible and it puts the onus on the insurance company."  (*Id*.)  Dr. Wu's statement is supported by the email evidence; for example, on February 13, 2019, defendant directed Dr. Wu - "Work on the Pas [pre-authorizations], and I will work on the surgery center stuff and we will re-confer after the Pas are done.  The Pas are cash in the bank!!"  (Exh.-2 (Rep309\sub34\3053471) at 1.)  Moreover, Dr. Marshak

**6(e)**

Enticing professionals with good insurance, such as teachers, to come in to TMI by offering freebies: Defendant and Linda would entice individuals with good insurance to come into TMI for a free facial,

after which defendant would sell them on the need for cosmetic surgery, which could be paid for by their "good" insurance.  For example, a 04/21/09 email from defendant to Linda, Drs. Marshak and Wu, and TMI employees Jennifer S. and Amy B., with subject line "RE: DRAFT of agenda for Teacher Reception," lists one item of agenda as "Amy gives introduction; speaks about insurance Coverage, etc. Introduces Dr. Morrow," followed by:

- "… Dr. Morrow introduces Dr. Marshak."
- "… Dr. Marshak introduces Dr. Wu.."
- "Dr. Wu speaks about gynie, gynie surgery, breast reduction, abdominoplasty and vein treatment…"
- "…If appropriate, quick private Q&A with Dr. Morrow, Dr. Marshak, Dr. Wu."

(Exh.-111 (file 3084730) at 3.)

   <u>Nominee billing entities</u>: The PSR noted that to attempt to conceal that multiple different procedures done at TMI for the same patient were being billed, defendant would use two other billing entities, Specialty Surgeons, Inc., and Stellar Surgical Specialties, Inc., (SSS) to bill some of the procedures.  (DE 149 ¶ 38.)  The following shows that defendant used SSS as a nominee billing entity, to attempt to conceal from the insurance companies that the procedures being billed were really all done at TMI:

- TMI employee Jennifer S. (formerly Jennifer P.) ███████████

**6(e)**

- 11/04/09 email from defendant to Jennifer S., which shows that the real reason for SSS was to "spread out" the

billings away from TMI.  As defendant wrote in that email,
"I really want to know asap when one of the claims is paid
under SSS or the other Co. so I can spread things out."
(Exh.-112 (file 2986712) at 1 (emphasis added).)

- 02/18/10 email from defendant to Jennifer S., with subject
  "ALL UNPAID STELLAR CLAIMS", which shows that SSS was just
  a nominee billing entity, because when the SSS claims
  weren't paid, defendant directed Jennifer S. to re-bill
  them under TMI: "And the one claim we submitted under
  Specialty Surgeons.  Let's just rebill all of them under
  TMI.  Please re-do and advise so I can also re-ck and
  possibly revise pricing."  (Exh.-113 (file 2998348) at 1.)

- 08/27/09 email from defendant to TMI employee re: the
  letterheads for the nominee billing entities: "Please type
  up 2 WORD letterheads for me for the e2 new companies to
  include in them the address, phone, fax, tax id.  Leave out
  my name."  (Exh.-114 (file 2899718) at 1 (emphasis added).)

- Dr. Marshak

**6(e)**

Even if everyone working at TMI could not technically qualify as
a participant, most knew that billing cosmetic procedures to
insurance as medically necessary was not on the up-and-up.  For
example, in a 05/15/09 email from Linda to multiple TMI employees and
defendant and Dr. Wu, with an attachment that lists that insurance
may cover procedures, Linda asks: "From a strategic point of view,

what do we want to do?  Subtly or hammer home the insurance aspect "in the public eye?" This is opposed to what we are doing now which is somewhat under the radar screen....minimally exposing the insurance aspect of our practice, expect to our target market." (Exh.-115 (file 3050986) at 1 (emphasis added); Exh.-116 (file 3050987).)

Splitting operative reports: As discussed *supra*, defendant also would direct the other doctors to split operative reports, and sometimes do it himself, and improperly sign for the other doctors, to make it appear as if the other doctor had authored the fraudulent report.

Cover-up: And, defendant used various methods to conceal the fraud, once the insurance companies began to discover that something was wrong:

- low-tech method of whiting out and writing over;
- using Adobe to insert white text boxes;
- having patients come in to re-do intake forms;
- using various techniques to stage the patient photos to make it appear that a particular symptomology existed when it in fact did not.  (Exh.-34 (Wu GJ) at 43-45.);

Last, in addition to the 7 participants discussed *supra*, defendant directed others who were involved in helping him operate the scheme, even if they were not technically criminal participants. For example, TMI employee Kristin G. worked as the manager of TMI for a while,

**6(e)**



6(e)

Another TMI employee, <u>Jennifer S. (formerly Jennifer P.)</u> worked at TMI

6(e)

    Defendant's criminal activity lasted for more than four years, encompassed more than 100 fraudulent billings to insurance, claimed more than $75,000,000 in payment, consumed tens of millions of

---

[57] TMI employees Dorothy B., Shirley W., Roxanna P., and Liliana C. all were used by defendant to further his scheme.

dollars in actual payments, affected many lives, and involved a legion of people beyond defendant and his wife and the participating doctors and other schemers.  Moreover, the complexity of defendant's scheme is shown by its many moving parts, including exploiting the lack of a "daily cap," obtaining pre-authorizations when not needed, utilizing novel diagnoses, doctoring all types of medical records, using multiple different nominee billing entities to conceal from the insurance companies that all the procedures were done at TMI, and creating false declarations.  Accordingly, his criminal activity qualifies as "otherwise extensive" under Section 3B1.1.

### 3. Aggravating role conclusion

Defendant did everything in the scheme, from dream it up, set it in motion, and operate it.  Defendant directed all the other criminal participants and others involved in his scheme.  Defendant made all the money from his scheme.  He was the leader of an extensive fraudulent scheme that involved many other participants.

Thus, defendant's offense level should be increased by 4 levels based on his aggravating role, pursuant to U.S.S.G. § 3B1.1(a).

### G. U.S.S.G. § 3C1.1: Obstruction of Justice

Section 3C1.1 of the Guidelines, entitled "Obstructing or Impeding the Administration of Justice" provides a two-level adjustment in the offense level for obstruction of justice.  U.S.S.G. § 3C1.1.  Here, defendant obstructed justice by failing to appear at a recent court hearing and previously providing false information to U.S. Probation throughout the sentencing process.

### 1. Failure to appear

Section 3C1.1's Application Notes provide as an example of conduct to which the adjustment applies: "willfully failing to

appear, as ordered, for a judicial proceeding." U.S.S.G. § 3C1.1 Application Note 4(E).

This Guidelines adjustment applies because defendant failed to appear for the status conference hearing on July 14, 2017, after the Court ordered him to appear in person.

### 2.    Providing false information to U.S. Probation

Section 3C1.1's application notes provide as an example of conduct to which the obstruction-of-justice adjustment applies: "providing materially false information to a probation officer in respect to a presentence or other investigation for the court." U.S.S.G. § 3C1.1 app. n.4(H).

This Guidelines adjustment also applies because defendant provided false information to the Probation Officer on multiple different important issues.

### a.    Defendant concealed from Probation the quitclaim transfer and immediate sale of his Beverly Hills residence for $9.5 million, which occurred days after he pleaded guilty in March 2016.

On January 18 2017, the government raised its first factual objection to the PSR, because the "Financial Condition: Ability to Pay" section of the PSR did not include any mention or facts regarding the following: the week after defendant pleaded guilty in March 2016, defendant and his wife/co-defendant Linda Morrow quitclaimed their Beverly Hills residence to an LLC, which then immediately sold it for approximately $9,450,000, resulting in more than $6,000,000 in net proceeds, including a gain of approximately $4,000,000. (DE 131.) No facts about that March 2016 quitclaim transfer of ownership, the $9,450,000 sale, or the disposition of the

$6,000,000 in net proceeds appeared in the PSR, because defendant failed to include that transfer on the "TRANSFER OF ASSETS" part of the forms he submitted to Probation.  (Exh.-117 (10/02/16 form defendant submitted to Probation ) at 9 (page 5 of the form).)

On January 30, 2017, defense counsel submitted a letter with attachments to Probation in response to the above objection, claiming that because defendant had purportedly gifted that property to his children in December 2011, "[s]ince Dr. Morrow did not own or control this property since 2011, he was in compliance with his reporting obligations regarding his financial disclosure to the Probation Office."  (Exh.-118 (01/30/17 letter to Probation) at 1.)

That statement is dubious, as shown by the following four pieces of evidence, which demonstrate that defendant both owned and controlled the property well after 2011:

- In May 2013, defendant applied for and obtained a $1,100,000 loan on the property, where on the first page defendant checked "Own" for whether he owned or rented the property.  (Exh.-119 (05/09/13 UBS loan application) at 1.) Further, on page 3 of that loan application, under the section entitled "Schedule of Real Estate Owned," defendant listed the property.  (*Id.* at 3.).  Last, the government is not aware of how someone could obtain a loan on a piece of property if they have no ownership interest in that property.

- In July 2013, defendant leased out the property to a third party for $25,000 per month, with defendant listed as "landlord" on the agreement, and the checks payable to defendant.  (Exh.-120 at 1.)

- In October 2014, defendant leased out the property to a third party for $35,000 per month, with "Morrow Family Trust" listed as the landlord on the agreement, and the checks payable to defendant (as opposed to defendant's children's gift trusts). (Exh.-121 at 6.)

- When the property sold in March 2016, right after defendant pleaded guilty in this case, it was he and his wife who executed the quitclaim deed to the LLC. (Exh.-122 at 3 (showing quitclaim deed from defendant and his wife as trustees under their own trusts, and not gift trusts, to the LLC.) However, if the gift trusts in the name of defendant's children really owned the property since 2011, like defendant represented in his January 2017 letter to Probation, there would have been a deed change of ownership transfer in 2011, and the property would then have been quitclaimed from the gift trusts to the LLC in 2016, rather than from defendant's own trust to the LLC.

As the above shows, defendant was not truthful to Probation when he failed to report the March 2016 transfer and sale of his Beverly Hills property. And then, when his omission was uncovered, rather than fess up, defendant attempted to mislead Probation by claiming that he had no ownership or control in the property since 2011. Thus, he provided false information to Probation.

          b.    <u>Defendant falsely represented to Probation that</u>
                     <u>he was not the grantor, donor, trustee,</u>
                     <u>fiduciary, or beneficiary of any trust.</u>

On April 13, 2017, the government filed its fourth objection (3d factual) to the PSR, premised on another false statement by defendant

to Probation – that defendant failed to report his positions in trusts.  (DE 151.)  Specifically, on the same Probation form containing the questions about asset transfers and civil lawsuit history, a question required all information about trusts in which defendant occupied certain capacities, such as a trustee.  (Exh.-117 (10/02/16 form to Probation) at 8 (page 4 of form).)  In Section J ("TRUST ASSETS") of the "Assets" Part of the New Worth Statement that defendant submitted under oath to Probation, defendant wrote "NONE" in the box requiring information for all trusts in which defendant was a trustee, grantor, donor, fiduciary, or beneficiary.  (*Id.*) That statement was false.

Defendant was the grantor in four of the gift trusts in the names of his children: (1) "Ariella Aliza Morrow 2011 Irrevocable Gift Trust No. 1"; (2) "Daniella Shira Morrow 2011 Irrevocable Gift Trust No. 1"; (3) "Dina Meira Morrow 2011 Irrevocable Gift Trust No. 1"; and (4) "Joshua Joseph Morrow 2011 Irrevocable Gift Trust No. 1". Defendant was also a co-trustee in all of those above 4 trusts, as well as the four related trusts in which his wife was the grantor: (5) "Ariella Aliza Morrow 2011 Irrevocable Gift Trust No. 2"; (6) "Daniella Shira Morrow 2011 Irrevocable Gift Trust No. 2"; (7) "Dina Meira Morrow 2011 Irrevocable Gift Trust No. 2"; and (8) "Joshua Joseph Morrow 2011 Irrevocable Gift Trust No. 2".

Defendant signed the 901 N. Bedford, LLC operating agreement as trustee of all of those trusts.  (Exh.-123 (USA_FinInv_00000676-732) at 40-42, 54.)  Defendant signed the 116 N. Palm, LLC, operating agreement as trustee of all of those trusts.  (Exh.-124 (USA_FinInv_00000376-417) at 40-42.)  Bank accounts were opened in the names of those trusts, with defendant and his wife listed as

1  trustees.  (Exh.-125 (USA_FinInv_00004390-4396) at 4.)

2      On May 17, 2017, $1,000,000 and $877,000 were wire-transferred

3  into a bank account in the name of Linda Morrow.  (Exh.-126 (BOA acct

4  3885) at 7.)  The $877,000 came from an account named "Morrow Living

5  Trust."  (*Id*.)  Presumably, that is the same living trust that

6  defendant and his wife have been using since 1984, which is the same

7  trust in which they held title to the 901 Bedford property, and they

8  were trustees of that trust (as shown by the 2016 quit-claim deed

9  they signed in that capacity).

10      Last, the government exercised its right under the plea

11  agreement to require defendant to complete the USAO's financial form,

12  which he submitted with a signature date of May 12, 2017.  Question

13  65 on that USAO form asked "ARE YOU A TRUSTEE, EXECUTOR, BENEFICIARY

14  OR ADIMINSTRATOR UNDER ANY WILL OR TESTAMENT, INSURANCE POLICY OR

15  TRUST AGREEMENT?" with "YES" and "NO" boxes immediately following.

16  (Exh.-117A at 8.)  Rather than choose yes or no, defendant responded

17  "I have not been able to get a hold of my Trust attorney to be sure

18  my answers are correct.  Therefore, I will answer this question after

19  I get his clarification."  (*Id*.)

20      Defendant was both the donor and trustee of many trusts.

21  However, when asked whether he was on the Probation financial form

22  (that he signed under oath), he falsely wrote "None."

23                    c.   Defendant falsely reported to Probation that he

24                         had never been party to a lawsuit, when in fact,

25                         he has been party to many lawsuits.

26      On February 21, 2017, the government filed its third objection

27  (2d factual) to the PSR premised upon defendant's false statement to

28  Probation that he had never been party to a civil lawsuit.  (DE 133.)

1   Specifically, on the same form to Probation on which he failed to

2   report the March 2016 transfer and subsequent $9.5M sale of his

3   Beverly Hills residence, he falsely wrote "NONE" in the box for

4   information about any civil lawsuits in which he was ever a party.

5   (Exh.-117 (defendant's form to Probation) at 11 (page 7 of the

6   form).)

7        Probation dealt with this objection in its First Addendum to the

8   PSR:

9            The financial forms submitted by the

10           defendant indicated that he was never a party to

11           any civil suit.  In reply to the above factual

12           objection, defense counsel stated that the

13           defendant was under the assumption that he only

14           had to provide information to current lawsuits

15           and judgments.  Defense counsel has acknowledged

16           the error and provided documentation indicating

17           the defendant has been a party to eight lawsuits,

18           which have been summarized in the Financial

19           Condition: Ability to Pay section of the Revised

20           PSR.

21   (DE 150 ¶ 4.)  The Revised PSR lists 9 lawsuits reported by defendant

22   to Probation.  (DE 149 ¶ 184.)  It appears that defendant failed to

23   mention the case of TMI v. Leslie W., Case No. 30-2011-00454268-CU-

24   FR-CJC (Orange County Superior Court, filed 03/01/2011).  While TMI

25   is the named party, that case is a lawsuit by TMI against a patient

26   to recover approximately $48,000 from the patient, who TMI alleged

27   had kept the insurance checks issued to her.  (Exh.-127 (TMI v.

28   Leslie W. complaint) ¶¶ 10-23.)  The lawsuit also notes "In or about

Page **143** of **157**

1    March and April 2010, TMI performed medical services to [Leslie W],

2    and thereafter submitted bills to [Leslie W.]'s insurance company for

3    said services as a courtesy to her in the amount of $162,450." (*Id.*

4    ¶ 10.)

5         In addition, as noted in the letter from victim REEP, defendant

6    filed a lawsuit in Riverside Superior Court seeking payment from REEP

7    and the school districts and community colleges for the same claims.

8    (Exh.-128 at 4.)   Likewise, Anthem Blue Cross indicated that

9    defendant sued it in May 2010, when Anthem had refused to pay an

10   additional $17,000,000 in claims defendant was pursuing.   (Exh.-129

11   at 2.)[58]   Interestingly, the fifth cause of action in defendant's 2010

12   lawsuit against Anthem was for slander, based upon that "Blue Cross

13   is informing TMI's patients that TMI is committing fraud and/or

14   fraudulently billing Blue Cross for medically unnecessary services."

15   (Exh.-130 at 17.)[59]   In California, "Truth is a complete defense to

16   slander." Conkle v. Jeong, 73 F.3d 909, 917 (9th Cir. 1995); see

17   also Ringler Assocs. Inc. v. Md. Cas. Co., 80 Cal. App. 4th 1165,

18   1180, 96 Cal. Rptr. 2d 136 (2000) ("In all cases of alleged

19   defamation, whether libel or slander, the truth of the offensive

20   statements or communication is a complete defense against civil

21   liability, regardless of bad faith or malicious purpose." (quotations

22   and citations omitted)).

23        Although not lawsuits, defendant also made claims against the

24   following public entities for procedures he had billed but were not

25

26   _____

27        [58] Blue Cross Blue Shield of Massachusetts also submitted a
     victim impact statement.   (Exh.-129A.)

28        [59] In July 2010, defendant amended the lawsuit to add as
     defendants REEP, Desert Sands USD, Palm Springs USD, and the
     California Highway Patrol.

paid:

- <u>California Highway Patrol</u>: $256,782.50 (05/27/10);
- <u>City of Palm Springs</u>: $1,341,519.45 (05/27/10);
- <u>Desert Sands USD</u>: $10,931,237.40 (05/27/10);
- <u>Palm Springs USD</u>: $4,199,862.94 (05/27/10).

(Exh.-131, Exh.-132, Exh.-133, Exh.-134.)

Last, one of the lawsuits that defendant initially failed to report to Probation was a lawsuit in January 2005, where the family of a decedent sued defendant and TMI for wrongful death in <u>Colvin et al. v. David Morrow, M.D., et. al.</u>, Case No. INC 048204 (Riverside Superior Court).  (Exh.-135 (USA_REPORTS_000006821-24.)[60]

Thus, defendant made an additional false statement to Probation about his lawsuit filing history when he wrote "NONE" in the documents he submitted to Probation signed under penalty of perjury.

**H.   Defendant does not qualify for acceptance of responsibility credit under Section 3E1.1.**

The Guidelines provide for a two- or three-point reduction in offense level if "the defendant clearly demonstrates acceptance of responsibility."  U.S.S.G. § 3E1.1(a).  "The primary goal of the reduction is to reward defendants who are genuinely contrite." <u>United States v. McKinney</u>, 15 F.3d 849, 853 (9th Cir. 1994).  "True acceptance of responsibility for a crime includes acceptance of whatever justice society deems proper in response."  <u>United States v. Swanson</u>, 253 F.3d 1220, 1225 (10th Cir. 2001).

As discussed above, defendant provided false information to Probation as part of his pre-sentence investigation process.  Such

---

[60] In that case, a doctor signed a declaration indicating that defendant had breached multiple standards of care that resulted in that patient's death.  (Exh.-136 (Shiffman decl.) at 3-4.)

1  false statements to Probation constituting obstruction are

2  inconsistent with accepting responsibility.  United States v.

3  Bazuaye, 240 F.3d 861, 865-66 (9th Cir. 2001) (affirming district

4  court's decision to deny acceptance based on his false statements to

5  the probation office); see also United States v. Clarke, 520 F. App'x

6  603, 605 (9th Cir. 2013).  In fact, the application notes to Section

7  3E1.1 provide that "[c]onduct resulting in an enhancement under

8  §3C1.1 (Obstructing or Impeding the Administration of Justice)

9  ordinarily indicates that the defendant has not accepted

10  responsibility for his criminal conduct."  U.S.S.G. § 3E1.1 app. n.4.

11       In addition to defendant's false statements to Probation, his

12  recent flight further cuts strongly against granting him the two-

13  point reduction for acceptance of responsibility.  United States v.

14  Rosas, 615 F.3d 1058, 1066-67 (9th Cir. 2010) (affirming denial of an

15  acceptance of responsibility reduction based on defendant's flight);

16  see also  United States v. McMahan, 531 F. App'x 757, 759 (7th Cir.

17  2013) (affirming district court's refusal to grant acceptance of

18  responsibility based upon defendant's pre-plea flight); United States

19  v. Amponsah, 247 F. App'x 395, 400 (3d Cir. 2007) (affirming district

20  court's denial of Section 3E1.1 reduction for acceptance, based upon

21  defendant's flight); United States v. Baldovinos, 113 F. App'x 187,

22  189 (8th Cir. 2004) (affirming district court's refusal to grant

23  acceptance credit based on defendant's pre-sentencing flight);

24  Swanson, 253 F.3d at 1225 ("'[c]onduct amounting to escape or

25  violation of an appearance bond is certainly evidence of failure to

26  accept responsibility, and this fact alone provides adequate

27  foundation' for denial of the downward adjustment." (quoting case)).

28       Thus, based upon his lies to Probation and his recent flight,

1    defendant cannot be described as someone who is "genuinely contrite,"

2    so he should not be credited the two-point reduction under Section

3    3E1.1(a).[61]

4        **I.   Defendant's health care fraud offense does not group with**

5            **his tax offense.**

6        Fraud counts and tax counts do not group under the Guidelines,

7    because they are not the same.   E.g., United States v. Vucko, 473

8    F.3d 773, 773, 777-81 (7th Cir. 2007).   In other words, defendant's

9    health care fraud scheme is different than his tax fraud scheme,

10   including the primary consideration of grouping, having different

11   victims.   The health care fraud scheme involved victims that included

12   patients and insurance companies, whereas the tax charges had a

13   completely different victim, the federal government (IRS).   Moreover,

14   not grouping the offenses conflicts with the "incremental punishment"

15   rationale underlying the Guidelines.

16   **IV.   ADDITIONAL RELEVANT SECTION 3553(A) INFORMATION**

17       **A.   Prior similar troubling conduct by defendant**

18       As shown above, defendant was engaged in the fraudulent billing

19   as early as 2007.   In addition, a discussed above, defendant was sued

20   in 2005.   The government received information that in 2003, a patient

21   had undergone a procedure at TMI and died a couple of days later.   In

22   January 2005, the family of decedent sued defendant and TMI for

23   wrongful death in Case No. INC 048204 (Riverside Superior Court).   In

24   that case, one doctor signed a declaration indicating that defendant

25   had breached multiple standards of care that resulted in his

26   patient's death.   (Exh.-136 (Shiffman decl.) at 3-4.)   As discussed

27   _____

28       [61] Based upon his breaches of the plea agreement, the government
     is not moving for the additional one-point reduction under Section
     3E1.1(b).

1  above, many patients underwent multiple surgeries in short time

2  frames, and defendant routinely had patients undergo unneeded

3  surgeries and/or procedures (e.g., IV treatment), so that he could

4  bill to insurance.

5  **B.   False information to U.S. Probation**

6     The government has previously raised three factual objections to

7  the PSR, premised upon false information defendant provided to U.S.

8  Probation: (1) failing to report to Probation the quitclaim transfer

9  and $9.5M sale of his Beverly Hills residence; (2) falsely reporting

10 to Probation his involvement in trusts; and (3) falsely reporting to

11 Probation that he had never been party to a lawsuit.  (DE 131, 133,

12 151.)

13    As discussed *supra* under the obstruction of justice section,

14 defendant provided false information to U.S. Probation as part of the

15 sentencing process.  In addition to supporting a two-level upward

16 adjustment to his offense level, defendant's multiple lies to

17 Probation shed additional light on his character, background, and

18 shiftiness.  Specifically, defendant's multiple misrepresentations to

19 Probation show that defendant is someone who tries all methods to

20 lie, cheat, and steal.

21 **V.   APPROPRIATE SENTENCE**

22    Based upon the final offense level of 41, defendant's applicable

23 Guideline sentencing range is 324 to 405 months' imprisonment, capped

24 at the statutory maximum of 276 months/23 years.  Based upon the

25 totality of the circumstances, the government believes that the

26 statutory maximum sentence of **23 years of imprisonment** and a fine of

27 $500,000 is reasonable and justified.

28    Before the government summarizes the evidence and other Sections

1   3553(a) considerations below, patient victim Michelle B. put it best

2   in her written victim impact statement to the Court:

3          David Morrow is a money hungry, pride-

4          filled, unprincipled man with no concern for

5          the welfare of other human beings and has

6          taken advantage of hundreds of women in his

7          singular goal of gaining wealth.

8   (Exh.-137 at 3.)

9       Defendant is approximately 71 years old, and has been a licensed

10  physician for decades.[62]  He was and is a rich cosmetic surgeon.

11  Nonetheless, defendant orchestrated a huge fraudulent scheme to

12  defraud insurance companies by tricking them into paying for cosmetic

13  procedures that he billed as medically necessary.  He billed more

14  than $75,000,000 in such fraudulent billings, admitting in his plea

15  agreement and change of plea to approximately $3,500,000 in such

16  fraudulent billings.  Defendant tricked the insurance companies into

17  paying him more than $20,000,000 from his fraudulent billings.

18  Moreover, defendant cheated the U.S. government by failing to report

19  $6,000,000 dollars in income that he siphoned from the medical

20  practice and deposited into his personal bank accounts, which he used

21  for personal expenses.  Defendant has pleaded guilty to two serious

22  federal felonies – one a huge health-care fraud and one a tax fraud.

23  A Guidelines sentence is not unreasonable and appears quite

24  appropriate given all the facts.  Unfortunately, the statutory

25  maximum is below the applicable Guidelines range.  Defendant should

26  be sentenced to 23 years (276 months) of imprisonment.

27

28      [62] The Revised PSR appears to indicate that defendant completed
    two residencies, in psychiatry and dermatology.  (DE 149 ¶¶ 161-62.)

Defendant's multi-million-dollar health care fraud scheme was huge, and particularly egregious.  Not only did defendant – a doctor – completely fabricate symptoms and diagnoses on official medical reports, but he also altered official medical records by either writing over the those records' text to conceal that the surgeries had in fact been cosmetic – *e.g.*, writing "hernia" over "abdominoplasty" – or inserting blank text boxes (or using white-out) over other portions of official medical records.  That was a particularly involved endeavor, with defendant and other scheme participants scouring the patients' files to wipe them clean of any evidence or mention of cosmetic procedures.  And behind closed doors, defendant didn't even try to hide it with the other participants of his fraudulent scheme, as demonstrated by the internal emails between him and Dr. Wu and/or others.

Defendant was the sole leader of his huge health care fraud scheme.  Defendant envisioned the scheme.  Defendant followed up on his vision and hatched his multi-million dollar fraudulent scheme.  Once in full motion, defendant orchestrated his scheme.  Defendant oversaw and directed the other scheme participants.  Defendant paid the other scheme participants.  In the words scheme participant Dr. Wu used in the email to defendant's wife at the time, defendant was the "boss."  Defendant made all the decisions in the scheme.  He also personally participated in all facets of the scheme, from making up symptoms and diagnoses on medical reports, to altering documents to trick the insurance companies.  Moreover, defendant also pressured many patients to undergo the cosmetic procedures in the first instance, so he could then bill the insurance companies.  He made and kept the lion share of the fraudulent proceeds, and he directed the

1  other participants involved in the scheme.  And, that involved

2  millions and millions of dollars.

3      Behind the façade, defendant was blatant about his fraud,

4  including email messages such as: "**DO NOT USE THIS CODE: IT IS A RED**

5  **FLAG FOR abdominoplasty (cosmetic)**" or telling one patient: "if we do

6  a nose job, then we could provide you with the breast, or we could

7  provide you with a tummy tuck."

8      Defendant's actions are egregious, and quite candidly, they are

9  shameful.  Put aside defendant's pressuring patients into undergoing

10 multiple different procedures over short time periods, including

11 procedures they did not need, so that he could bill hundreds of

12 thousands of dollars for each of those procedures.  Put aside that

13 defendant completely fabricated symptoms and diagnoses on medical

14 reports sent to insurance companies, when billing them for cosmetic

15 procedures.  But defendant went even further – he doctored many

16 official medical records to hide the cosmetic nature of the

17 procedures, which he concealed both by personally handwriting over

18 the original text on those medical records, as well as placing white

19 boxes on the PDFs to hide the original text.  And he did so on many

20 forms, including patient intake forms, anesthesia notes, and nurse's

21 notes, as well as third-party hospital medical test results.



6(e)

28 Further, defendant's tax fraud also sheds light on his

character, or candidly, the lack thereof.  In his tax fraud,
defendant tricked his regular tax return preparer into preparing
false tax returns.  **6(e)**

In
truth and fact, defendant was the person who for years had been
siphoning off business checks into his personal bank accounts for his
own use.  Defendant's tax fraud also shows that, like his health care
fraud scheme, he was not only not slowing down or stopping on his
own, but in fact, he was increasing the size of the fraud.  In other
words, for tax year 2008, he siphoned off more than $100,000, which
he failed to report to the IRS; for tax year 2009, he increased the
siphoned-off amount to more than $1,500,000, and for tax year 2010
alone, he siphoned off approximately $6,000,000.  The tax loss for
just 2008 and 2009, to which defendant admitted in his plea
agreement, exceeds half a million dollars.  The total attempted tax
loss for tax years 2008, 2009, and 2010 is approximately $2,700,000.
The increasing size of defendant's fraud definitely shows how greedy
defendant is.  One has to ask, had the FBI not executed the search
warrant at TMI in March 2011, how many more tens of millions would
defendant have continued to bill the insurance companies, and also,
how much in income would he have continued to illegally conceal from
the IRS.

The victims of defendant's fraudulent scheme included not only
big insurance companies, but also self-insured government entities.
For example, one of the entities listed on the agreed-to loss
spreadsheet that ended up paying for the fraudulently billed
surgeries was REEP, which stands for "Regional Employer/Employee

1  Partnership for Benefits (formerly known as Riverside

2  Employer/Employee Partnership), which is a joint powers authority

3  created under the California Government and Education Codes, with 36

4  school districts, serving more than 23,00 employees and retirees in

5  the Inland Empire by providing cost-effective employee benefit

6  programs.  As discussed above, the millions of dollars that REEP

7  ended up having to pay as part of defendant's scheme hurt the entity

8  and its insured individuals, which resulted in higher premiums for

9  all.

10     And, defendant did not only bill the various insurance companies

11  or self-insured government entities.  When after collectively paying

12  defendant more than $20,000,000 based on the fraudulent billings, the

13  insurance companies ultimately caught on to his fraud and stopped

14  paying defendant, he sued them.  Many times.  And not just suing big

15  insurance companies, but also against REEP, claims against school

16  districts and the CHP.

17     However, defendant's victims did not simply involve insurance

18  companies who lost money.  Not only were millions of dollars

19  involved, but many patients' lives were also devastated by trusting

20  in defendant's position as a medical doctor to do what was good for

21  the patients, as opposed to doing what was great only for himself.

22  As detailed above, to be able to fraudulently bill hundreds of

23  thousands of dollars to insurance, defendant abused his position of

24  trust as a medical doctor to pressure patients into undergoing

25  procedures they did not need.  Also, in some cases, patients had body

26  parts moved around without their knowledge or authorization, which

27  has resulted both in ongoing medical problems as well as disfiguring

28  some patients.  For example, as related above, one patient related in

an email her dismay over what had happened to her at TMI:

I have seen 3 board certified plastic surgeons in
my area who have all looked at my stomach area and
were shocked at the results and the cost of the
surgery.  My insurance has paid over 140,000$ so far
and mindless of the cost incurred the issue is my
stomach looks worse then I started.  A normal tummy
tuck in the state of Wa. and Ca. costs between 6-8
thousand.  Like I said the cost you received however
outrageous is not the issue what the issue is I am
still left with a horrible looking abdominal area.

…

Dr. Morrow said "now I am being picky" Not the
appropriate thing to say to the patient.

I want a belly button back and it all to look
normal again.

Further, as part of the scheme, defendant committed identity theft
both against patients and other doctors, unlawfully using both their
names and signatures, as well as disclosing patients' protected
medical information in violation of HIPAA.

Also very troubling is that defendant bullied his victims
against taking action against him, boasting that he could not be
touched – in his words "I'm a big fish" (Exh.-64 (04/14/11 Michelle
B.(-S.) interview) at 3) -- simply because he thought it unlikely
that his victims would have the energy, time, or resources to go
after him in court.

Defendant was rich before he began the fraud.   He became
$20,000,000 richer by executing his scheme.  Defendant's particular

financial condition is another reason justifying sentencing him to a substantial term of imprisonment:

> A crime of fraud by one who already has more than enough—and who cannot argue that he suffered a deprived or abusive childhood or the compulsion of an expensive addiction—is simply a crime of greed.  A crime of fraud by one who is otherwise successful, apparently by legitimate means, is also particularly disturbing.  Thus, in light of [defendant]'s history and characteristics, this is a case of greed for the sake of greed, not greed for the sake of gain.

United States v. Miell, 744 F. Supp. 2d 904, 955 (N.D. Iowa 2010) (imposing sentence of 240 months of imprisonment and denying motion for downward departure).  Defendant's financial condition makes his siphoning off $6,000,000 of income to also evade taxes on the millions he was making that much more problematic.  E.g., United States v. Tomko, 562 F.3d 558, 577 (3d Cir. 2009) (Fisher, Scirica, Sloviter, Rendell, and Coweh, JJ., dissenting) ("A review of the Defendant's financial condition paints a picture of a very wealthy man who had the means and the wherewithal to easily pay whatever tax obligation is owing.  He was a successful businessman earning a significant salary.  There is simply no reason for him to have done this." (quoting district court)).

This proposed sentence is not out of proportion with other recent sentences meted out for health care fraud crimes.  E.g., United States v. Simon Hong, SA CR 16-00038-DOC (imposing sentence of 121 months of imprisonment in health care fraud with loss of more than $3.5M and restitution of $2.9M).

1    General deterrence also supports the recommended sentence.  This
2    case was one of the largest health care fraud cases in the history of
3    California's Inland Empire, involving tens of millions of dollars in
4    health care fraud and many victims.  Like the government does with
5    federal income taxes, insurance companies rely heavily upon the
6    accuracy and truthfulness of the information that doctors provide to
7    them, because it is impossible to check every submission for
8    accuracy.  As noted by victim Anthem Blue Cross, "[u]ndetected and
9    unreimbursed provider fraud and abuse drives up health care premiums
10   and wastes precious health care resources."  Countless investigative
11   resources were expended to uncover defendant's large-scale fraud,
12   which was widely publicized within the Inland Empire and elsewhere.
13   A sizable sentence is further justified to deter other doctors from
14   also trying to defraud insurance companies.  Doctors like defendant
15   need to know that if they engage in insurance fraud, they will be
16   caught, prosecuted, and once convicted, sentenced to a long term of
17   imprisonment.

18   Last, defendant's recent calculated decision to flee from
19   justice gives this Court an additional glimpse into defendant's
20   character.  Rather than face his victims, defendant fled.  Rather
21   than obey his terms of release on bond – to which he specifically
22   promised, defendant fled.  Rather than appear and face this Court to
23   receive his sentence, defendant fled.  Someone that does all that
24   merits an upward departure, were it available.

25   In conclusion, the egregious nature of defendant's fraud, the
26   size of his multi-million-dollar fraudulent scheme, the number of
27   victims (and how they were victimized), and specific and general
28   deterrence all mandate the prison sentence the government recommends.

**VI.   CONCLUSION**

For the foregoing reasons, the applicable Guidelines offense level for defendant's sentencing is 41, based upon an attempted loss of more than $25,000,000 and Guideline adjustments for (1) aggravating role (U.S.S.G. § 3B1.1); (2) abuse of position of trust (U.S.S.G. § 3B1.3); (3) more than 10 victims (U.S.S.G. § 2B1.1(b)(2)(A)); (4) sophisticated means (U.S.S.G. § 2B1.1(b)(10)(C)); and (5) obstruction of justice (U.S.S.G. § 3C1.1).   And, based upon all the facts and circumstances, including defendant's background, the government respectfully requests that the Court sentence defendant to 276 months (23 years) of imprisonment, $22,013,606 in restitution, a $500,000 fine, and 3 years of supervised release.