UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CRIMINAL MINUTES – GENERAL

Case No. 8:15-CR-00099-JLS　　　　　　　　　　　　　　　Date: July 21, 2021

Present: **HONORABLE JOSEPHINE L. STATON, UNITED STATES DISTRICT JUDGE**

Interpreter　　NONE

| Melissa Kunig | NONE | NOT PRESENT |
|---|---|---|
| *Deputy Clerk* | *Court Reporter/Recorder* | *Assistant U.S. Attorney* |

| U.S.A. v. Defendant(s): | Present | Cust. | Bond | Attorneys for Defendant: | Present | App. | Ret. |
|---|---|---|---|---|---|---|---|
| David Morrow | NOT | X | | Alana Yakovlev | NOT | | X |

**Proceedings:** **(In Chambers) ORDER DENYING MOTION FOR COMPASSIONATE RELEASE (Doc. 348)**

　　The Court has reviewed Defendant's Motion for Compassionate Release, brought pursuant to 18 U.S.C. § 3582(c)(1)(A), as well as related filings. (*See* Docs. 347-348 (Motion, Exhibits 1-19,[1] Expert Reports (sealed)), 351 (Opposition), 356 (Victim Evidence), 359 (BOP Medical Records), 360 (Reply).) As set forth herein, the Court DENIES Defendant's Motion.

I. **BACKGROUND**

　　The Indictment in this case (Doc. 1) charges that Defendant David M. Morrow, and his wife and co-Defendant Linda Morrow, engaged in a scheme to defraud health insurance companies by performing cosmetic procedures on their insureds while billing the insurers as if those procedures were medically necessary. (*See generally* Indictment.) During the course of the scheme, Defendants allegedly billed health insurers over $50 million and collected more than $20 million. (*Id.* at ¶¶ 14-15.) As a result, Defendants were charged with, among other things, conspiracy and multiple counts of mail fraud and tax fraud. (*See*

---

[1] Defendant's Index to his Appendix A has two items designated as Exhibit 13. The paper copy provided to the Court has 19 tabbed exhibits. These exhibits include medical reports, a letter regarding where Defendant could reside upon his release, a letter of support from an individual, a letter Defendant reportedly sent to 750 doctors in 2017, a statement from Defendant to the Court dated November 23, 2020, BOP form documents related to administrative exhaustion and Individualized Needs Plan – Program Review, a scholarly article related to retinal detachment, BOP Clinical Guidelines related to Compassionate Release Criteria for Elderly Inmates with Medical Conditions, a January 2021 Pandemic Response Report related to an inspection of Defendant's facility of incarceration, and a "mitigation report" prepared by a representative of The Aleph Institute on behalf of Defendant.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Case No.  8:15-CR-00099-JLS                                            Date:   July 21, 2021

*generally id.*)  Defendant[2] entered into a Plea Agreement on December 16, 2016, acknowledging his guilt as to the conspiracy count and a tax fraud count.  (*See generally* Doc. 42, Plea Agreement.)  As part of the Plea Agreement, Defendant admitted the scheme charged in the Indictment.  (*See id.* at 8-9.)  His change of plea hearing was held on March 18, 2016.  (Doc. 45.)

Having been informed by the Government that Defendant had absconded prior to sentencing, the Court declared a breach of the Plea Agreement.  (*See* Docs. 167, 170.)  After extensive briefing by the parties, including counsel on behalf of Defendant, on September 29, 2017, the Court sentenced Defendant *in absentia* to a term of imprisonment of 240 months.  (Doc. 205.)  The Court also held proceedings and reviewed briefing before ordering restitution in the amount of $14,025,904.81 on January 25, 2018.  (Doc. 232.)  Defendants were found living in Israel under false identities and were extradited to the United States in December 2019.  (*See* Doc. 292.)

In absconding, Defendants used fraudulent passports in other people's identities (but with Defendants' photographs), and used those identities to apply for Israeli citizenship.  (Doc. 292-1, Pell Decl. ¶¶ 4-5.)  They later were found to be living under different fake identities using Guatemalan passports.  (*Id.* ¶ 6.)  The two transferred more than $4 million to bank accounts in Israel, and attempted to launder more than $2 million while they were there.  (*Id.* ¶¶ 3, 8.)

Defendant is now an inmate at the Bureau of Prisons ("BOP") facility FCI Terminal Island.  (Mot. at 6.)  Defendant sent a compassionate release request to the warden on April 1, 2020.  (Doc. 348-1 at 196, Mot. Ex. 11.)  This was denied by the warden on February 24, 2021.  (*Id.* at 197, Mot. Ex. 12.)  Defendant moves for immediate release and/or a reduction in sentence based on the combination of his age, health conditions, and the COVID-19 pandemic.  (Mot. at 6.)

**II.    LEGAL STANDARD**

The First Step Act permits an inmate to seek compassionate release from the court that sentenced him.  18 U.S.C. § 3582(c)(1)(A).  Specifically, the compassionate release statute provides an exception to the finality of a judgment of conviction.  *See* 18 U.S.C. § 3582(b).  It allows for modification of a sentence—that is, allows a court to immediately release or to reduce an inmate's sentence—under certain circumstances:

> (1) [I]n any case—(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the

---

[2] References to "Defendant" herein are to Defendant David M. Morrow.

**CRIMINAL MINUTES – GENERAL**                                                                 2

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Case No.  8:15-CR-00099-JLS                                                               Date:   July 21, 2021

---

> receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—(i) extraordinary and compelling reasons warrant such a reduction; or (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c) . . . ; and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

18 U.S.C. § 3582(c)(1)(A).

Thus, under the statute, defendants must first either exhaust Bureau of Prisons ("BOP") administrative remedies or they must wait 30 days after receipt of their request by the warden, whichever is earlier. *Id.* In addition to fulfilling one of these exhaustion requirements, the inmate must establish "extraordinary and compelling reasons" (as provided in subsection (c)(1)(A)(i))[3] for the requested sentence reduction. *Id.* In determining whether to grant release or a reduction in sentence, the sentencing court must consider the factors set forth in 18 U.S.C. § 3553(a) to the extent such factors are applicable. These factors are also considered when imposing a sentence. The most relevant of those factors are:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed—
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> . . . and
> (7) the need to provide restitution to any victims of the offense.

*Id.*

---

[3] Most motions are brought pursuant to subsection (c)(1)(A)(i), as subsection (c)(1)(A)(ii) applies only to a small subset of inmates who are both greater than 70 years of age and who have served over 30 years' imprisonment.

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Case No.  8:15-CR-00099-JLS                                                                                  Date:   July 21, 2021

    The Policy Statement referred to in the compassionate release statute was developed by the Sentencing Commission as required by 28 U.S.C. § 994(a)(2)(C), and it is found in the United States Sentencing Guidelines ("USSG"), § 1B1.13.  In large part, it echoes the requirements of the statute; in relevant part, it states:

> Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that (1)(A) [e]xtraordinary and compelling reasons warrant the reduction; or (B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison . . . ; (2) [t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g);[4] and (3) [t]he reduction is consistent with this policy statement.

USSG § 1B1.13 (footnote added).

    Although the compassionate release statute provides that the proposed release or reduction in sentence must be "consistent with" the Policy Statement, this requirement is relaxed as applied to motions brought by inmates themselves rather than by the BOP Director.  Specifically, in *United States v. Aruda*, 993 F.3d 797 (9th Cir. 2021), the Ninth Circuit held that, in deciding a motion for compassionate release filed by an inmate (rather than by the Bureau of Prisons Director), courts are not bound by the Policy Statement set forth in § 1B1.13.  *Aruda*, 993 F.3d at 802.  Under *Aruda*, as to motions brought by inmates, although the Policy Statement "may inform a district court's discretion," it is not binding. *Id.*

    Nevertheless, the Court looks to the Policy Statement for guidance in analyzing such motions.  In doing so, the Court considers the comments to § 1B1.13, which define a key phrase from the compassionate release statute and the Policy Statement:

> 1. Extraordinary and Compelling Reasons.—Provided the defendant meets the requirements of subdivision (2), extraordinary and compelling reasons exist under any of the circumstances set forth below:
>
>     (A) Medical Condition of the Defendant.—

---

[4] The factor identified in § 3553(a)(2)(C), "to protect the public from further crimes of the defendant," overlaps with the § 3142(g) inquiry, pursuant to which the Court considers "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(4).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Case No. 8:15-CR-00099-JLS Date: July 21, 2021

 (i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
 (ii) The defendant is—
 (I) suffering from a serious physical or medical condition,
 (II) suffering from a serious functional or cognitive impairment, or
 (III) experiencing deteriorating physical or mental health because of the aging process,
 that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
 (B) Age of the Defendant.—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.
 (C) Family Circumstances.—
 (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.
 (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.
 (D) Other Reasons.—As determined by the Director of the Bureau of Prisons,[5] there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).
USSG § 1B1.13, cmt 1 (footnote added).

 As held by courts throughout the pandemic, coronavirus pandemic conditions generally and an inmate's more specific concern regarding contracting COVID-19 do not, on

---

[5] The Policy Statement has not been amended since the passage of the First Step Act, and this opening clause of subsection (D) is a vestige of the since-eliminated requirement that the BOP Director be the one to file a motion for compassionate release on behalf of the inmate. In light of the holding of *Aruda*, when looking to the Policy Statement for guidance, the Court also considers the "Other Reasons" provision.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Case No. 8:15-CR-00099-JLS                                       Date: July 21, 2021

their own, establish extraordinary and compelling reasons for sentence reduction. *See, e.g., United States v. Drobot*, Case No. 8:14-cr-00034-JLS (C.D. Cal. July 21, 2020) (Doc. 330); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("We do not mean to minimize the risks that COVID-19 poses in the federal prison system, . . . [b]ut the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release . . . ."); *United States v. Ramon Rubio*, No. 11-CR-00291-SBA-14, 2021 WL 2670744, at *3 (N.D. Cal. June 15, 2021) ("the existence of the COVID-19 pandemic, without more, does not constitute an 'extraordinary and compelling reason' for release under § 3582(c)(1)(A)"); *United States v. Echevarria*, No. 13-CR-00678-ODW, 2021 WL 1374277, at *1 (C.D. Cal. Apr. 12, 2021) ("General concerns about possible exposure to COVID-19 do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence set forth in the Sentencing Commission's policy statement.") (internal quotation marks and alteration marks omitted); *United States v. Pascua-Suyat*, No. CR 19-00056 HG-01, 2021 WL 130658, at *4 (D. Haw. Jan. 13, 2021) ("A defendant's general concerns about potential exposure to COVID-19 while incarcerated do not meet the criteria for extraordinary and compelling reasons for a reduction in sentence."); *United States v. Franklin*, No. 07-CR-178 (JDB), 2020 WL 4049917, at *2 (D.D.C. July 20, 2020) (rejecting argument "that COVID-19 is by itself an 'extraordinary and compelling reason' warranting compassionate release"); *Briggs v. United States*, No. 4:17-CR-33, 2020 WL 4032136, at *2 (E.D. Va. July 16, 2020) (acknowledging "the magnitude of the COVID-19 pandemic and its effect on prisons," but nevertheless concluding that "the pandemic alone does not warrant compelling and extraordinary reasons for the release of all inmates"); *United States v. Wade*, No. 5:15-CR-00458-EJD-1, 2020 WL 3254422, at *2 (N.D. Cal. June 16, 2020) ("[G]eneralized concerns about COVID-19, without other factors showing present extraordinary and compelling reasons to warrant modification of a sentence and immediate release from custody, are insufficient.").

**III. DISCUSSION**

      Defendant has satisfied the administrative exhaustion requirement. (*See* Doc. 348-1 at 196, Mot. Ex. 11; Opp. at 9.)

      The Court defers deciding whether Defendant has established "extraordinary and compelling reasons" for a reduction in sentence based on a combination of his age, poor health, and pandemic conditions. [redacted]

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Case No. 8:15-CR-00099-JLSDate: July 21, 2021



However, there is little risk to Defendant of contracting COVID-19. FCI Terminal Island is reporting no current inmate cases of COVID-19.[6] And the BOP has administered over 201,000 doses of COVID-19 vaccines among approximately 180,000 inmates and staff nationwide.[7] Defendant himself has received the first dose of the Moderna vaccine but, for the first time with his Reply brief, Defendant submitted a declaration reporting that he was unable to consent to the second dose due to an allergic reaction to the first dose.[8] (*See* Reply at 3; Doc. 360-1, Morrow Decl.)

But even if Defendant's age and health, coupled with pandemic conditions, constituted "extraordinary and compelling reasons" for a reduction in sentence, the § 3553(a) factors and the § 3142(g) inquiry weigh heavily in favor of continued incarceration.

At the sentencing hearing, the Court noted that it was particularly struck by "the nature and circumstances of the offense," which included "Dr. Morrow's utter disregard for his patients' well-being and safety." (Doc. 301, Sept. 29, 2017 Tr. at 60.) This disregard included convincing his patients to have unnecessary surgeries to "test" insurance, convincing patients to undergo multiple surgeries in order to maximize his profit, and leaving patients under anesthesia longer than necessary to increase the amount charged. (*Id.* at 59-60.) The Court also remarked that Defendant's crime was one of greed that "knew no bounds," as Defendant fraudulently billed medical insurers—and collected—tens of millions of dollars under the scheme charged in the Indictment. (*Id.* at 59; Indictment ¶¶ 14-15.)

---

[6] *See* https://www.bop.gov/coronavirus/ (last accessed July 14, 2021).
[7] *See* https://www.bop.gov/coronavirus/ (last accessed July 14, 2021).
[8] For reasons that are unclear, Dr. Morrow's *post hoc* explanation is not supported by BOP records. (*Compare* Doc. 360-1, Morrow Decl. ¶¶ 2 *with* Doc. 351-1, Opp. Ex. 1 (consent form for second dose noting declination but giving no reason therefor, including no note regarding a prior allergic reaction, despite the specific question on the form related to allergic reactions); *see also* Morrow Decl. ¶ 4 ("I reported [the allergic reaction] to Nurse Practitioner Bogdanovic. Due to my functional blindness, I have not been able to effectively review my medical records to see if this was accurately reported but I suffered from an adverse reaction and therefore was forced to refuse the second dose of the vaccine on March 15, 2021.").)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Case No.  8:15-CR-00099-JLS                                                                 Date:   July 21, 2021

As for Defendant's "history and characteristics," the Court considered how, as a result of the length and the magnitude of the fraudulent scheme, Defendant's criminal conduct had become an everyday occurrence.  (*Id.* at 60.)  And now, with the record more fully developed than it was at the sentencing hearing, it is clear that rather than face responsibility for the charges (to which he pleaded guilty), Defendant not only absconded, but he absconded to a foreign country after expropriating another's identity and transferring millions of dollars in assets.  (*See id.* at 61; Pell Decl. ¶¶ 4-6.)  This action was designed to enable him to live in comfort, not to accept responsibilities for his crimes, and it diverted a significant amount of funds that could have been used to satisfy the restitution ordered by the Court.  Thus, on this record, Defendant's statements about remorse and acceptance of responsibility ring hollow.

Next, reducing Defendant's sentence would not "reflect the seriousness of the offense, . . . promote respect for the law, and . . . provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).  Defendant paints himself a non-violent offender, and it is true that the crimes charged are fraud crimes rather than crimes involving weapons or physical violence; however, Defendant's crimes involved actions that subjected patients to the real risk of physical harm (through unnecessary multiple and prolonged surgeries) in the same manner as a crime of violence subjects the victim to the risk of physical harm.

And Defendant's sentence still must provide "adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).  Defendant's scheme involved tens of millions of dollars.  The Court's Restitution Order found that over $14 million should be paid to the victims of Defendant for their losses.  To release Defendant now, after he profited so richly from his scheme, after he has served only ten to eleven percent of his sentence of imprisonment, and after he absconded to a foreign country and had to be apprehended and extradited to the United States, would provide little deterrence to other would-be fraudsters.

Moreover, as for "protect[ing] the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C), and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release," 18 U.S.C. § 3142(g)(4), the Court notes that Defendant's advancing age, his declining health, and his declining eyesight tends to suggest he is unlikely to continue to be able to successfully engage in a fraudulent scheme on the same scale as the one that underlies his conviction.[9]  Nevertheless, the Court concludes that, even considering his debilitation, Defendant continues to pose a danger to the community.  As discussed, Defendant's greed knew no bounds, he engaged in criminal conduct daily, as a way of life, and he subjected patients to unnecessary risks in furtherance

---

[9] The Court notes, however, that his fraudulent scheme and his flight from justice did not take place when he was a young man, but rather only a few years ago, while Defendant was in his 60's and 70's.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

| | |
|---|---|
| Case No.  8:15-CR-00099-JLS | Date:   July 21, 2021 |

of greed.  And although he pleaded guilty to the conspiracy charge—a charge which encompasses many illegal acts in furtherance of the conspiracy—when he was faced with sentencing, he chose to abscond rather than answering for his admitted crimes.

Thus, a far cry from the acceptance of responsibility he and his counsel claim, Defendant's actions represent an outright rejection of responsibility for his crimes, and Defendant's letters of remorse do not establish a contrary state of mind.  Counsel posits that "Morrow has accepted responsibility for his crime and has expressed explicit and repeated remorse."  (Mot. at 19.)  The Court is unconvinced.  Although Defendant expresses regret regarding his decisions based on the impact this case has had on him and his family, he stops well short of accepting responsibility.  Certainly, Defendant's action in absconding is fundamentally incompatible with any claim of acceptance of responsibility.  Moreover, Defendant's letters, one addressed to other physicians in 2017 and one addressed to the Court in late 2020, also reveal a lack of acceptance of responsibility and lack of concern for the victims of his crimes.  Therein, Defendant focuses extensively on what he has lost as a result of his crimes, including his practice, his reputation, his money, his family relationships, and his freedom.  (*See* Doc. 348-1 at 190-193, Mot. Ex. 9 at 1 ("I have lost my practice, my home and my life as I knew it.  My personal pain is devastating; my public disgrace is humiliating; . . . my reputation is ruined."); *id.* at 3 ("My misconduct and resulting prosecution has caused my financial ruin."); Doc. 348-1 at 1, Mot. Ex. 10 at 194-95 ("The consequences of my actions have been utterly devastating to my wife, our children and grandchildren, extended family and friends, and me personally.").)  Defendant catalogs his past good deeds, some dating back as far as 1981, as contrast to his criminal activity.  (*See* Mot. Ex. 9 at 1-3.)  He suggests that he would not have engaged in criminal activity were it not for steroids he took as treatment following his surgery for retinal reattachment.  (Mot Ex. 9 at 2-3 ("***I had no idea that my thinking, judgement and decision-making was impaired by complex PTSD and steroids.***") (emphasis in the original).  Significantly, having pleaded guilty to the conspiracy charge, Defendant downplays its extent.  (Mot. Ex. 9 at 2 ("I manipulated a limited number of medical records to meet insurance criteria for medically-necessary services . . . .  Specifically, the criminal acts to which I pleaded guilty involved medical billing records for 13 patients.") (paragraph structure altered); *cf.* Indictment ¶ 25 (charging a four-year conspiracy); *id.* ¶ 27 (charging over $50 million in fraudulent billing); Doc. 185, Revised PSR ¶ 17 (referring to interviews of "at least 100 former patients, almost all of [whom] reported[] that their surgeries were cosmetic in nature").)  Defendant also downplays his crimes by suggesting they could have been worse when he states "[t]here were no 'ghost' surgeries and there was no malpractice."  (Mot. Ex. 9 at 2; *cf. id.* at 3 (imploring recipients never to "be tempted to 'fudge' a medical record so a patient's insurance company will cover a procedure").)  Defendant eagerly shares the blame for his

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CRIMINAL MINUTES – GENERAL**

Case No.  8:15-CR-00099-JLS                                                          Date:   July 21, 2021

crimes by stating that another physician at The Morrow Institute engaged in the same conduct, expressly noting that it was this other physician (not him) who actually "performed almost all of the procedures." (Mot. Ex 9 at 2.)  And of course, Defendant did not follow through on the intention he expressed in 2017 to make restitution (*see id.* at 3), and instead absconded; in late 2020, he blamed his flight from justice on the fact that a superseding indictment was filed against his wife (Mot. Ex. 10 at 1), further illustrating the inability to accept responsibility for his actions.  Thus, on this record, the Court concludes that Defendant's continued incarceration is necessary to protect the community.

Importantly, the Court also considers "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a)(7).  Defendant absconded rather than pay restitution to his victims.  In advance of Defendants' flights, millions of dollars of their assets were transferred.  There is no indication in the record that any restitution has been paid.  Given that Defendant in the past chose to flee and take his assets with him, it is highly unlikely that release from imprisonment now will inspire him to pay restitution to his many victims.

On this point, a victim to which a major portion of the restitution is owed, Regional Employee/Employer Partnership for Benefits ("REEP"), opposes Defendant's Release.  (*See* Opp. Ex. 2; Doc. 218 at 5 (restitution as to REEP ordered in the amount of $4,190,830.78).)  Counsel for REEP recounts Defendant's actions in fabrication of medical charts and reports, his solicitation of patients with insurers that would pay higher level of benefits for out-of-network providers, and his filing of a civil action against REEP to collect on these fraudulent billings.  (*Id.*)  REEP's counsel observes that "Dr. Morrow is clearly a person who is more likely to perpetuate criminal behavior than be repentant for it."  (*Id.*)

Weighed against these factors is Defendant's need for medical care.  18 U.S.C. § 3553(a)(2)(D); (*see* Mot. at 21-22 (ten appointments with specialists in the prior six months).  Although the BOP is managing Defendant's specialized care, it is apparent that Defendant's care could be more easily managed were he not incarcerated.  Nevertheless, this single factor does not counterbalance the other relevant factors, all of which weigh in favor of continued incarceration.

**IV.     CONCLUSION**

As set forth herein, the Court DENIES Defendant's Motion for Compassionate Release.
        **IT IS SO ORDERED.**

                                                                                  Initials of Deputy Clerk:  mku